**Volume 1 of 4**

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

Dr. MICHAEL A. NEWDOW; PAT
DOE; JAN DOE; DOECHILD; JAN
POE; POECHILD; ROECHILD-1,
            *Plaintiffs*,

            and

JAN ROE and ROECHILD-2,
            *Plaintiffs-Appellees,*

            v.

RIO LINDA UNION SCHOOL DISTRICT,
            *Defendant-Appellant,*

            and

UNITED STATES OF AMERICA; JOHN
CAREY; ADRIENNE CAREY; BRENDEN
CAREY; ADAM ARAIZA; ANITA
ARAIZA; ALBERT ARAIZA; MICHAELA
BISHOP; CRAIG BISHOP; MARIE
BISHOP; TERESA DECLINES; DARIEN
DECLINES; RYANNA DECLINES;
ROMMEL DECLINES; JANICE
DECLINES; ANTHONY DOERR; DAN
DOERR; KAREN DOERR; SEAN
FORSCHLER; TIFFANY FORSCHLER;
FRED FORSCHLER; ESTERLITA
FORSCHLER; MARY MCKAY; ROBERT
MCKAY; SHARON MCKAY; THE
KNIGHTS OF COLUMBUS,
*Defendants-Intervenors-Appellants,*

            and

Nos. 05-17257
     05-17344
     06-15093

D.C. No.
CV-05-00017-
LKK

OPINION

3865

CONGRESS OF THE UNITED STATES OF
AMERICA; ELK GROVE UNIFIED
SCHOOL DISTRICT; SACRAMENTO
CITY UNIFIED SCHOOL DISTRICT; Dr.
STEVEN LADD, Superintendent, Elk
Grove Unified School District; M.
MAGDALENA CARRILLO MEJIA,
Superintendent, Sacramento City
Unified School District; Dr.
DIANNA MANGERICH,
Superintendent, Elverta Joint
Elementary School District; FRANK
S. PORTER, Superintendent, Rio
Linda Unified School District;
PETER LEFEVRE, Law Revision
Counsel; ARNOLD
SCHWARZENEGGER, Governor of
California; RICHARD J. RIORDAN,
California Secretary for Education,
                            *Defendants.*

Appeal from the United States District Court
for the Eastern District of California
Lawrence K. Karlton, District Judge, Presiding

Argued and Submitted
December 4, 2007—San Francisco, California

Filed March 11, 2010

Before: Dorothy W. Nelson, Stephen Reinhardt, and
Carlos T. Bea, Circuit Judges.

Opinion by Judge Bea;
Dissent by Judge Reinhardt

## COUNSEL

Dr. Michael Newdow (argued), Sacramento, California, for plaintiffs-appellees Jan Roe, *et al.*

Craig M. Blackwell, Theodore C. Hirt, Peter D. Keisler, McGregor W. Scott, Gregory G. Katsas (argued), Robert M. Loeb, Lowell V. Sturgill, Jr., Department of Justice, Washington, D.C., for defendant-intervenor-appellant United States.

Terence J. Cassidy (argued), Michael W. Pott, Thomas L. Riordan, Porter, Scott, Weiberg & Delehant, Sacramento, California, for defendant-appellant Rio Linda Union School District.

Kevin J. Hasson (argued), Anthony R. Picarello, Jr., Derek L. Gaubatz, Eric C. Rassbach, Jared N. Leland, The Becket Fund for Religious Liberty, Washington, D.C., for defendants-intervenors-appellants John Carey *et al.*

Amici:*

As Amicus Curiae in Support of Defendants-Appellants:

Patrick T. Gillen, Ann Arbor, Michigan, for the Thomas More Law Center;

---

*The amici in this case are extensive and include the following: All 50 States; the Pacific Justice Institute; the American Legion; the National Legal Foundation; the Thomas More Law Center; the Foundation for Moral Law; Los Angeles County; Rex Curry; the Appignani Humanist Legal Center; the Freedom from Religion Foundation, Inc.; American Atheists Inc.; the Madison-Jefferson Society; the Secular Coalition for America; the Atheists and Other Freethinkers, Humanist Association of Las Vegas and Southern Nevada, Agnostic and Atheist Student Association, Las Vegas Freethought Society; and the Humanist Community, Humanists of Houston, and the Humanist Association of the Greater Sacramento. We thank them all for their thoughts and efforts regarding this case.

Peter D. Lepiscopo, James M. Griffiths, Law Offices of Peter D. Lepiscopo, San Diego, California for the Pacific Justice Institute;

Eric L. Hirschhorn, Anne W. Stukes, Andrew C. Nichols, Winston & Strawn LLP, Washington, DC, and Philip B. Onderdonk, Jr. for The American Legion, Indianapolis, Indiana;

Greg Abbott, R. Ted Cruz, Office of the Attorney General, Austin, Texas; Lawrence Wasden, Attorney General of Idaho; Drew Edmondson, Attorney General of Oklahoma; Troy King, Attorney General of Alabama for all 50 States;

Roy S. Moore, Gregory M. Jones, Benjamin D. Dupré, for the Foundation for Moral Law, Montgomery, Alabama;

Steven W. Fitschen, The National Legal Foundation, Virginia Beach, Virginia, for the National Legal Foundation; and

Raymond G. Fortner, Jr., Ralph L. Rosato, Doraine F. Meyer for the County of Los Angeles.

As Amicus Curiae in Support of Plaintiffs-Appellees:

Dr. Rex Curry, Tampa, Florida;

Chris J. Evans, American Atheists, Inc., Irvine, California; for American Atheists, Inc.;

George Daly, Charlotte, North Carolina, for the Freedom From Religion Foundation, Inc.;

Shawn C. Mills and Paul S. Sanford, Aptos, California, for the Madison-Jefferson Society;

Herb Silverman, Washington, D.C., for the Secular Coalition;

Norman Goldman, Los Angeles, California, for Atheists and other Freethinkers, Humanist Association of Las Vegas and Southern Nevada, Agnostic and Atheist Student Association, Las Vegas Freethought Society, The Humanist Community, Humanists of Houston, Humanist Association of the Greater Sacramento; and

Melvin S. Limpan, Washington, D.C. for Appignani Humanist Legal Centerl.

---

**OPINION**

BEA, Circuit Judge:

## I. Introduction

We are called upon to decide whether the teacher-led recitation of the Pledge of Allegiance to the Flag of the United States of America, and to the Republic for which it stands, by students in public schools constitutes an establishment of religion prohibited by the United States Constitution. We hold it does not; the Pledge is constitutional.

The Pledge of Allegiance serves to unite our vast nation through the proud recitation of some of the ideals upon which our Republic was founded and for which we continue to strive: *one Nation under God*—the Founding Fathers' belief that the people of this nation are endowed by their Creator with certain inalienable rights; *indivisible*—although we have individual states, they are united in one Republic; *with liberty*—the government cannot take away the people's inalienable rights; *and justice for all*—everyone in America is entitled to "equal justice under the law" (as is inscribed above the main entrance to our Supreme Court). Millions of people daily recite these words when pledging allegiance to the United States of America:

> I pledge allegiance to the Flag of the United States of America, and to the Republic for which it stands, one Nation under God, indivisible, with liberty and justice for all.

4 U.S.C. § 4 (2002).

Pursuant to California Education Code § 52720, the Rio Linda Union School District in California ("the School District") has a practice that every morning, willing students, led by their teachers, face the American Flag, place their right hands over their hearts, and recite the Pledge of Allegiance.

Plaintiff Jan Roe is a self-proclaimed atheist whose child, RoeChild-2, attends elementary school in the School District. Roe filed suit alleging that the words "under God" in the Pledge offend her belief that there is no God, interfere with her right to direct her child's upbringing, and indoctrinate her child with the belief that God exists. The parties have stipulated that RoeChild-2 has never recited the Pledge, but Roe nevertheless asks us to prohibit the recitation of the Pledge by *other* students. Thus, this case presents a familiar dilemma in our pluralistic society—how to balance conflicting interests when one group wants to do something for patriotic reasons that another groups finds offensive to its religious (or atheistic) beliefs. In other words, does Roe have the right to prevent teachers from leading other students from reciting the Pledge of Allegiance—something we all agree is a patriotic exercise —because the mention of God in the Pledge offends her as an atheist?

Plaintiffs challenge the School District's policy as constituting a violation of the Establishment Clause: "Congress shall make no law respecting an establishment of religion." U.S. Const. amend. I.

The Pledge reflects many beliefs held by the Founding Fathers of this country—the same men who authored the

Establishment Clause—including the belief that it is the people who should and do hold the power, not the government. They believed that the people derive their most important rights, not from the government, but from God:

> We hold these truths to be self-evident, that all men are created equal, that *they are endowed by their Creator with certain unalienable Rights*, that among these are Life, Liberty and the pursuit of Happiness.

The Declaration of Independence, 1 U.S.C. § XLIII (1776) (emphasis added). The Founders did not see these two ideas— that individuals possessed certain God-given rights which no government can take away, and that we do not want our nation to establish a religion—as being in conflict.

Not every mention of God or religion by our government or at the government's direction is a violation of the Establishment Clause. *See Lynch v. Donnelly*, 465 U.S. 668, 673 (1984) ("Nor does the Constitution require complete separation of church and state; it affirmatively mandates accommodation, not merely tolerance, of all religions, and forbids hostility toward any."). The Supreme Court has upheld several government actions that contained a religious element against Establishment Clause claims: a display of the Ten Commandments on the Texas State Capitol grounds;[1] the display of a Chanukah menorah outside a City-County Building;[2] the display of a Nativity scene in a public Christmas display;[3] a state legislature's practice of opening each day with a prayer led by a chaplain paid with state funds;[4] a state's property tax exemption for religious organizations;[5] and a township's pro-

---

[1]*Van Orden v. Perry*, 545 U.S. 677, 681 (2005).

[2]*County of Allegheny v. ACLU*, 492 U.S. 573, 578-79 (1989).

[3]*Lynch v. Donnelly*, 465 U.S. 668, 670-71 (1984).

[4]*Marsh v. Chambers*, 463 U.S. 783, 784-86 (1983).

[5]*Walz v. Tax Comm'n*, 397 U.S. 664, 667 (1970).

gram for reimbursing parents for the cost of transporting their children to parochial schools.[6] Each of these cases involved religion. But taken in context, none of the government actions violated the Establishment Clause.

The plaintiffs and the dissent focus solely on the words "under God" in isolation, stripped of all context and history. Plaintiffs and the dissent even go so far as to disregard the plain text of the preamble to 4 U.S.C. § 4 which sets forth that Congress had two primary purposes in including the phrase "one nation under God" in the Pledge: (1) to underscore the political philosophy of the Founding Fathers that God granted certain inalienable rights to the people which the government cannot take away; and (2) to add the note of importance which a Pledge to our Nation ought to have and which ceremonial references to God invoke. The Supreme Court has instructed us to do otherwise: "Focus exclusively on the religious component of any [governmental] activity would inevitably lead to its invalidation under the Establishment Clause." *Lynch*, 465 U.S. at 678. Were the correct focus as the dissent suggests, all of the above examples would have been found to violate the Establishment Clause, for all contain religious symbols or words. On the contrary, under Supreme Court law we are instructed to examine the history and context in which the phrase "one Nation under God" is used so that we may discern Congress' "ostensible and predominant" purpose when it enacted the Pledge. *See McCreary County v. ACLU*, 545 U.S. 844, 867-68 (2005). Because California Education Code § 52720 as implemented by the School District's Policy requires the recitation of the Pledge as a whole, we must examine the Pledge as a whole, not just the two words the Plaintiffs find offensive. In doing so, we find the Pledge is one of allegiance to our Republic, not of allegiance to the God or to any religion. Furthermore, Congress' ostensible and predominant purpose when it enacted and amended the Pledge over time was patriotic, not religious.

---

[6]*Everson v. Bd. of Educ.*, 330 U.S. 1, 8-11 (1947).

The Supreme Court has agreed the Pledge is a "patriotic exercise designed to foster national unity and pride." *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 6 (2004). Even the dissent agrees on this determinative point. Dissent at 4040 ("[T]he recitation of the Pledge both as originally written and as amended is a patriotic exercise . . . ."). The question about which we disagree is whether this patriotic activity is turned into a religious activity because it includes words with religious meaning.

We hold that the Pledge of Allegiance does not violate the Establishment Clause because Congress' ostensible and predominant purpose was to inspire patriotism and that the context of the Pledge—its wording as a whole, the preamble to the statute, and this nation's history—demonstrate that it is a predominantly patriotic exercise. For these reasons, the phrase "one Nation under God" does not turn this patriotic exercise into a religious activity.

Accordingly, we hold that California's statute requiring school districts to begin the school day with an "appropriate patriotic exercise" does not violate the Establishment Clause even though it permits teachers to lead students in recitation of the Pledge. California Education Code § 52720. In doing so we join our sister circuits who have held similar school policies do not violate the Establishment Clause. *See Myers v. Loudoun County Pub. Schs.*, 418 F.3d 395, 409 (4th Cir. 2005) (upholding a Virginia statute requiring the daily recitation of the Pledge of Allegiance by students, but allowing students to sit or stand quietly if they object); *Sherman v. Cmty. Consol. Sch. Dist. 21 of Wheeling Twp.*, 980 F.2d 437, 447 (7th Cir. 1992), *cert. denied*, 508 U.S. 950 (1993) (same as to an Illinois statute).[7] Therefore, we reverse the district court's

---

[7]Contrary to the dissent's assertion, *Myers* and *Sherman* are not based solely on Supreme Court dicta. We encourage the reader to read these cases for himself for we find them to be not only well-written, but also elegantly reasoned.

judgment and vacate the permanent injunction prohibiting the daily recitation of the Pledge in the School District.

## II.   The Procedural History of this Case

This is not the first time the Pledge has been challenged in our Circuit. In 2000, Newdow brought a similar Establishment Clause challenge against the Elk Grove Unified School District's policy requiring teachers to lead their classes in the recitation of the Pledge. *Newdow v. United States Congress*, 2000 WL 35505916, at *1 (E.D. Cal. July 21, 2000). The district court rejected Newdow's challenge and dismissed his complaint. *Id.*

A divided panel of this Circuit reversed. *Newdow v. United States Congress*, 292 F.3d 597 (9th Cir. 2002) ("*Newdow I*"). In its opinion, the panel held Newdow had standing as a parent to challenge Elk Grove's Pledge-recitation policy, because the policy interfered with his right to direct his daughter's religious upbringing. *Id.* at 602. Over Judge Fernandez's dissent, the majority (of which Judge Reinhardt was a member) held Elk Grove's policy violated the Establishment Clause. *Id.* at 612.

Following the panel's decision in *Newdow I*, the mother of Newdow's daughter intervened in the case to challenge New-dow's standing to sue on the basis that a California Superior Court had awarded her sole legal custody of the daughter. *Newdow v. United States Congress*, 313 F.3d 500, 502 (9th Cir. 2002) ("*Newdow II*"). The panel held the custody order did not deprive Newdow of standing to challenge the Elk Grove Pledge-recitation policy, even though he had lost custody of his daughter. *Id.* at 502-03.

The panel then issued an order amending its opinion in *Newdow I* and denying panel rehearing and rehearing en banc. *Newdow v. United States Congress*, 328 F.3d 466 (9th Cir. 2003) ("*Newdow III*"). The amended opinion did not reach the

question whether the Pledge was constitutional and instead invalidated, again over Judge Fernandez's dissent, only the Elk Grove School District's policy. *Id.* at 490. Nine judges of our Circuit dissented from the denial of rehearing en banc. *See Newdow III*, 328 F.3d at 471, 482.

The Supreme Court of the United States reversed. *Elk Grove*, 542 U.S. at 5. The Court held that Newdow, as a non-custodial parent with interests potentially adverse to those of his daughter, failed to satisfy the requirements of "prudential standing, which embodies judicially self-imposed limits on the exercise of federal jurisdiction." *Id.* at 11 (citation and internal quotation marks omitted). Accordingly, the Court held the *Newdow III* panel erred by reaching the merits of Newdow's Establishment Clause challenge. *Id.* at 17.

Plaintiffs, including Jan Roe who has full custody of her daughter, filed this action contending the teacher-led recitation of the Pledge in California public schools violates the Establishment Clause. *Newdow v. United States Congress*, 383 F. Supp. 2d 1229 & n.1 (E.D. Cal. 2005) ("*Newdow IV*").

The district court dismissed the majority of plaintiffs' claims. As to the plaintiffs' Establishment Clause claim against the recitation of the Pledge in the School District, the district court held this court's decision in *Newdow III* remained binding authority, despite the Supreme Court's decision in *Elk Grove Unified Sch. Dist. v. Newdow*. *Newdow IV*, 383 F. Supp. 2d at 1240-41. Relying on *Newdow III*, the district court held the School District's Policy requiring the daily, voluntary recitation of the Pledge by students violated the Establishment Clause. "Because this court is bound by the Ninth Circuit's holding in *Newdow III*, it follows that the school districts' policies violate the Establishment Clause. Accordingly, upon a properly-supported motion, the court must enter a restraining order to that effect." *Id.* at 1242. The district court stayed the permanent injunction pending any

appeals to this court and to the Supreme Court. This timely appeal followed.

### III.  Standard of Review

We review a district court's grant of a permanent injunction for abuse of discretion. *Biodiversity Legal Found. v. Badgley*, 309 F.3d 1166, 1176 (9th Cir. 2002). However, we review legal questions underlying the district court's grant of injunctive relief *de novo*. *Id.* Whether a statute violates the Establishment Clause is a question of law we review *de novo*. *Vasquez v. Los Angeles County*, 487 F.3d 1246, 1254 (9th Cir. 2007).

### IV.  Standing

It is important to distinguish exactly which statutes are challenged on appeal and which are not. Only California Education Code § 52720 and the School District's Policy are at issue in this case. The district court dismissed plaintiffs' challenge to the 1954 Amendment to the Pledge, and their direct challenge to the Pledge, as codified in 4 U.S.C. § 4. *Newdow IV*, 383 F. Supp. 2d at 1242. Plaintiffs did *not* cross-appeal this dismissal of their claims challenging the 1954 amendment to the Pledge and the codification of the Pledge at 4 U.S.C. § 4, and therefore they have abandoned those claims on appeal.

[1] Even though Plaintiffs do not assert they have standing to challenge the 1954 Amendment, the Dissent assumes they do. Plaintiffs do not have standing to challenge the 1954 Amendment because no federal statute requires plaintiffs to recite the Pledge. Even under the School District's Policy, children "may choose not to participate in the flag salute for personal reasons" or they can simply omit any words they find offensive.

To satisfy standing requirements, a plaintiff must prove: "(1) he has suffered an 'injury in fact' that is (a) concrete and

particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envt'l. Servs. (TOC), Inc.* 528 U.S. 167, 180-81 (2000) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).

[2] Plaintiffs are unable to show the 1954 amendment causes them to suffer any concrete and particularized injury because nothing in the Pledge actually requires anyone to recite it. To the contrary, however, because the Pledge does not mandate that anyone say it, Newdow has no personal injury to contest its wording in the courts. Rather, his remedy must be through the legislative branch.

[3] Instead of a particularized injury, plaintiffs would, at most, be asserting "generalized grievances more appropriately addressed in the representative branches", which do not confer standing. *Allen v. Wright*, 468 U.S. 737, 751 (1984); *see also Valley Forge Christian College v. Americans United for Separation of Church & State, Inc*., 454 U.S. 464, 489-90 n.26 (1982). Additionally, the 1954 Amendment did not involve Congress' power to tax and spend, U.S. Const. art. I § 8, so the narrow exception established in *Flast v. Cohen*, 392 U.S. 83, 88 (1968), allowing a taxpayer to bring an Establishment Clause challenge to the use of public funds does not apply.

## V.   The *Lemon* Test

We turn now to the merits of the plaintiffs' Establishment Clause claims.[8] There are three possible tests for determining whether a statute violates the Establishment Clause—the

---

[8]The Establishment Clause applies to the states through the Fourteenth Amendment. *Everson v. Bd. of Educ.*, 330 U.S. 1, 8 (1947).

*Lemon* test, the Endorsement test and the Coercion Test. We examine each in turn.

Plaintiffs contend the School District's policy violates the Establishment Clause test announced in *Lemon v. Kurtzman*, 403 U.S. 602 (1971), commonly known as the "*Lemon* test." Although the *Lemon* test has been widely criticized, our court has reaffirmed its continuing vitality. *See Card v. City of Everett*, 520 F.3d 1009, 1013 (9th Cir. 2008); *Access Fund v. USDA*, 499 F.3d 1036, 1042 (9th Cir. 2007) ("The *Lemon* test remains the benchmark to gauge whether a particular government activity violates the Establishment Clause.").

**[4]** Under the *Lemon* test, to be constitutional (1) the challenged governmental action must have a secular purpose; (2) "its principal or primary effect must be one that neither advances nor inhibits religion"; and (3) it "must not foster an excessive government entanglement with religion." *Lemon*, 403 U.S. at 612-13 (citations and internal quotation marks omitted). The School District's Policy must satisfy all three prongs of the *Lemon* test. Under each prong of this test, we first examine California Education Code § 52720 and the School District's Policy and then, because the School District's Policy states that recitation of the Pledge will suffice, we also examine the Pledge.

## VI. California Education Code § 52720 and the School District's Policy Are Constitutional under the *Lemon* test.

California Education Code § 52720 states as follows:

> In every public elementary school each day during the school year at the beginning of the first regularly scheduled class or activity period at which the majority of the pupils of the school normally begin the school day, there shall be conducted appropriate patriotic exercises. The giving of the Pledge of Alle-

giance to the Flag of the United States of America shall satisfy the requirements of this section.

In every public secondary school there shall be conducted daily appropriate patriotic exercises. The giving of the Pledge of Allegiance to the Flag of the United States of America shall satisfy such requirement. Such patriotic exercises for secondary schools shall be conducted in accordance with the regulations which shall be adopted by the governing board of the district maintaining the secondary school.

To comply with California Education Code § 52720, the Rio Linda Union School District adopted the following policy ("The School District's Policy"):

Patriotic Exercises

Each school shall conduct patriotic exercises daily. At elementary schools, such exercises shall be conducted at the beginning of each school day. The Pledge of Allegiance to the flag will fulfill this requirement. (Education Code § 52720)

Individuals may choose not to participate in the flag salute for personal reasons.

[5] All parties agree that the "ostensible and predominant" purpose of both California Education Code § 52720 and the School District's Policy is patriotic. We agree. The plain wording of California Education Code § 52720 and the School District's Policy both express a secular purpose: to encourage the performance of patriotic exercises in public school. Not only does the plain wording provide for the students to begin the day with a "patriotic exercise", but it does not mandate the text of the Pledge or any other patriotic exercise. The Pledge is one acceptable alternative. Because only a patriotic exercise is encouraged and no particular text is

mandated, the California statute and the School District's policy are neutral toward religion. *See Wallace v. Jaffree*, 472 U.S. 38, 55 n.37 (1985).

**[6]** *Lemon's* second prong is also met. The effect of California Education Code § 52720 and the School District's Policy is stated quite clearly in each: each school shall conduct "appropriate patriotic exercises" daily. There is no mention of anything religious in either. Further, although the recitation of the Pledge "shall satisfy" this requirement, it is not mandated under California law. Schools could decide to have the children learn and recite a different historical document each week, or participate in another patriotic activity, such as working on a project to help the nation. Recitation of the Pledge is just one of many ways to satisfy this patriotic requirement.

**[7]** Plaintiffs also concede that *Lemon's* third prong, "excessive [governmental] entanglement" with religion, is not violated by California Education Code § 52720 or the School District's Policy, and we agree. Neither involves any entanglement with religion at all, let alone excessive entanglement. *Lemon*, 403 U.S. at 612-13.

## VII.   The Pledge of Allegiance Is Constitutional under the *Lemon* test.

Because the School District's Policy states that recitation of the Pledge will fulfill the policy, we also examine the Pledge itself. We begin our analysis with the least controversial elements of the *Lemon* test in this case.

### A.   The Pledge does not involve any excessive entanglement with religion.

**[8]** Plaintiffs concede that the Pledge does not violate *Lemon's* third prong, "excessive [governmental] entangle-

ment" with religion, and we agree. There is no excessive entanglement with religion. *Lemon*, 403 U.S. at 612-13.

## B. The primary or principal effect of the Pledge is neither to advance nor inhibit religion.

**[9]** The Supreme Court has said the Pledge is a "common public acknowledgment of the ideals that our flag symbolizes. Its recitation is a patriotic exercise designed to foster national unity and pride in those principles." *Elk Grove*, 542 U.S. at 6. The Pledge also has the permissible secular effect of promoting an appreciation of the values and ideals that define our nation. The recitation of the Pledge is designed to evoke feelings of patriotism, pride, and love of country, not of divine fulfillment or spiritual enlightenment. In sum, the students are simply supporting the nation through their Pledge "to the Flag of the United States of America and to the Republic for which it stands." Thus, the Pledge passes *Lemon*'s second prong.

Next, we turn to the hotly contested issue in this case, whether Congress' purpose in enacting the Pledge of Allegiance was predominantly patriotic or religious.

## C. Congress' purpose in enacting the Pledge of Allegiance was patriotic.

Under *Lemon*'s first prong, governmental action is unconstitutional only if it has the "ostensible and predominant purpose of advancing religion." *McCreary County*, 545 U.S. at 860. We must defer to the government's articulation of a secular purpose, of which patriotism is one; however, the government's stated purpose must be sincere, not a sham. *Edwards v. Aguillard*, 482 U.S. 578, 586-87 (1987).

In 2002, Congress' purpose in reaffirming the Pledge by enacting 4 U.S.C. § 4 was predominantly secular. The phrase "under God", when read in context with the whole of the Pledge, has the predominant purpose and effect of adding a

solemn and inspiring note to what should be a solemn and inspiring promise—a promise of allegiance to our Republic.

### 1. We must examine the Pledge as a whole.

When it comes to testing whether words and actions are violative of the Establishment Clause, context is determinative. The dissent analyzes only the words "under God", instead of analyzing the context in which those words appear.[9] The Supreme Court has specifically rejected such a limited analysis: "[the dissenting Justices] would cut context out of the enquiry, to the point of ignoring history, no matter what bearing it actually had on the significance of current circumstances. There is no precedent for [their] arguments, or reason supporting them." *McCreary County*, 545 U.S. at 864. Further, "[t]he eyes that look to purpose belong to an 'objective observer' . . . one presumed to be familiar with the history of the government's actions and competent to learn what history has to show." *Id.* at 864-66 (quoting *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 308 (2000)).

The dissent suggests that we should look *only* at the 1954 textual amendments to the Pledge. *See* Dissent at 3973-78, 3998-99. We disagree. *Wallace* looked not only to the textual difference between two statutes, but also to the legislative record surrounding the second statute, to the statute's sponsor's testimony before the district court, and to the informa-

---

[9]The dissent mis-characterizes our analysis on page 3998. It is not the word "under" upon which we must focus, it is the entire wording of the Pledge as a whole. If the Pledge were solely: "We are under God's rule", would it make a difference? It would. There would be an argument that this was nothing more than a prayer. So would the Ten Commandments be a purely religious symbol if they stood alone in the Texas governmental park; so would the Nativity Crèche in the Rhode Island Park, if not surrounded by a Christmas tree, Santa and a Menorah. The recognition that words or symbols change and have different meanings in different contexts is not "pure poppycock", Dissent at 3998, unless *Van Orden* and *Donnelly* are pure poppycock.

tion Governor Wallace supplied in his answer to plaintiff Jaffree's complaint, and to the character of a statute on a similar topic passed one year later. *Wallace*, 472 U.S. at 56-60 (1985). Following *Wallace's* holistic approach, we must examine the relevant history.

[10] "[T]he question is what viewers may fairly understand to be the purpose of the display. That inquiry, of necessity, turns upon the context in which the contested object appears." *McCreary County*, 545 U.S. at 867-68 (quoting *County of Allegheny v. ACLU*, 492 U.S. 573, 595 (1989)). The California statute and the School District's Policy provide for recitation of the entire Pledge, not just the two words to which the plaintiffs and the dissent object. Accordingly, we examine the Pledge as a whole.

[11] In the previous case brought by Newdow, the Supreme Court recognized why we pledge allegiance to the flag:

> The very purpose of a national flag is to serve as a symbol of our country, and of its proud traditions of freedom, of equal opportunity, of religious tolerance, and of good will for other peoples who share our aspirations. As its history illustrates, the Pledge of Allegiance evolved as a common public acknowledgment of the ideals that our flag symbolizes. Its recitation is a patriotic exercise designed to foster national unity and pride in those principles.

*Elk Grove*, 542 U.S. at 5 (internal citations and quotation marks omitted).

The Supreme Court has held prayers, invocations and other overtly religious activities in public school violate the Establishment Clause. A student-led prayer before high school football games;[10] a prayer delivered by a clergyman in a high

---

[10]*Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290 (2000).

school graduation ceremony;[11] a period of silence in a public school for "meditation or voluntary prayer;"[12] a required Bible reading before each school day;[13] and a daily prayer[14] all have been invalidated by the Supreme Court as unconstitutional school-sponsored religious exercises.

All of the religious exercises invalidated in those cases shared a fundamental characteristic absent from the recitation of the Pledge: the exercise, observance, classroom lecture, or activity was predominantly religious in nature—a prayer, invocation, petition, or a lecture about "creation science."[15]

---

[11]*Lee v. Weisman*, 505 U.S. 577 (1992). In *Lee*, the Court found that a prayer led by a Rabbi specifically made reference to the Judeo-Christian tradition, because it was taken from Micah 6:8. *See id.* at 603 n.5. In the Pledge, the phrase "one Nation under God" does not make reference to any text, doctrine, or the practice of any particular religion in a manner that might be taken as suggestive, let alone coercive. The most likely provenance of the words is from either George Washington's address to boost his troops' morale, the Declaration of Independence, or President's Lincoln's tribute to the dead at Gettysburg. George Washington, General Orders (July 2, 1776); Abraham Lincoln, The Gettysburg Address (Nov. 19, 1863). *See* pages 3903 to 3908 *infra*.

Much as Justice Brennan explained, the "references to God contained in the Pledge of Allegiance" are "uniquely suited to serve such wholly secular purposes as solemnizing public occasions, or inspiring commitment to meet some national challenge in a manner that simply could not be fully served in our culture if government were limited to purely non-religious phrases." *Lynch*, 465 U.S. at 716-17.

[12]*Wallace v. Jaffree*, 472 U.S. 38 (1985).

[13]*Sch. Dist. of Abington Twp., Pa. v. Schempp*, 374 U.S. 203 (1963).

[14]*Engel v. Vitale*, 370 U.S. 421 (1962).

[15]*See e.g. Santa Fe*, 530 U.S. at 306-07 ("[T]he only type of message that is expressly endorsed in the text [of the school policy] is an 'invocation'—a term that primarily describes an appeal for divine assistance."); *Lee*, 505 U.S. at 581-82, 598 ("[T]he State has . . . compelled attendance and participation in an explicit religious exercise [involving repeated thanks to God and requests for blessings] at an event of singular importance to every student."); *Wallace*, 472 U.S. at 58 ("The wholly religious character of the later enactment [of the Alabama statute] is plainly

**[12]** The purpose of public prayer is always active—to invite divine intercession, to express personal gratitude, to ask forgiveness, etc. On the other hand, the recitation of "one Nation under God" is a description of the Republic rather than an expression of the speaker's particular theological beliefs, a recognition of the historical principles of governance, affected by religious belief, embedded in the Pledge. "[Our] institutions presuppose a Supreme Being." *Zorach v. Clausen*, 343 U.S. 306, 313 (1952).

The dissent states that the mere recitation of "under God" in the Pledge is an affirmation that God exists: it " 'requires affirmation of a belief and an attitude of mind' to which young Roe does not subscribe: a belief that God exists and is watching over our nation." Dissent at 3975 (quoting *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 633 (1943)). If in fact the students were required to say the Pledge, the dissent would have a valid point. But the California legislature has already taken this consideration into account by allowing anyone not to say the Pledge, or hear the Pledge said, for any personal reason. What is at issue is not saying the Pledge or affirming a belief in God. What is at issue is whether Roechild can prevent other students, who have no such objection, from saying the Pledge.

**[13]** In contending the Pledge is an unconstitutional religious exercise, plaintiffs erroneously fixate solely on the

evident from its text."); *Edwards*, 482 U.S. at 589 (striking down a Louisiana statute that had the "purpose of discrediting ' "evolution by counterbalancing its teaching at every turn with the teaching of creationism' "); *Schempp*, 374 U.S. at 210 ("The reading of the [Bible] verses, even without comment, possesses a devotional and religious character and constitutes in effect a religious observance." (citation and internal quotation marks omitted)); *Engel*, 370 U.S. at 424 ("There can, of course, be no doubt that New York's program of daily classroom invocation of God's blessings as prescribed in the Regents' prayer is a religious activity. It is a solemn avowal of divine faith and supplication for the blessings of the Almighty.").

words "under God" and disregard the context in which those words appear. True, the words "under God" have religious significance. This, however, does not convert the Pledge into a prayer or other religious exercise. As the Supreme Court has explained, "Focus exclusively on the religious component of any activity would inevitably lead to its invalidation under the Establishment Clause." *Lynch*, 465 U.S. at 680. Under the dissent's rationale, every government action that had any religious component to it would violate the Establishment Clause. But that is clearly not the case, as the Supreme Court has repeatedly told us. *See also* discussion at pages 3875-76 *supra*.

Where the very same religious symbols are displayed for traditional cultural purposes and in a context evoking themes and values other than religion, they have been found not to violate the Establishment Clause. *See Van Orden v. Perry*, 545 U.S. 677, 681 (2005) (upholding a Ten Commandments display on state capitol grounds among other historical monuments); *Lynch*, 465 U.S. at 670-71, 680, 687 (upholding a crèche displayed as just one part of a city's annual Christmas display because the crèche depicted the "historical origins of this traditional event long recognized as a National Holiday").

The Supreme Court's most recent pronouncements on the Establishment Clause, *Van Orden* and *McCreary County*, are instructive on the importance of context. *Van Orden* and *McCreary County* were decided on the same day in 2005. Although a display containing the Ten Commandments was at issue in both cases, the Court upheld the display in *Van Orden*, but invalidated it in *McCreary County*. The words displayed were the same, but the context made all the difference:

> On the one hand, the Commandments' text undeniably has a religious message, invoking, indeed emphasizing, the Deity. On the other hand, focusing on the text of the Commandments alone cannot conclusively resolve this case. Rather, to determine the

message that the text here conveys, we must exam-
ine how the text is *used*. And that inquiry requires us
to consider the context of the display.

*Van Orden*, 545 U.S. at 700-01 (Breyer, J., concurring)
(emphasis in original).

The Ten Commandments display in *Van Orden* was in a
state park that contained both religious and secular monu-
ments and historical markers. *Van Orden*, 545 U.S. at 681. In
contrast, the Ten Commandments display in a Kentucky
courthouse appeared alone and thus the "unstinting focus was
on religious passages." *McCreary County*, 545 U.S. at 870.
Only after the display was challenged did the County add
other displays to the area. *Id.* As we discuss, *infra* at page
3896, fn. 19, the 2002 Act is distinguishable from the actions
of McCreary County.

Just as the text of the Ten Commandments display may be
constitutional in one context but not the other, the word
"God" may violate the Establishment Clause when placed in
one context, but not another. For example, a school district's
policy requiring teachers to lead students in reciting, "We
give thanks to You, Lord, for keeping us alive, sustaining us
and allowing us to reach this special, happy occasion," consti-
tutes a prayer or religious exercise violative of the Establish-
ment Clause. *Lee*, 505 U.S. at 582 (citation and internal
quotation marks omitted). There, the word "Lord," like the
Ten Commandments display in *McCreary County*, is placed
in a wholly religious context and is surrounded by words
whose "unstinting focus" are religious. Not so, the same word
"Lord" on the granite monument in *Van Orden*, surrounded
by other monuments and historical objects.[16] Likewise, the

---

[16]The text of the Ten Commandments display in *Van Orden* was far
more religious than the phrase "under God" at issue here:

> I AM the LORD thy God. Thou shalt have no other gods before
> me.

phrase "one Nation under God" in the Pledge appears as part of a pledge of allegiance to "the Flag of the United States of America, and to the Republic for which it stands," not a personal pledge of allegiance to God. The Pledge recitation is led by a teacher, not by a clergyman or other religious leader. *Cf. Lee*, 505 U.S. at 586, 587. The students doff baseball caps; they do not kneel, nor don yarmulkes, veils or rosaries. The Pledge is thus distinguishable from the school-sponsored prayers invalidated by the Supreme Court in *Lee* and *Wallace*.

Nevertheless, the dissent would have us ignore the wording of the Pledge as a whole to focus only on one portion of the Pledge, the portion plaintiffs find objectionable, because in *Wallace v. Jaffree*, 472 U.S. 38 (1985), the Court examined an amendment to a statute to provide for prayer. We must disagree with the dissent as to its application of *Wallace* to this case. In *Wallace*, the parents of public school children challenged an amendment to a state statute which had provided for a moment of silence at the beginning of each day in the public schools. The challenged amendment changed the purpose of the moment of silence from "meditation" to "medita-

---

Thou shalt not make to thyself any graven images.

Thou shalt not take the Name of the Lord thy God in vain.

Remember the Sabbath day, to keep it holy.

Honor thy father and thy mother, that thy days may be long upon the land which the Lord thy God giveth thee.

Thou shalt not kill.

Thou shalt not commit adultery.

Thou shalt not steal.

Thou shalt not bear false witness against thy neighbor.

Thou shalt not covet thy neighbor's house. Thou shalt not covet thy neighbor's wife, nor his manservant, nor his maidservant, nor his cattle, nor anything that is thy neighbor's.

*Van Orden*, 545 U.S. at 707 (Stevens, J., dissenting).

tion *or voluntary prayer*." *Id.* at 58-59 (emphasis added); Ala. Code § 16-1-20.1 (1984). This statute was enacted the year before another statute, Alabama Code § 16-1-20.2, which provided the text of a prayer to be said each day by the students.[17] This combination of "voluntary prayer" and the suggested prayer to be said out loud left no doubt that the purpose of the statute was to promote religion.

Focusing, as we must, on how the text of the statute is *used*, *Van Orden*, 545 U.S. at 701 (Breyer, J., concurring), we see that the addition of "or voluntary prayer" to the statute in *Wallace* was *used* to encourage students to participate in a religious exercise—the very prayer enacted in Alabama Code § 16-1-20.2. Here, the addition of "under God" was *used* to describe an attribute of the Republic, "one Nation under God" —a reference to the historical and religious traditions of our country, not a personal affirmation through prayer or invocation that the speaker believes in God.

---

[17]Alabama Code § 16-1-20.2 provided:

> From henceforth, any teacher or professor in any public educational institution within the state of Alabama, recognizing that the Lord God is one, at the beginning of any homeroom or any class, may pray, may lead willing students in prayer, or may lead the willing students in the following prayer to God:

> Almighty God, You alone are our God. We acknowledge You as the Creator and Supreme Judge of the world. May Your justice, Your truth, and Your peace abound this day in the hearts of our countrymen, in the counsels of our government, in the sanctity of our homes and in the classrooms of our schools in the name of our Lord. Amen.

*Wallace v. Jaffree*, 466 U.S. 924 (1984) (holding Ala. Code § 16-1-20.2 violates the Establishment Clause).

## 2. The legislative history shows Congress had a predominantly patriotic purpose when it enacted the Pledge.

*Lemon* mandates our inquiry look to the "plain meaning of the statute's words, enlightened by their context and the contemporaneous legislative history [and] the historical context of the statute, . . . and the specific sequence of events leading to [its] passage." *McCreary County*, 545 U.S. at 862 (quoting from *Edwards*, 482 U.S. at 594-95) (alteration in original). The dissent fails to do any of this.

**[14]** In 2002, Congress reaffirmed the current Pledge, which now includes references to how it is to be recited and which specifically sets forth Congress' reasons for the "plain meaning of the statute's words." *See* Pub. L. No. 107-293, 116 Stat. 2057 (codified as amended in 4 U.S.C. § 4, 36 U.S.C. § 302) (effective November 13, 2002). It is the 2002 statute—4 U.S.C. § 4—that sets forth our current Pledge. It is the contemporaneous legislative history of the 2002 Act which should tell us the purpose of the Congress in 2002 that is relevant to our inquiry because that is the statute that was in force when Roe Child-2 heard her schoolmates recite the Pledge and when Jan Roe brought this action. It remains the current statute. It is the "specific sequence of events" leading to the passage of the 2002 Act we must consider.[18]

---

[18]The Dissent asserts that we should ignore the current statute in effect because it was not argued by the parties at oral argument. With respect, just because the Dissent does not like the 2002 Act does not mean we are free to ignore its legal effect. We are charged with conducting a correct legal analysis of this case whether the parties on appeal do or not. Indeed, often issues that are not discussed at oral argument are determinative of the case. For instance, prudential standing was not argued during the oral argument in this court in *Newdow I*, nor did this court hold further arguments before issuing *Newdow III* but the Supreme Court nevertheless certainly found prudential standing to be the determinative issue in *Elk Grove*. 542 U.S. at 6.

In determining Congress' purpose under the *Lemon* test, "[t]he starting point in every case involving construction of a statute is the language itself." *Edwards*, 482 U.S. at 597-98 (quoting *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 756 (1975) (Powell, J., concurring)). The primary flaw in the dissent's reasoning is that, because the secular reasons given directly in the statute do not lead to the dissent's desired result, the dissent ignores those reasons and instead focuses on the statements of individual legislators making statements in an election year. The Supreme Court has been very clear that we are not to do this:

> As an initial matter, the [text of the statute] is a sufficient basis for meeting the secular purpose prong of the *Lemon* test. *See Edwards v. Aguillard*, 482 U.S. 578, 586 (1987) ([The] Court "is normally deferential to a [legislative] articulation of a secular purpose"); *Mueller v. Allen*, 463 U.S. 388, 394-95 (1983) ([The] Court is "reluctan[t] to attribute unconstitutional motives to the States, particularly when a plausible secular purpose for the State's program may be discerned from the face of the statute"). . . . Even if some legislators were motivated by a conviction that religious speech in particular was valuable and worthy of protection, that alone would not invalidate the Act, because what is relevant is the legislative purpose of the statute, not the possibly religious motives of the legislators who enacted the law.

*Bd. of Educ. of Westside Comm. Sch. v. Mergens*, 496 U.S. 226, 248-49 (1990) (emphasis added).

With the 2002 Act, Congress "reaffirmed the exact language that has appeared in the Pledge for decades." *See* Pub. L. No. 107-293, 116 Stat. 2057 at 2060 (codified as amended in 4 U.S.C. § 4, 36 U.S.C. § 302) (effective November 13, 2002). *McCreary County* tells us we must also consider the

legislative history of this act to determine its predominant purpose and effect.[19]

Congress chose to explain in great detail its purpose in reaffirming the language of the Pledge, for although it did not amend the text of the Pledge, it did extensively amend the text of the statute enacting the Pledge, setting forth its specific purposes in the following extensive legislative findings:[20]

Congress finds the following:

> (1) On November 11, 1620, prior to embarking for the shores of America, the Pilgrims signed the Mayflower Compact that declared: "Having undertaken, for the Glory of God and the advancement of the Christian Faith and honor of our King and country, a voyage to plant the first colony in the northern parts of Virginia,".

> (2) On July 4, 1776, America's Founding Fathers, after appealing to the "Laws of Nature, and of

---

[19]The reenactment of the Pledge here is distinguishable from the actions of the county in *McCreary County* for several key reasons. First and foremost, in *McCreary County* it was the same governmental body which put up the challenged display, containing as "unstinting focus" on "religious passages", that then added secular documents to camouflage that display only after an Establishment Clause challenge was brought. Here, Congress thought the Pledge as amended in 1954 was constitutional for 48 years. It re-enacted the text only because it thought that this court had misinterpreted its original purpose. Further, only one member of Congress, Senator Byrd, served in both the 1954 and 2002 Congresses. Further, unlike the late-blooming additions to the display in *McCreary County*, the 2002 Legislature did not add any further secular content to the Pledge to dilute the challenged words.

[20]We presume the 2002 Legislature's purpose is as stated, and is not a sham, because the 2002 Legislature has given us no reason to presume its stated reasons are not in fact its real reasons for the enactment. *See Edwards*, 482 U.S. at 586-87. The plaintiffs have not carried their burden to show otherwise.

Nature's God" to justify their separation from Great Britain, then declared: "We hold these Truths to be self-evident, that all Men are created equal, that they are endowed by their Creator with certain unalienable Rights, that among these are Life, Liberty, and the Pursuit of Happiness".

(3) In 1781, Thomas Jefferson, the author of the Declaration of Independence and later the Nation's third President, in his work titled "Notes on the State of Virginia" wrote: "God who gave us life gave us liberty. And can the liberties of a nation be thought secure when we have removed their only firm basis, a conviction in the minds of the people that these liberties are of the Gift of God. That they are not to be violated but with His wrath? Indeed, I tremble for my country when I reflect that God is just; that his justice cannot sleep forever.".

(4) On May 14, 1787, George Washington, as President of the Constitutional Convention, rose to admonish and exhort the delegates and declared: "If to please the people we offer what we ourselves disapprove, how can we afterward defend our work? Let us raise a standard to which the wise and the honest can repair; the event is in the hand of God!".

(5) On July 21, 1789, on the same day that it approved the Establishment Clause concerning religion, the First Congress of the United States also passed the Northwest Ordinance, providing for a territorial government for lands northwest of the Ohio River, which declared: "Religion, morality, and knowledge, being necessary to good government and the happiness of mankind, schools and the means of education shall forever be encouraged.".

(6) On September 25, 1789, the First Congress unanimously approved a resolution calling on Presi-

dent George Washington to proclaim a National Day of Thanksgiving for the people of the United States by declaring, "a day of public thanksgiving and prayer, to be observed by acknowledging, with grateful hearts, the many signal favors of Almighty God, especially by affording them an opportunity peaceably to establish a constitution of government for their safety and happiness.".

(7) On November 19, 1863, President Abraham Lincoln delivered his Gettysburg Address on the site of the battle and declared: "It is rather for us to be here dedicated to the great task remaining before us —that from these honored dead we take increased devotion to that cause for which they gave the last full measure of devotion—that we here highly resolve that these dead shall not have died in vain— that this Nation, under God, shall have a new birth of freedom—and that Government of the people, by the people, for the people, shall not perish from the earth.".

(8) On April 28, 1952, in the decision of the Supreme Court of the United States in *Zorach v. Clauson*, 343 U.S. 306 (1952), in which school children were allowed to be excused from public schools for religious observances and education, Justice William O. Douglas, in writing for the Court stated: "The First Amendment, however, does not say that in every and all respects there shall be a separation of Church and State. Rather, it studiously defines the manner, the specific ways, in which there shall be no concern or union or dependency one on the other. That is the common sense of the matter. Otherwise the State and religion would be aliens to each other —hostile, suspicious, and even unfriendly. Churches could not be required to pay even property taxes. Municipalities would not be permitted to render

police or fire protection to religious groups. Policemen who helped parishioners into their places of worship would violate the Constitution. Prayers in our legislative halls; the appeals to the Almighty in the messages of the Chief Executive; the proclamations making Thanksgiving Day a holiday; 'so help me God' in our courtroom oaths—these and all other references to the Almighty that run through our laws, our public rituals, our ceremonies would be flouting the First Amendment. A fastidious atheist or agnostic could even object to the supplication with which the Court opens each session: 'God save the United States and this Honorable Court.' ".

(9) On June 15, 1954, Congress passed and President Eisenhower signed into law a statute that was clearly consistent with the text and intent of the Constitution of the United States, that amended the Pledge of Allegiance to read: "I pledge allegiance to the Flag of the United States of America and to the Republic for which it stands, one Nation under God, indivisible, with liberty and justice for all.".

(10) On July 20, 1956, Congress proclaimed that the national motto of the United States is "In God We Trust", and that motto is inscribed above the main door of the Senate, behind the Chair of the Speaker of the House of Representatives, and on the currency of the United States.

(11) On June 17, 1963, in the decision of the Supreme Court of the United States in *Abington School District v. Schempp*, 374 U.S. 203 (1963), in which compulsory school prayer was held unconstitutional, Justices Goldberg and Harlan, concurring in the decision, stated: "But untutored devotion to the concept of neutrality can lead to invocation or approval of results which partake not simply of that

noninterference and noninvolvement with the reli-
gious which the Constitution commands, but of a
brooding and pervasive devotion to the secular and
a passive, or even active, hostility to the religious.
Such results are not only not compelled by the Con-
stitution, but, it seems to me, are prohibited by it.
Neither government nor this Court can or should
ignore the significance of the fact that a vast portion
of our people believe in and worship God and that
many of our legal, political, and personal values
derive historically from religious teachings. Govern-
ment must inevitably take cognizance of the exis-
tence of religion and, indeed, under certain
circumstances the First Amendment may require that
it do so.".

(12) On March 5, 1984, in the decision of the
Supreme Court of the United States in *Lynch v.
Donelly*, 465 U.S. 668 (1984), in which a city gov-
ernment's display of a nativity scene was held to be
constitutional, Chief Justice Burger, writing for the
Court, stated: "There is an unbroken history of offi-
cial acknowledgment by all three branches of gov-
ernment of the role of religion in American life from
at least 1789 . . . [E]xamples of reference to our reli-
gious heritage are found in the statutorily prescribed
national motto 'In God We Trust' (36 U.S.C. 186),
which Congress and the President mandated for our
currency, see (31 U.S.C. 5112(d)(1) (1982 ed.)), and
in the language 'One Nation under God', as part of
the Pledge of Allegiance to the American flag. That
pledge is recited by many thousands of public school
children—and adults—every year . . . Art galleries
supported by public revenues display religious paint-
ings of the 15th and 16th centuries, predominantly
inspired by one religious faith. The National Gallery
in Washington, maintained with Government sup-
port, for example, has long exhibited masterpieces

with religious messages, notably the Last Supper, and paintings depicting the Birth of Christ, the Crucifixion, and the Resurrection, among many others with explicit Christian themes and messages. The very chamber in which oral arguments on this case were heard is decorated with a notable and permanent—not seasonal—symbol of religion: Moses with the Ten Commandments. Congress has long provided chapels in the Capitol for religious worship and meditation.".

(13) On June 4, 1985, in the decision of the Supreme Court of the United States in *Wallace v. Jaffree*, 472 U.S. 38 (1985), in which a mandatory moment of silence to be used for meditation or voluntary prayer was held unconstitutional, Justice O'Connor, concurring in the judgment and addressing the contention that the Court's holding would render the Pledge of Allegiance unconstitutional because Congress amended it in 1954 to add the words "under God," stated "In my view, the words 'under God' in the Pledge, as codified at (36 U.S.C. 172), serve as an acknowledgment of religion with 'the legitimate secular purposes of solemnizing public occasions, [and] expressing confidence in the future.' ".

(14) On November 20, 1992, the United States Court of Appeals for the 7th Circuit, in *Sherman v. Community Consolidated School District 21*, 980 F.2d 437 (7th Cir. 1992), held that a school district's policy for voluntary recitation of the Pledge of Allegiance including the words "under God" was constitutional.

(15) The 9th Circuit Court of Appeals erroneously held, in *Newdow v. U.S. Congress* (9th Cir. June 26, 2002), that the Pledge of Allegiance's use of the

express religious reference "under God" violates the First Amendment to the Constitution, and that, therefore, a school district's policy and practice of teacher-led voluntary recitations of the Pledge of Allegiance is unconstitutional.

(16) The erroneous rationale of the 9th Circuit Court of Appeals in Newdow would lead to the absurd result that the Constitution's use of the express religious reference "Year of our Lord" in Article VII violates the First Amendment to the Constitution, and that, therefore, a school district's policy and practice of teacher-led voluntary recitations of the Constitution itself would be unconstitutional.

4 U.S.C. § 4 (2002).

**[15]** These findings make it absolutely clear that Congress in 2002 was not trying to impress a religious doctrine upon anyone. Rather, they had two main purposes for keeping the phrase "one Nation under God" in the Pledge: (1) to underscore the political philosophy of the Founding Fathers that God granted certain inalienable rights to the people which the government cannot take away; and (2) to add the note of importance which a Pledge to our Nation ought to have and which in our culture ceremonial references to God arouse.

The dissent contends that we must ignore the 2002 reaffirmation in its entirety. *See* Dissent at 3973-78. But the Supreme Court has rejected this mode of analysis. Again, "[t]he eyes that look to purpose belong to an objective observer . . . competent to learn what history has to show," *McCreary County*, 545 U.S. at 862-66 (quotations and citations removed), and our observer's competence will not suddenly fail her when she is presented with the most recent legislative history of 4 U.S.C. § 4.

Even if the dissent were correct that the focus of our inquiry should be the 1954 amendments to the text of the

Pledge, *Wallace* makes clear that the 2002 reaffirmation would still be relevant. In *Wallace*, the Court determined whether a school prayer statute had a secular purpose by looking at, among other things, the "character" of a subsequent statute, passed a year later, which the Court described as a "sequel" to the statute at issue. *Wallace*, 472 U.S. at 58. Determining the purpose of the Pledge requires understanding the history of the Pledge, and any such history is incomplete without the 2002 reaffirmation.

### 3. *History supports Congress' view of the Pledge.*

[16] Not only must we examine the words "under God" in the context of the rest of the Pledge, we must also examine them in the context of history. Without knowing the history behind these words, one might well think the phrase "one Nation under God" could not be anything but religious. History, however, shows these words have an even broader meaning, one grounded in philosophy and politics and reflecting many events of historical significance.

The words "under God" were added to the Pledge of Allegiance in 1954 in response to the oppressive governments forming around the World. Congress wanted to emphasize that in America, the government's power is limited by a higher power. But to understand this concept, we must look back to the beginning of our nation.

Among the "self-evident truths" the Framers believed was the concept that all people are entitled to certain inalienable rights given to them by the "Laws of Nature and Nature's God" and that the purpose of government should be "to secure these rights." In the monarchies of Europe, it was believed that God gave the King his power, and the people had only such limited rights as the King graciously bestowed upon them. When drafting the Establishment and Free Exercise Clauses of the First Amendment, the Founders had this religious history of Europe in mind:

> [T]o the men who wrote the Religion Clauses of the First Amendment the 'establishment' of a religion connoted sponsorship, financial support, and active involvement of the sovereign in religious activity. In England, and in some Colonies at the time of the separation in 1776, the Church of England was sponsored and supported by the Crown as a state, or established, church; in other countries 'establishment' meant sponsorship by the sovereign of the Lutheran or Catholic Church. *See Engel v. Vitale*, 370 U.S., at 428 n. 10, 82 S. Ct., at 1265. *See generally* C. Antieau, A. Downey, & E. Roberts, Freedom from Federal Establishment (1964). The exclusivity of established churches in the 17th and 18th centuries, of course, was often carried to prohibition of other forms of worship.

*Walz v. Tax Comm'n*, 397 U.S. 664, 667 (1970); *see also Everson v. Bd. of Educ.*, 330 U.S. at 8-11 ("A large proportion of the early settlers of this country came here from Europe to escape the bondage of laws which compelled them to support and attend government favored churches. The centuries immediately before and contemporaneous with the colonization of America had been filled with turmoil, civil strife, and persecutions, generated in large part by established sects determined to maintain their absolute political and religious supremacy. . . . In efforts to force loyalty to whatever religious group happened to be on top and in league with the government of a particular time and place, men and women had been fined, cast in jail, cruelly tortured, and killed.").

In contrast, the Framers believed that God endowed people with certain inalienable rights, rights no government could take away and no church could regulate. These rights were inalienable by the government because they were derived from a source more powerful than, and entitled to more respect than, the government—even a democratically elected government. The government could regulate only those rights

the people gave to the government. This fundamental debate —whether government has only limited rights given to it by the people, or whether the people have only limited rights given to them by the government—remains one of the crucial debates around the world to this day. Whether government is limited or unlimited has a profound impact on people's day-to-day lives. For instance, if the police arrest an individual, in many countries, the only question is whether there is a law forbidding the arrest. If there is no such law, the arrest is legal because the government is all powerful and not to be questioned. In America, the question is what law allows the police to arrest the person. If there is no such law, then the arrest is unlawful and the person can petition the courts to be released because the government has only such power as the people have chosen to give it through their elected representatives.

In 1776, limited government was a rare concept. If the new government of this nation would have only limited powers, what authority limited these powers? If the people would retain certain rights that did not emanate from the government, whence came those rights? The Framers referred to the source of the people's rights as the "Creator," the "Supreme Judge," and "Nature's God." The Declaration of Independence, 1 U.S.C. § XLIII (1776). The name given to this unknowable, varied source was not crucial, but the source was a necessary prerequisite to the concept of limited government that formed the basis of our nation's founding.[21]

---

[21]After the Revolutionary War, a committee consisting of James Madison, Alexander Hamilton, and later Chief Justice Oliver Ellsworth drafted an "Address to the States, by the United States in Congress Assembled." According to the Address, the Revolutionary War was won for the rights of human nature, rights that had an "Author":

Let it be remembered, finally, that it has ever been the pride and boast of America that the rights for which she contended were the rights of human nature. By the blessings of the *Author* of these rights on the means exerted for their deference, they have prevailed against all opposition, and form the basis of thirteen independent States.

Long before this nation could be founded, the Framers had to convince the people in the American colonies that their individual rights were important enough to start a war. Important enough to die for. Important enough to send their sons to die for. We must remember the Framers urged a rationale for committing treason against Great Britain. For this, they needed to draw upon every weapon in their intellectual arsenal. They needed to call upon divine inspiration, as so many armies before them had.[22]

Alexander Hamilton argued in February 1775, "The sacred rights of mankind are not to be rummaged for among old parchments or musty records. They are written, as with a sunbeam, in the whole volume of human nature, by the hand of the Divinity himself, and can never be erased or obscured by mortal power." Alexander Hamilton, *The Farmer Refuted* (1775).

And so when the Second Continental Congress of the United States met on July 4, 1776, the original thirteen states sought to convince not only the Colonists, but also the world

---

William Hickey, The Constitution of the United States of America 139-40 (1853) (emphasis added), *cited in* Anthony R. Picarello, Jr., *Establishing Anti-Foundationalism Through the Pledge of Allegiance Cases*, 5 First Amend. L. Rev. 183, 188 (2006) (filed as part of the brief for Defendant-Intervenor Carey).

[22]In his General Orders, George Washington invoked the phrase "under God" to inspire his troops when describing the fate of America if the King of Great Britain, with his unlimited powers, should win the Revolutionary War:

> The fate of unborn Millions will now depend, *under God*, on the Courage and Conduct of this army—Our cruel and unrelenting Enemy leaves us no choice but a brave resistance, or the most abject submission; this is all we can expect—We have therefore to resolve to conquer or die.

George Washington, General Orders (July 2, 1776) (emphasis added), *cited in* Picarello, 5 First Amend. L. Rev. at 187.

that a higher power granted rights directly to the people, who would in turn grant only limited powers to their new government:

> When in the Course of human events, it becomes necessary for one people to dissolve the political bands which have connected them with another, and to assume among the powers of the earth, the separate and equal station to which *the Laws of Nature and of Nature's God* entitle them,[23] a decent respect to the opinions of mankind requires that they should declare the causes which impel them to the separation.

> We hold these truths to be self-evident, that all men are created equal, that *they are endowed by their Creator with certain unalienable Rights*, that among these are Life, Liberty and the pursuit of Happiness.

The Declaration of Independence, 1 U.S.C. § XLIII (1776) (emphasis added).

"The Declaration of Independence was the promise; the Constitution was the fulfillment."[24] The Constitution fulfilled the promise of the Declaration by creating a government of limited powers. The government was divided into three co-equal but separate branches that would check and balance one another to ensure the government remained limited, and the people's rights secure.

---

[23]Here, Jefferson was referring to Cicero's concept that "God himself" was the author, promulgator, and enforcer of the "universal law of justice." Marcus Tullius Cicero, De Republica III, xxii. Cicero, who lived from 106 BC to 43 BC, obviously was not a Christian. Thus, this concept of God and Nature bestowing rights upon the people is not confined to the traditions of Christianity, regardless of some of the proclamations of preachers and Congressmen in 1954.

[24]Charles Alan Wright, *Warren Burger: A Young Friend Remembers*, 74 Tex. L. Rev. 213, 219 (1995) (quoting Chief Justice Warren Burger).

While the Revolutionary War was waged against the abusive King of Great Britain, the Civil War was waged against abusive State governments.[25] Many abolitionists asserted that slaves were also endowed by the Creator with certain inalienable rights that could not be taken away by the government. During his Gettysburg Address, President Abraham Lincoln called upon this higher power, using the very same phrase—"nation, under God"—to describe a belief in equality and limited government:

> [T]he great task remaining before us—that from these honored dead we take increased devotion to that cause for which they gave the last full measure of devotion—that we here highly resolve that these dead shall not have died in vain—that *this nation, under God*, shall have a new birth of freedom—and that government of the people, by the people, for the people, shall not perish from the earth.

Abraham Lincoln, The Gettysburg Address (Nov. 19, 1863) (emphasis added).

The original Pledge of Allegiance was drafted by Frances Bellamy in 1892: "I pledge allegiance to my Flag and the Republic for which it stands: one Nation indivisible,[26] with Liberty and Justice for all." *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 6 (2004). It was published in a national youth magazine commemorating the 400th anniversary of Christopher Columbus' arrival in America. *Id.*

---

[25]Following the Civil War, the Fourteenth Amendment was added, to limit the power of the States as against the rights of the people. In particular, the Fourteenth Amendment was necessary to guard against states disregarding the prohibition against slavery found in the Thirteenth Amendment.

[26]Reinforcement of the idea that this nation is indivisible, a concept most Americans today would not even think was up for debate, reflects the fact that the Pledge was first drafted in 1892, not long after the Civil War.

During World War II, Congress formally codified the Pledge of Allegiance. Unlike Bellamy's version, the 1942 Pledge referred expressly to the United States of America because there was a worry that a Pledge to "my Flag" would allow those who sympathized with other nations to appear to be supporting America, while secretly supporting Germany, Japan, or the like: "I pledge allegiance to the flag of the United States of America and to the Republic for which it stands, one Nation indivisible, with liberty and justice for all." *Id.* (citation and internal quotation marks omitted). Pub. L. No. 623, Ch. 435, § 7, 56 Stat. 380 (1942) (codified at 36 U.S.C. § 1972, now repealed).

In the early 1950s America became involved in the war waged between North and South Korea. North Korea was aided by the communist regimes of the Soviet Union and China, while South Korea was aided by the United Nations, including the United States, Australia, and Great Britain. This was just one of many times when the West opposed the spread of communism. American soldiers had just fought and died in this war, not returning until after the cease fire in July 1953. Encyclopedia Britannica Online Ed. available at http://search.eb.com/eb/article-9046072 (last visited August 4, 2009). Indeed, America still has troops in South Korea. The tensions over the differences in political systems continue today. *Id*. It was while the scars of the Korean War were still fresh that Congress decided to amend the Pledge again.

**[17]** In 1954, during the escalating Cold War with North Korea, the Soviet Union and other communist countries, Congress further amended the Pledge by changing the phrase "one Nation indivisible" to "one Nation under God, indivisible." Pub. L. No. 396, Ch. 297, 68 Stat. 249 (1954). The words "under God" were added as a description of "one Nation" primarily to reinforce the idea that our nation is founded upon the concept of a limited government, in stark contrast to the unlimited power exercised by communist forms of government. In adding the words "under God" to the Pledge, Con-

gress reinforced the belief that our nation was one of individual liberties granted to the people directly by a higher power:

> At this moment of our history the principles underlying our American Government and the American way of life are under attack by a system whose philosophy is at direct odds with our own. [O]ur American Government is founded on the concept of the individuality and the dignity of the human being. Underlying this concept is the belief that the human person is important because he was created by God and endowed by Him with certain inalienable rights which no civil authority may usurp.

H.R. Rep. No. 83-1693, 1954 U.S.C.C.A.N. 2339, 2340 (May 28, 1954). The House Report adopted this statement from Representative Rabaut:

> By the addition of the phrase 'under God' to the pledge, the consciousness of the American people will be more alerted to the true meaning of our country and its form of government. In this full awareness we will, I believe, be strengthened for the conflict now facing us and more determined to preserve our precious heritage.
>
> More importantly, the children of our land, in the daily recitation of the pledge in school, will be daily impressed with a true understanding of our way of life and its origins. As they grow and advance in this understanding, they will assume the responsibilities of self-government equipped to carry on the traditions that have been given to us.

*Id.* at 2341.[27]

---

[27]The dissent appears to think the historical context for the Pledge extends back no more than to the Sunday when Reverend Docherty gave

Undoubtedly, as the dissent sets forth in great detail, some members of Congress sought to promote religion and to combat atheism. We do not dispute that those motives do not comport with the First Amendment. Where the dissent errs, however, is in focusing solely on what individuals *say* when they are making political statements to their constituencies and ending its analysis there instead of also looking at what Congress *did* when it enacted and amended the Pledge over time. The dissent ignores the plain language of the 2002 Act —the only evidence we have of what an overwhelming majority of both houses of Congress voted for.[28] Why does the dissent ignore the language in the statute that Congress voted for? Because the Congressional findings set forth in the statute do not lead to the result the dissent desires. The dissent

his sermon. With respect, Reverend Docherty was never elected to office and, though he may indeed have delivered a moving sermon, the concept of this nation being "one Nation under God" extended back long before his time, at least to General Washington's address to his troops in 1776 and to President Lincoln's Gettysburg address in 1863. George Washington, General Orders (July 2, 1776); Abraham Lincoln, The Gettysburg Address (Nov. 19, 1863).

We do not doubt some members of Congress were motivated to add the phrase "under God" to the Pledge to serve wholly religious ends. Nevertheless, under Supreme Court precedent, our Establishment Clause inquiry focuses solely on "the *legislative purpose* of the statute, not the possibly religious *motives* of the legislators who enacted the law." *Bd. of Educ. v. Mergens*, 496 U.S. 226, 249 (1990) (plurality opinion of O'Connor, J.); *see United States v. O'Brien*, 391 U.S. 367, 384 (1968) ("What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it.").

[28]The Senate passed the 2002 Act with 99 Yeahs and 1 member not voting. For the Senate vote, see http://www.senate.gov/legislative/LIS/roll_call_lists/roll_call_vote_cfm.cfm?congress=107&session=2&vote=00166 (last visited January 15, 2010).

The House passed the Act with a vote of 401 Yeahs; 5 Nays; 4 members present; and 21 members not voting. For the House vote, see http://thomas.loc.gov/cgi-bin/query/D?r107:36:./temp/r10777QQHb:: (last visited January 15, 2010).

also ignores the inescapable fact that it is the 2002 Act that is in effect today.

The dissent points to instances where individual Congressmen proclaimed, as politicians often do in election years, the obvious religious elements of the amendment. But we are called upon to discern Congress' ostensible and predominant purpose, not the purpose of an individual. *See McCreary County*, 545 U.S. at 867-68. That purpose is not the statement of one or more individual members of Congress, but what the committees putting forth the amendment actually stated and, more important, what the *text* of the statute says. *Id.*; *Mergens*, 496 U.S. at 248-49.

One related point is important. The dissent attributes one meaning to the words "under God" and proclaims that is the end of the inquiry. We are called upon to discern Congress' purpose. We first stated what we thought the purpose of the words was in *Newdow III*. Congress thought we misinterpreted its purpose. *See* page 3903 *supra*. Thus, Congress set forth its reasons in detail in the 2002 Act.

Another related point is that:

> It cannot be the case that Congress may override a constitutional decision by simply rewriting the history upon which it is based. For instance, Congress surely cannot negate the effect of a Fourth Amendment decision by penning its own account of the scope of lawful searches at the time of the Founding. *Cf. Florida v. White*, 526 U.S. 559, 563-64 (1999) ("In deciding whether a challenged governmental action violates the [Fourth] Amendment, we have taken care to inquire whether the action was regarded as an unlawful search and seizure when the Amendment was framed.").

*United States v. Enas*, 255 F.3d 662, 675 (9th Cir. 2001) (en banc). This principle applies when Congress is trying to re-

write history, not when Congress is trying to clarify our misunderstanding of *its* own purpose in enacting a statute. The 2002 Congress made it clear that we had misunderstood Congress' purpose in our ruling in *Newdow III*. It was thus perfectly appropriate for a different Congress to clarify its present purpose for us by setting forth its reasons in detail in the 2002 Act. And given the margins by which the 2002 Act passed, it is clear that virtually all of the members of Congress agreed we had misinterpreted the purpose of the words "under God."

The dissent calls the 2002 Congress' purpose a sham but does not point to even one place where Congress is incorrect in its recitation of history. The dissent disregards the fact that the Supreme Court has also recognized that the Founders' religious beliefs are a part of our nation's history. "The fact that the Founding Fathers believed devotedly that there was a God and that the unalienable rights of man were rooted in Him is clearly evidenced in their writings, from the Mayflower Compact to the Constitution itself." *Schempp*, 374 U.S. 213.

Further, it makes sense that we must examine the purpose of the most recent Congressional enactment, since under the *Lemon* test we are required to examine purpose.[29] Otherwise,

---

[29]One can certainly question the wisdom of trying to discern a legislature's unitary purpose and whether that purpose, even if it can be discerned, should be a part of the relevant test for Establishment Clause claims. First, it is difficult if not impossible to say that members of a Congress act with one purpose. Second, litigants challenging a governmental action do not tend to care about the government's purpose as much as the effect the governmental action has on their lives. Third, concentrating on the purpose can lead to either striking down a facially secular action that had a religious purpose, or upholding an action with religious content where the legislature was careful to set forth a secular purpose. Although both are remote possibilities because the *Lemon* test has three parts and does not focus solely on legislative purpose, both possibilities highlight the potential pitfalls of including purpose in the analysis. Nevertheless, as long as we are constrained by the *Lemon* test, we must attempt to examine the purpose of the legislature that enacted the statute in issue, which in this case is the 2002 statute.

a perfectly valid measure, with a predominantly secular effect, as is the Pledge, would forever be banned by the politically motivated statements of some legislators (or even someone who is not in the legislature, like Reverend Docherty). The dissent's analysis would grant a heckler's veto to anyone who made just enough noise in support of an enactment so as to defeat an otherwise valid measure. That is not the law.

### 4. Secular purposes that have a religious component to them can be constitutional.

That certain enactments can have both secular and religious purposes and still be constitutional has been recognized by the Supreme Court. "A religious purpose alone is not enough to invalidate an act of a state legislature. The religious purpose must predominate."[30] *Edwards*, 482 U.S. at 598 (Powell, J., concurring). *See also McGowan v. Maryland,* 366 U.S. 420, 442 (1961) ("[T]he 'Establishment' Clause does not ban federal or state regulation of conduct whose reason or effect merely happens to coincide or harmonize with the tenets of some or all religions. In many instances, the Congress or state legislatures conclude that the general welfare of society, wholly apart from any religious considerations, demands such regulation . . . . [T]he fact that [a policy] agrees with the dictates of the Judeo Christian religions while it may disagree with others does not invalidate the regulation.").

We must be "reluctant to attribute unconstitutional motives" to Congress when the stated purpose of the statute is a plausible secular purpose. *Mueller v. Allen*, 463 U.S. 388, 394-95 (1983). Both the purposes of inspiring and solemniz-

---

[30]Webster's defines predominant as:

1. having ascendancy, power, authority, or influence over others; preeminent.

2. preponderant; prominent: a predominant trait; the predominant color of a painting. *See* http://dictionary.reference.com/browse/predominant (last visited January 20, 2010).

ing do have a religious element to them. Nevertheless, that does not make them predominantly religious in nature. The Supreme Court has recognized that sometimes a statute has a religious purpose mixed with a secular purpose, and yet the statute does not violate the Establishment Clause. *Lynch*, 465 U.S. at 680. Indeed, even in *Wallace*, both the majority and Justice Powell's concurrence recognized that a statute can still be constitutional even when the statute has both secular and religious purposes. 472 U.S. at 56 & n.41 (majority) (holding that "even though a statute that is motivated in part by a religious purpose may satisfy the first criterion . . . the First Amendment requires that a statute must be invalidated if it is entirely motivated by a purpose to advance religion" and "a statute must be invalidated if it is *entirely motivated* by a purpose to advance religion."; *id.* at 64 (Powell, J., concurring) ("We have not interpreted the first prong of *Lemon, supra,* however, as requiring that a statute have 'exclusively secular' objectives. . . . If such a requirement existed, much conduct and legislation approved by this Court in the past would have been invalidated.").

The preamble to the 2002 Act specifically mentions *Zorach v. Clausen*, 343 U.S. 306, 313 (1952). In *Zorach*, the plaintiffs brought a challenge under the Establishment Clause to a New York City program releasing children who wanted to attend classes on religion from attendance in public school for part of the day. As is the case here, no student was forced to participate in any religious exercises. *Id.* at 311-12.[31] Similarly, in *Marsh v. Chambers*, the Court held that the opening of the

---

[31]Also, as is the case here, any coercion in *Zorach* was from fellow students, not any of the state employees. Again, the Court dismissed such coercion as not being controlled by the Establishment Clause: "The only allegation in the complaint that bears on the issue [of coercion] is that the operation of the program 'has resulted and inevitably results in the exercise of pressure and coercion upon parents and children to secure attendance by the children for religious instruction.' But this charge does not even implicate the school authorities." *Zorach*, 343 U.S. 306, 312 n.7 (1952).

Nebraska legislature's session with a prayer by a chaplain paid for with public funds was simply an acknowledgment of the role that religion played in our nation's history. *Marsh v. Chambers*, 463 U.S. 783, 793 (1983). There, as the Court observed, the nation's historical practices can outweigh even obvious religious concerns under the Establishment Clause:

> We turn then to the question of whether any features of the Nebraska practice violate the Establishment Clause. Beyond the bare fact that a prayer is offered, three points have been made: first, that a clergyman of only one denomination-Presbyterian-has been selected for 16 years; second, that the chaplain is paid at public expense; and third, that the prayers are in the Judeo-Christian tradition. Weighed against the historical background, these factors do not serve to invalidate Nebraska's practice.

*Id.* at 792-93 (footnotes omitted).

The Court later invalidated opening a graduation ceremony with a prayer, citing the vulnerability of children. The religious component of the words at issue was much stronger; *Lee* involved a religious exercise. Here, a patriotic exercise is involved which only mentions the concept of "God."

**Volume 2 of 4**

The dissent would have us strike down the Pledge because it is not *exclusively* secular, but contains the words "under God." The *Lemon* test, however, asks whether a challenged statute or governmental action is *predominantly* religious or secular, not exclusively secular. *McCreary County*, 545 U.S. at 867-68. This formulation makes sense because oftentimes what one person considers secular, another considers religious. For instance, even the dissent thinks the 1942 version of the Pledge was secular, yet that was the version challenged in *West Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 626, 629 (1943). Dissent at 4028-29. To the Jehovah's Witnesses in *Barnette*, even the version of the Pledge that did not contain the words "under God" violated their religious freedom by causing them to pledge allegiance to something other than God. *Id.*

In *Barnette*, Jehovah's Witnesses challenged a school board regulation requiring students to recite the Pledge and salute the flag, contending that the regulation compelled them to violate their religious prohibition against bowing down to a graven image. 319 U.S. at 626, 629. Refusal to comply with the mandatory Pledge recitation resulted in the expulsion of the student from school and criminal penalties for his parents for the consequent truancy. *Id.* at 630. The school policy did not allow students to opt out for any reason, much less without explanation, as do the schools involved here. The Supreme Court held the school policy mandating recitation of the Pledge violated the Free Speech Clause of the First Amendment, because the policy forced the students, under threat of penalty, to recite the Pledge against their wishes. *Id.* at 633-34, 642. The Supreme Court did not, however, go as far as the dissent would here, and strike down the Pledge of Allegiance. The Supreme Court held that as long as recitation of the Pledge was optional, then the Pledge was constitutional. The same principle applies here. This is one of the great principles of our nation, when it comes to participating in non-violent religious exercises, or holding particular religious views: All may, none must.

**[18]** In the context of the Pledge, the phrase "one Nation under God" constitutes a powerful admission by the government of its own limitations.[32] Although the phrase also has religious connotations, "one Nation under God" in the Pledge is a reference to the historical and political underpinnings of our nation. As Justice Brennan noted, "[T]he revised pledge of allegiance, for example, may merely recognize the historical fact that our Nation was believed to have been founded 'under God.' Thus reciting the pledge may be no more of a religious exercise than the reading aloud of Lincoln's Gettysburg Address, which contains an allusion to the same historical fact." *Schempp*, 374 U.S. at 304 (Brennan, J., concurring).

**[19]** In light of the patriotic context in which the phrase "under God" is recited and the historical context in which that phrase has been enacted into law, we hold its voluntary recitation as part of the Pledge by school children, as practiced by the Rio Linda Union School District, does not violate the Establishment Clause.

## VIII. The Endorsement Test: The Pledge has neither the purpose nor the effect of endorsing religion.

**[20]** For the same reasons we find the Pledge does not violate the *Lemon* test, we similarly find the Pledge does not violate the Endorsement Test, first articulated by Justice O'Connor in her *Lynch* concurrence and subsequently

---

[32]Whether Congress could have represented sufficiently the historical and political foundations of our nation with a wholly secular phrase instead of "one Nation under God" is not for us to say. The Establishment Clause does not require the government to show it has adopted the most narrow means of accomplishing its objectives by avoiding reference to religion or God wherever possible. In upholding the display of a crèche as part of a City's annual Christmas display, the *Lynch* Court stated that "Justice [Brennan in dissent] argues that the City's objectives could have been achieved without including the crèche in the display. True or not, that is irrelevant. The question is whether the display of the crèche violates the Establishment Clause." *Lynch*, 465 U.S. at 681 n.7 (citation omitted).

adopted by a majority of the Court in *County of Allegheny*. 492 U.S. at 578-79. Under the Endorsement Test, we look to see whether the challenged governmental action has the purpose or effect of endorsing, favoring, or promoting religion, particularly if it has the effect of endorsing one religion over another. *Id*. at 593-94. "Endorsement sends a message to non-adherents that they are outsiders, not full members of the political community." *Lynch*, 465 U.S. at 688 (O'Connor, J., concurring).

> [Under the Endorsement Test,] the question is what viewers may fairly understand to be the purpose of the display. That inquiry, of necessity, turns upon the *context* in which the contested object appears: A typical museum setting, though not neutralizing the religious content of a religious painting, negates any message of endorsement of that content.

*County of Allegheny*, 492 U.S. at 595 (internal marks omitted). In other words, under the Endorsement Test, as under the *Lemon* Test, the words "one Nation under God" must be analyzed in terms of the context of the Pledge, which the dissent once again fails to do.

Thus, in *Wallace v. Jaffree*, the Court held Alabama's moment-of-silence statute was unconstitutional because it was "enacted . . . for the sole purpose of expressing the State's endorsement of prayer activities." 472 U.S. at 60. Similarly, in *County of Allegheny*, the Court held a nativity display with a banner proclaiming "Gloria in Excelsis Deo" unconstitutional because it was intended to convey the message that the viewer should give glory to God for the birth of Christ, a specifically Christian belief. 492 U.S. at 580.

**[21]** Here, in contrast, as analyzed in detail above, both the purpose and effect of the Pledge are that of a predominantly patriotic, not a religious, exercise. The phrase "under God" is a recognition of our Founder's political philosophy that a

power greater than the government gives the people their inalienable rights. Thus, the Pledge is an endorsement of our form of government, not of religion or any particular sect.

**[22]** The dissent would have us analyze the Pledge in terms of what a child reciting it may or may not understand about the historical significance of the words being recited. But a child's understanding cannot be the basis for our constitutional analysis. The Supreme Court has expressly rejected this approach: "We decline to employ Establishment Clause jurisprudence using a modified heckler's veto, in which a group's religious activity can be proscribed on the basis of what the youngest members of the audience might misperceive." *Good News Club v. Milford Central Sch.*, 533 U.S. 98, 119 (2001). Rather, the inquiry turns on how a reasonable observer would view the wording of the Pledge as a whole:

> "[B]ecause our concern is with the political community writ large, the endorsement inquiry is not about the perceptions of particular individuals or saving isolated nonadherents from . . . discomfort . . . . It is for this reason that *the reasonable observer* in the endorsement inquiry *must be deemed aware of the history and context* of the community and forum in which the [activity takes place]."

*Id.* (emphasis added) (quoting *Capitol Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753, 779-80 (1995) (O'Connor, J., concurring in part and concurring in the judgment)). We recognize some school children who are unaware of its history may perceive the phrase "under God" in the Pledge to refer exclusively to a monotheistic God of a particular religion. A reasonable observer, however, aware of the history and origins of the words in the Pledge would view the Pledge as a product of this nation's history and political philosophy.

## IX. The Coercion Test: The Pledge does not coerce students to support or participate in religion or in a religious exercise.

This brings us to plaintiffs' next contention, that the recitation of the Pledge in a public school classroom unconstitutionally coerces objecting students into affirming a belief in God. Even though the students in the school are not compelled[33] to recite the Pledge by threat of penalty, are they nonetheless coerced into participating in a religious exercise? Relying primarily on the Supreme Court's decision in *Lee v. Weisman*, plaintiffs ask us to find they are.

We agree that the students in elementary schools are being coerced to listen to the other students recite the Pledge. They may even feel induced to recite the Pledge themselves. Although the School District's Policy does not compel them to recite the Pledge, or even to listen to others reciting the Pledge, we recognize that elementary school children are unlikely to walk out of the classroom in protest. But the main distinction is this: Here, the students are being coerced to participate in a patriotic exercise, not a religious exercise. The Pledge is not a prayer and its recitation is not a religious exercise. The students are not being forced to become involuntary congregants listening to a prayer, as they were in *Lee*. 505 U.S. at 593.

---

[33]Under the School District's policy, the recitation of the Pledge is purely voluntary. Students can choose not to recite the Pledge for any personal reason and to keep that reason to themselves. No student is required to recite or even to hear the recitation of the Pledge, nor can any student be disciplined for refusing to participate. Students can also participate in the recitation of the Pledge and simply omit the words "under God" without fear of discipline. Thus, the free speech claim that was involved in *Barnette*, where the students were forced to say the Pledge, is not at issue in this case. 319 U.S. at 630. We note that even though the *Barnette* Court held students who considered it to be against their religion could not be forced to recite the Pledge, the Court nonetheless did not hold that those students could also prevent *other* students who had no such religious objection from reciting the Pledge, which is what plaintiffs seek here.

Children are coerced into doing all sort of things in school, such as learning to read and to solve mathematical problems. What they must not be coerced into doing is to support or participate in religion, or engage in a religious exercise. *Lee*'s indirect psychological coercion analysis, by its own terms, applies only to religion or to religious exercises, which carry "a particular risk of indirect coercion." *Lee*, 505 U.S. at 592.

In *Lee v. Weisman*, the Supreme Court addressed the constitutionality of an invocation and benediction prayer delivered by a rabbi during a high school graduation ceremony. 505 U.S. at 580. The prayer contained repeated references and thanks to God and, throughout its opinion, the Court described the prayer as a "religious exercise." *See e.g.*, *id.* at 580-82, 588, 589, 598. In analyzing the constitutionality of the prayer, the *Lee* Court adopted and applied what is now known as the coercion test: "[A]t a minimum, the Constitution guarantees that government may not coerce anyone to support or participate in religion or its exercise." *Id.* at 587.[34]

The Supreme Court, in a divided 5-4 decision, held the prayer failed the coercion test and was unconstitutional. Although attendance at the graduation ceremony was voluntary, the students' participation in an event as important as a high school graduation ceremony was in a "fair and real sense obligatory." *Id.* at 586, 595. Although the students were not compelled to say the prayers, the students in attendance would nonetheless be indirectly coerced to participate in the religious exercise or at least maintain respectful silence. *Id.* at 593.

---

[34]Although plaintiffs do not raise the argument RoeChild-2 is required to "support or participate" in religion, the dissent calls attention to these words in *Lee*. It is difficult to see how RoeChild-2 supports or participates in religion when she is neither required to recite nor even to listen to the Pledge, and when it is stipulated by her attorneys that she has never said the Pledge.

The Court in *Lee*, however, expressly confined its holding to religious exercises. "These dominant facts mark and control the confines of our decision: State officials direct the performance of a formal religious exercise at promotional and graduation ceremonies for secondary schools." 505 U.S. at 586; *see also id.* at 599 ("The *sole* question presented is whether a *religious exercise* may be conducted at a graduation ceremony . . . .") (emphasis added).[35] The *Lee* Court noted the Pledge of Allegiance, with "under God" in it by then, was recited at the graduation ceremony before the challenged prayer. *Lee*, 505 U.S. at 583. Although not dispositive of our inquiry, we find it telling that the plaintiffs in *Lee* did not challenge, nor did the Court suggest, the recitation of the Pledge was unconstitutionally coercive. *Lee* did not rule that every mention of God or religion in public school is unconstitutionally coercive. Other Courts of Appeal examining this issue and applying *Lee* agree.

In holding a school policy providing for the daily recitation of the Pledge by students does not violate the Establishment Clause, the Fourth Circuit explained:

> The prayers ruled unconstitutional in *Lee*, *Schempp*, and *Engel* . . . were viewed by the Court as distinctly religious exercises. It was the religious nature of these activities that gave rise to the concern that non-participating students would be indirectly coerced

---

[35]Eight years later, in *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290 (2000), the Court applied *Lee*'s indirect coercion test to invalidate a school policy that permitted, but did not require, students to elect a speaker to deliver "a brief invocation and/or message" before high-school football games. *Id.* at 298 n.6, 301-02. Once again, it was the nature of the activity —a prayer—that coerced those in attendance to participate in an unconstitutional exercise: "Even if we regard every high school student's decision to attend a home football game as purely voluntary, we are nevertheless persuaded that the delivery of a pregame prayer has the improper effect of coercing those present to participate in an act of religious worship." *Id.* at 312.

into accepting a religious message. The indirect coercion analysis discussed in *Lee*, *Schempp*, and *Engel*, simply is not relevant in cases, like this one, challenging non-religious activities. *Even assuming that the recitation of the Pledge contains a risk of indirect coercion, the indirect coercion is not threatening to establish religion, but patriotism.*

*Myers*, 418 F.3d at 408 (emphasis added); *see also Elk Grove*, 542 U.S. at 31 n.4 (Rehnquist, C.J., concurring) ("[W]hatever the virtues and vices of *Lee*, the Court was concerned only with 'formal religious exercise[s],' which the Pledge is not." (citation omitted)); *Sherman*, 980 F.2d at 444-47 (holding that the phrase "under God" does not turn the Pledge from a patriotic exercise into a religious exercise, and finding that the state can coerce students into performing such patriotic exercises as reciting the Pledge).

**[23]** Limiting *Lee*'s indirect coercion analysis to religious exercises is consistent with the purposes of the Establishment Clause. Where, as here, compulsion to recite is absent, government action respects an establishment of religion only if the government coerces students to engage in a religious exercise. Coercion to engage in a patriotic activity, like the Pledge of Allegiance, does not run afoul of the Establishment Clause. The Supreme Court recognized this distinction in the earliest of the school prayer cases, *Engel v. Vitale*, 370 U.S. 421 (1962). In *Engel*, the Court considered a school's policy directing children to say aloud a prayer written by state officials. The Court found this policy violated the Establishment Clause because "[the] program of daily classroom invocation of God's blessings as prescribed in the Regents' prayer is a religious activity. It is a solemn avowal of divine faith and supplication for the blessings of the Almighty. The nature of such a prayer has always been religious." *Id.* at 424-25. The Court was also careful, however, to distinguish the prayer in *Engel* from a ceremonial reference to God in a footnote:

> There is of course nothing in the decision reached here that is inconsistent with the fact that school children and others are officially encouraged to express love for our country by reciting historical documents such as the Declaration of Independence which contain references to the Deity or by singing officially espoused anthems which include the composer's professions of faith in a Supreme Being, or with the fact that there are many manifestations in our public life of belief in God. Such patriotic or ceremonial occasions bear no true resemblance to the unquestioned religious exercise that the State of New York has sponsored in this instance.

*Id.* at 435 n. 21. Thus, the Court drew an explicit distinction between patriotic mentions of God on the one hand, and prayer, an "unquestioned religious exercise," on the other. Therefore, we hold the School District's Policy providing for the voluntary recitation of the Pledge does not violate the *Lee* coercion test.

## X.  *Newdow III* Does Not Constitute Binding Precedent.

**[24]** Finally, we explain why *Newdow III* does not control our analysis. As all members of our panel agree, the district court erred by holding this court's decision in *Newdow III* is binding precedent that district courts in this circuit and this court must follow. The Supreme Court in *Elk Grove* reversed the *Newdow III* decision, holding the sole plaintiff, Newdow, lacked prudential standing to challenge the constitutionality of the Pledge. Thus, the Supreme Court held *Newdow III* erred by reaching the merits of the case.

**[25]** There is an important difference, overlooked by the district court, between a reversal on a *merits* ground (a question of substantive law) and a reversal on a *threshold* ground (a question whether the court has jurisdiction to reach the substantive law claims). Merits questions may be independent of

each other; reversal on one merits ground may leave the decisions reached on other grounds intact. In contrast, when the Supreme Court reverses a lower court's decision on a threshold question, such as prudential standing, it effectively holds the lower court erred by reaching the merits of the case. *See Tenet v. Doe*, 544 U.S. 1, 6 n.4 (2005) ("[T]he prudential standing doctrine [is a] 'threshold question.' "). This is precisely what the Supreme Court did in *Elk Grove*. Because the Supreme Court held the *Newdow III* court erred by deciding the Establishment Clause question, *Newdow III*'s holding on that question is not precedential. To hold otherwise would give precedential effect to the determination of an issue that should never have been decided. *Preiser v. Newkirk*, 422 U.S. 395, 401 (1975) ("[A] federal court has neither the power to render advisory opinions nor to decide questions that cannot affect the rights of litigants in the case before them.") (citations and internal quotation marks omitted).[36]

**[26]** *Newdow III* is not binding for another, more important, reason: The law has changed. Congress, in 2002, reenacted the Pledge in response to this court's opinion in *Newdow I*. It is the 2002 Congress' purpose we are called upon to examine. The findings of the 2002 Congress make this a very different case from that evaluated by this court in *Newdow I* because the 2002 Congress detailed findings that make it clear

---

[36]The district court noted several courts have reached the merits of a case without deciding a disputed prudential standing question. True, courts have decided cases that presented "relatively easy" merits questions against the plaintiff without determining whether the plaintiff has standing. *See e.g.*, *Am. Iron & Steel Inst. v. OSHA*, 182 F.3d 1261, 1274 n.10 (11th Cir. 1999). Nevertheless, no court has ever bypassed a prudential standing question to rule *in favor* of the party *lacking* prudential standing, but attempting to invoke the court's subject matter jurisdiction as to the merits. Because the Supreme Court ruled our *Newdow III* court should not have bypassed the prudential standing question to rule in favor of Newdow, *Newdow III* 's ruling on the merits is not binding.

the 2002 Act was enacted for secular reasons which are constitutional.[37]

Furthermore, the Supreme Court clarified the analysis to be applied to Establishment Clause cases in *Van Orden* and *McCreary County*, which came down in 2005 after our 2003 decision in *Newdow III*. These cases are instrumental in showing us that the majority in *Newdow III* (of which Judge Reinhardt was a member) used an incomplete analysis when it concentrated solely on the two words "under God." For the reasons we express herein, we simply cannot agree that this is the correct focus under the current Supreme Court law.

## XI.   Conclusion

[27] We hold that California Education Code § 52720 and the School District's Policy of having teachers lead students in the daily recitation of the Pledge, and allowing those who do not wish to participate to refuse to do so with impunity, do not violate the Establishment Clause. Therefore, we reverse the decision of the district court holding the School District's Policy unconstitutional and vacate the permanent injunction prohibiting the recitation of the Pledge by willing students.

**REVERSED.**

---

[37]Although the 2002 Act was technically passed before issuance of *Newdow III*, neither the parties nor this court addressed the effect the 2002 Act had on the analysis. *Newdow III*, though decided after the 2002 Act, addressed the newly raised questions of whether Newdow had standing and authority to represent his child, and did not revisit the fundamental Establishment Clause analysis of *Newdow I*.

REINHARDT, Circuit Judge, dissenting:

## Contents

Introduction ....................................................................3931

I.     The Majority's Fundamental Errors ........................3936

II.    Historical and Factual Background ........................3939
     A.    Religious Origins of the "Under God"
         Amendment .....................................................3943
     B.    Congressional Enactment of the "Under
         God" Amendment ...........................................3948
     C.    The 1954 Amendment and America's
         Schoolchildren ................................................3956
     D.    The 2002 "Reaffirmation" ..............................3966
     E.    Jan Roe and Her Child's Constitutional
         Claim ...............................................................3974

III.   The 1954 Amendment and This Appeal ...............3976
     A.    Recent Contrivance of the Majority's
         Novel Theory ..................................................3979
     B.    Immateriality of the 2002 Legislation ...........3983
     C.    The Issue: The Constitutionality of the
         1954 Amendment As Applied ........................3989

IV.   Establishment Clause Tests ...................................3990
     A.    The *Lemon* Test and the
         "Under God" Amendment ..............................3992
     B.    The Endorsement Test and the "Under
         God" Amendment ...........................................4024
     C.    The Coercion Test and the "Under God"
         Amendment .....................................................4029
     D.    Application of the Tests to the 2002
         Legislation ......................................................4042

V.     The Inapplicability of Alternative Theories ..........4043
     A.    Supreme Court Dicta ......................................4044
     B.    Ceremonial Deism .........................................4054
     C.    The De Minimis Theory .................................4060

VI.   Conclusion ...........................................................4064

**Introduction**

Were this a case to be decided on the basis of the law or the Constitution, the outcome would be clear. Under no sound legal analysis adhering to binding Supreme Court precedent could this court uphold state-directed, teacher-led, daily recitation of the "under God" version of the Pledge of Allegiance by children in public schools. It is not the recitation of the Pledge as it long endured that is at issue here, but its recitation with the congressionally added two words, "under God" — words added in 1954 for the specific religious purpose, among others, of indoctrinating public schoolchildren with a religious belief. The recitations of the amended version as conducted by the Rio Linda Union and other school districts fail all three of the Court's Establishment Clause tests: The recitation of the Pledge in its historic secular version would not fail any of them. Only a desire to change the rules regarding the separation of church and state or an unwillingness to place this court on the unpopular side of a highly controversial dispute regarding both patriotism and religion could explain the decision the members of the majority reach here and the lengths to which their muddled and self-contradictory decision goes in order to reach the result they do.

To put it bluntly, no judge familiar with the history of the Pledge could in good conscience believe, as today's majority purports to do, that the words "under God" were inserted into the Pledge for any purpose other than an explicitly and predominantly religious one: "to recognize the power and the universality of God in our pledge of allegiance;" to "acknowledge the dependence of our people, and our Government upon the moral direction and the restraints of religion," 100 Cong. Rec. 7590-91 (1954); and to indoctrinate schoolchildren in the belief that God exists, *id.* at 5915, 6919. Nor could any judge familiar with controlling Supreme Court precedent seriously deny that carrying out such an indoctrination in a public school classroom unconstitutionally forces many young children either to profess a religious belief antithetical to their

personal views or to declare themselves through their silence or nonparticipation to be protesting nonbelievers, thereby subjecting themselves to hostility and ridicule.

It is equally clear that no judge familiar with our constitutional history and the history of the Pledge could legitimately rely on a 2002 "reaffirmation" to justify the incorporation of the words "under God" into the Pledge in 1954 by a statutory amendment, or suggest that, in determining the question before us, we should not look to that amendment but only to the Pledge itself, as if the finite act in 1954 of transforming a purely secular patriotic pledge into a vehicle to promote religion, and to indoctrinate public schoolchildren with a belief in God, had never occurred. Finally, no such judge could ignore the fact that in a clearly controlling decision that binds us here the Supreme Court has directed us, in deciding a constitutional question such as we now face, to examine the 1954 amendment and why it was adopted rather than to look to the pertinent statute, here the Pledge, as a whole. *See Wallace v. Jaffree*, 472 U.S. 38, 58-61 (1985).

The undeniably religious purpose of the "under God" amendment to the Pledge and the inherently coercive nature of its teacher-led daily recitation in public schools ought to be sufficient under any Establishment Clause analysis to vindicate Jan Roe and her child's constitutional claim, and to require that the Pledge of Allegiance, when recited as part of a daily state-directed, teacher-led program, be performed in its original, pre-amendment secular incarnation that served us so well for generations. Surely, our original Pledge, without the McCarthy-era effort to indoctrinate our nation's children with a state-held religious belief, was no less patriotic. For purposes of this case, the only difference between the original secular Pledge and the amended religious version is that the former did not subject, and was not designed to subject, our children to an attempt by their government to impose on them a religious belief regarding the existence of God. We should indeed have had more faith in our country, our citizens, and

our Constitution than we exhibited at the peak of the McCarthy era when we enacted the religious amendment to our Pledge of Allegiance, in part to inculcate in our children a belief in God. In doing so, we abandoned our historic principle that secular matters were for the state and matters of faith were for the church. The majority does so again today, sadly, by twisting, distorting, and misrepresenting the law, as well as the issues that are before us.

Today's majority opinion will undoubtedly be celebrated, at least publicly, by almost all political figures, and by many citizens as well, without regard for the constitutional principles it violates and without regard for the judicial precedents it defies and distorts, just as this court's decision in *Newdow I*[1] was condemned by so many who did not even bother to read it and simply rushed to join the political bandwagon. As before, there will be little attention paid to the constitutional rights of the minority or to the fundamental tenets of the Establishment Clause. Instead, to the joy or relief, as the case may be, of the two members of the majority, this court's willingness to abandon its constitutional responsibilities will be praised as patriotic and may even burnish the court's reputation among those who believe that it adheres too strictly to the dictates of the Constitution or that it values excessively the mandate of the Bill of Rights.

If a majority of the populace comes to believe in a patriotism that requires the abdication of judicial responsibility, if it comes to accept that we can only honor our nation by ignoring its basic values, if it comes to embrace a practice of bringing together the many by forfeiting the rights of the few, then

---

[1]*Newdow v. U.S. Cong.*, 292 F.3d 597 (9th Cir. 2002) ("*Newdow I*"), *amended by* 328 F.3d 482 (9th Cir. 2003) ("*Newdow III*"), *rev'd on other grounds sub nom. Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1 (2004); *see also Newdow v. U.S. Cong.*, 313 F.3d 500 (9th Cir. 2002) ("*Newdow II*") (addressing a justiciability issue without making any change to *Newdow I*).

we clearly will have imposed an untenable burden not only on our nation in general but on the judiciary in particular. In such circumstances, adherence to constitutional principles by all members of this court and all members of the judiciary will become all the more important. I do not doubt that many Americans feel bound together by their faith in God, but whatever beliefs may be shared by a *majority* of our citizens, it is respect for the rights of minorities and for the Constitution itself that must bind us *all*. That is not an easily achieved objective, as today's decision shows, but it remains an essential one.

History leaves no doubt that Congress inserted the words "under God" in the Pledge of Allegiance in order to inculcate in America's youth a belief in religion, and specifically a belief in God. No matter the majority's attempts to obfuscate the question, the record on that point is clear. It is equally clear that the daily, state-sponsored, teacher-led recitation of the "under God" version of the Pledge in public schools, institutions in which First Amendment rights are most in need of vigilant protection, violates the Establishment Clause, under any legal analysis in which this court may properly engage. If our constitutional principles are to be redefined in the manner the majority suggests (and I would hope that they would not be), only the Supreme Court may do so, not two members of an appellate court who for varying reasons wish to repudiate our earlier decision.

The Constitution "has never meant that a majority could use the machinery of the State to practice its beliefs." *Sch. Dist. of Abington Twp. v. Schemp*, 374 U.S. 203, 226 (1963). It was to forestall practices such as are currently engaged in by the Rio Linda and other school districts that the Founders adopted the Establishment Clause while deliberately omitting the term "God" from the Constitution. The Founders sought to preserve a strict division between the religious and the secular, and between the Church and the State. As appellate

judges it is our duty to preserve that division, unless and until the Supreme Court instructs us to the contrary.

The 2002 reaffirmation[2] by Congress made no change in the Pledge as amended in 1954, but simply purported to reaffirm the earlier Congress's action fifty years before, when it added to it the additional phrase "under God"; it also sought to explain why it believed that the earlier Congress's action was constitutional at the time it was taken, and why it thought that this court's interpretation of the Constitution in *Newdow I* half a century after the amendment was adopted was wrong.[3] Any effort to address the issue before us, however, must be based not on what happened in 2002, long after the "under God" amendment was adopted, but on the facts and circumstances surrounding the enactment of that amendment in 1954, as well as on other relevant historical facts. There is simply no basis in law, constitutional or otherwise, for using an event that occurred many years later, let alone one of no legal significance, to attempt to rewrite history: here, the history relating to the enactment of the amendment to the Pledge

---

[2]Throughout this dissent, the terms "reaffirmation" and "recodification" are used interchangeably when referring to the 2002 legislation. The former term is appropriate because the legislation was entitled "An Act To reaffirm the reference to one Nation under God in the Pledge of Allegiance." Pub. L. No. 107-293, 116 Stat. 2057 (2002). The latter term is also appropriate because the act contained two "codification" sections, one of which recodified "the exact language that has appeared in the Pledge for decades" at 4 U.S.C. § 4, and the other of which recodified "the exact language that has appeared in the [National] Motto for decades" at 36 U.S.C. § 302. *Id.* at 2060-61.

[3]The only substantive change made by the 2002 recodification involves a minor modification of the manner in which the Pledge is to be recited. Although the majority implies that all of the statutory provisions that explain how the Pledge should be recited were added in 2002, maj. op. at 3894, those instructions were in fact added in 1976. *See* Pub. L. No. 94-344, 90 Stat. 810 (1976). The 2002 Congress modified only the instruction that "men should remove their headdress" when reciting the Pledge, to read "men should remove *any non-religious* headdress." Pub. L. No. 107-293, 116 Stat. 2057, 2060 (2002) (emphasis added).

in 1954. History cannot be eradicated by a different Congress's recitation long afterwards of its version of the events that preceded or followed the actions of an earlier body. If this is not apparent to all on its face, it is clear as a matter of law, because the Supreme Court has so squarely held. *See McCreary County v. ACLU of Ky.*, 545 U.S. 844, 871-72 (2005).

## I.    The Majority's Fundamental Errors

A reader of the majority opinion, if unfamiliar with the facts of this case and the law that intermediate courts are bound to apply to those facts, would be left with a number of misconceptions about both. It might be helpful to identify the most fundamental of those misconceptions at the outset, prior to engaging in the more detailed examination of the facts and the law that follows. Although the majority's reasoning is far from clear, its conclusion that the state-directed, teacher-led, daily recitation of the "under God" version of the Pledge in public schools complies with the Establishment Clause appears to result from at least seven major errors in its legal analysis.

First, this case involves only the phrase "under God" as recited by young children as part of a state-directed, teacher-led, daily program in public schools. Only those two words are at issue. The plaintiffs in this case do not ask us to "strike down the Pledge" or to prohibit its recitation, as the majority claims. Rather, they ask only that the two words be stricken and that the state-directed, teacher-led, daily recitation return to the original, purely secular Pledge of Allegiance that schoolchildren had recited long before Congress enacted it into law in 1942, and long before Congress added the religious phrase at issue here by statutory amendment in 1954.

Second, the majority asserts that "under God" as that term appears in the amendment to the Pledge is not a religious phrase, and was not inserted in the Pledge for a religious pur-

pose. Instead, the majority argues that "under God" is simply "a reference to the historical and political underpinnings of our nation," that its purpose is to remind us that ours is a "limited government" and, thus, that the term as adopted by Congress has a predominantly secular meaning and purpose. There is simply no basis in fact or law for so absurd an assertion. If the plain meaning of the words "under God" were not enough to demonstrate beyond any doubt that the majority's contention borders on the irrational, and that the term is predominantly, if not entirely, religious in both meaning and purpose, the overwhelmingly religious intent of the legislators who added the phrase to the Pledge, as shown by the unanimous statements to that effect in the Congressional Record, would remove any possible doubt from the mind of any objective person.

Third, the majority states that in order to determine the constitutionality of the amendment adding the phrase "under God" to the Pledge, we must examine the Pledge as a whole and not the amendment. Well-established controlling Supreme Court law is squarely to the contrary. *See Wallace v. Jaffree*, 472 U.S. 38 (1985). *Wallace* makes it clear, beyond dispute, that it is the amendment and its language, not the Pledge in its entirety, that courts must examine when, as here, it is the amendment, not the Pledge as a whole, that is the subject of the claim of unconstitutionality. The majority's error in this respect causes it to analyze the legal issues improperly throughout its opinion. Examining the wrong issue inevitably leads the majority to reach the wrong result.

Fourth, the amendment to the Pledge that added the phrase "under God" was, contrary to the majority's contention, adopted in 1954, not in 2002. Congress's reaffirmation of the "under God" amendment in response to this court's *Newdow I* decision is of no legal consequence. Congress could not and did not change the meaning and purpose of the 1954 amendment in 2002 and did not purport to do so. It simply proclaimed that we were wrong in our legal ruling and that we

erred in our constitutional analysis of the First Amendment issue. Although the 2002 Congress did not purport to suggest a different purpose for Congress's 1954 action than did the earlier Congress, even had it sought to add a secular purpose, such as to remind us of our nation's "limited government" or "historical principles of governance," doing so would not have changed the overwhelmingly predominant religious meaning and purpose of the amendment. *See McCreary County v. ACLU of Ky.*, 545 U.S. 844 (2005). Nor, certainly, would it have changed the effect of the amendment upon the schoolchildren who are subjected to the state-directed, teacher-led, daily recitations of the Pledge.

Fifth, the majority suggests that the School District's policy is constitutional because under that policy only "willing" students recite the Pledge. The majority does not and cannot make that argument explicitly, however, because it is well-established that the Constitution forbids governmental coercion, and not just compulsion, of religious belief. The majority acknowledges at a later point in its opinion that public schoolchildren are "coerced to participate" in the state-directed, teacher-led recitation of the "under God" version of the Pledge, but then excuses that coercion on other grounds that are as fallacious as its initial argument.

Sixth, the majority repeatedly asserts that under the coercion test only "religious exercises" may be deemed unconstitutional. The majority's "religious exercise" limitation conflicts with the express holding of *Lee v. Weisman*, 505 U.S. 577, 587 (1992), as well as the Supreme Court's decisions in *Stone v. Graham*, 449 U.S. 39 (1980) (per curiam), and *Edwards v. Aguillard*, 482 U.S. 578 (1987). Coercion is prohibited with respect to participation in religious activities as well as other efforts to support or promote religion. Moreover, the majority errs in its contention that because the Pledge constitutes a patriotic rather than a religious exercise, the religious component does not fail the coercion test. A religious component included in a secular exercise, whether or

not a patriotic one, is subject to the same coercion rules as is any other religious practice to which public school students are subjected. Further, the majority's assertion that the coerced recitation of the Pledge does not require "a personal affirmation . . . that the speaker believes in God" is not only contradicted within the majority opinion itself, but is foreclosed by the Supreme Court's explicit statement that the Pledge "requires affirmation of a belief." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 633 (1943). In any event, it is self-evident that one cannot profess to believe that our nation is "under God" without professing to believe that God exists.

Seventh, the majority appears at several points in its opinion to imply that the use of the term "under God" in the Pledge may be justified by the doctrine of ceremonial deism. The theory of ceremonial deism has never been approved by the Supreme Court for use in Establishment Clause cases in general; the Court has, however, expressly disapproved the use of that doctrine to justify state-sponsored religious practices *in the public schools*. *Lee*, 505 U.S. at 596-97. The majority's suggestion that the doctrine may be applicable here is clearly erroneous.

If the majority made only one or two of the seven fundamental errors described above, its conclusion that the state-directed, teacher-led, daily recitation of the "under God" version of the Pledge is constitutional could not stand. With all seven errors, the majority sets an all-time record for failure to conform to any part of any of the three tests governing compliance with the Establishment Clause. Unless and until those tests are reversed or repudiated by the Supreme Court, an appellate court is not free to disregard the law and the Constitution in the manner that the two judges in the majority have in the case before us.

## II.   Historical and Factual Background

To begin with, this case concerns the daily recitation of a state-directed, teacher-led, religious version of the Pledge of

Allegiance *in public schools*, a setting that the Supreme Court has always considered especially significant to its Establishment Clause analysis. A proper constitutional analysis must give substantial weight to the critical fact that we are dealing with "young impressionable children whose school attendance is statutorily compelled." *Sch. Dist. of Abington Twp. v. Schemp*, 374 U.S. 203, 307 (1963) (Goldberg, J., concurring); *Edwards v. Aguillard*, 482 U.S. 578, 584 (1987) (same). We must also bear in mind that the issue before us is whether those children may, regardless of their own fundamental views, be subjected to a daily Pledge that includes a religious component, as opposed to simply reciting the historic version of the Pledge that contained no reference to God. However, before discussing the complex case law regarding the Establishment Clause, or the less complex case law regarding the relationship between the Establishment Clause and public schoolchildren, it is important to have a full understanding of the words at the heart of this controversy, the added two words of the amended Pledge, and the history of how the Pledge grew from twenty-nine to thirty-one words in 1954.

For many Americans, the current version of the Pledge is the only version they have ever known. Some individuals not familiar with our political history may even be under the impression that its language dates back to the founding fathers.[4] But those of us who attended school before the 1950s, including at least two members of this panel, may remember a different Pledge of Allegiance, a wholly secular pledge that was based solely on patriotism and not on any attempt at religious indoctrination. That version of the Pledge, the original version, was written by Francis Bellamy in 1892. It read: "I pledge allegiance, to my flag, and to the Republic for which

---

[4]See, for example, the words of former Governor Sarah Palin of Alaska: "If [the Pledge] was good enough for the founding fathers, its [*sic*] good enough for me . . . ." Eagle Forum Alaska, *2006 Gubernatorial Candidate Questionnaire*, July 31, 2006, http://irregulartimes.com/eagle-forum-2006-gubernatorial-candidate.html.

it stands — one Nation indivisible — with Liberty and Justice for all." The Pledge achieved such popularity and acceptability that in 1942, Congress codified it, departing only slightly from Bellamy's words by replacing "my flag" with "the flag of the United States of America," thereby recognizing officially the minor change that had been made in practice a generation earlier.[5] Neither Bellamy's version nor the slightly modified official version, recited for many years by schoolchildren throughout the land, contained any language even remotely associated with religious beliefs.

It was not until 1954 that the provision amending the Pledge was enacted, inserting the words "under God" into the Pledge of Allegiance, and it is at this point that the majority's version of history diverges sharply from the facts. In the majority's view, the words "under God" were added to the Pledge for a predominantly *secular* purpose. That is simply not the case. Seizing on the fact that the amendment to the Pledge was adopted during the Cold War, the majority asserts that the "words 'under God' were added . . . to reinforce the idea that our nation is founded upon a concept of a *limited government*, in stark contrast to . . . communist forms of government." Maj. op. at 3909 (emphasis added).[6] In the majori-

---

[5]Act of June 22, 1942, Pub. L. No. 77-623, §7, 56 Stat. 377, 380 (1942) (codified as amended at 4 U.S.C. § 4 (2006)). The change from "my flag" to "the flag of the United States" had already taken place informally in the 1920s when the American Legion and the Daughters of the American Revolution, "[c]oncern[ed] over the number of immigrants living in the United States," modified the then-unofficial Pledge to emphasize that "my flag" meant the American flag. *See* Linda P. McKenzie, Note, *The Pledge of Allegiance: One Nation Under God?*, 46 ARIZ. L. REV. 379, 387 (2004); *see also* RICHARD J. ELLIS, TO THE FLAG: THE UNLIKELY HISTORY OF THE PLEDGE OF ALLEGIANCE 66 (2005) (noting that the central proponent of the change "felt that the ambiguity of 'my flag' allowed devious or disloyal immigrants to avoid pledging their allegiance to the United States").

[6]The majority asserts that "under God" conveys the secular principle of "limited government" because it refers to "the Founding Fathers' belief that the people of this nation are endowed by their Creator with certain

ty's version of the facts, religion played at most only a minor part in the effort to amend the Pledge. Nothing could be further from the truth. As anyone with a whit of common sense will readily acknowledge, the word "God" carries predominantly, indeed exclusively, religious significance. While differentiating the United States from the Soviet Union was certainly *a* factor motivating the amendment of the Pledge, even that differentiation was based largely on the Soviets' purported belief in atheism and America's belief in religion, and particularly in God. Indeed, the overwhelmingly predominant purpose motivating the amendment of the Pledge was unqualifiedly religious in nature: Congress declared that "true" Americans believe in God and sought to imprint this belief on the minds of schoolchildren across the country.

Were the majority to engage seriously with the history of the Pledge, it would be compelled to recognize beyond any doubt that the words "under God" were inserted with the explicit and deliberate intention of endorsing a particular religious belief, of compelling nonadherents to that belief to pronounce the belief publicly or be labeled un-American, and of instilling the particular religious view in America's youth through daily indoctrination in the public schools.

For want of a respectable constitutional argument, the majority seeks to persuade us that "[i]t is the 2002 statute . . . that sets forth our current Pledge." Maj. op. at 3894. That statement is, at best, misleading: the "current Pledge" was

---

inalienable rights." Maj. op. at 3873. The majority's explanation of the phrase bears a suspicious resemblance to the platform of the Tea Party movement, which proclaims itself to be a "group of like-minded people who desire our God given Individual Freedoms which were written out by the Founding Fathers. *We believe in Limited Government*[!]" Tea Party Nation, http://www.teapartynation.com (last visited February 26, 2010) (emphasis added). But even the Tea Party has not suggested previously that the phrase "under God" was intended to refer presciently to its platform.

enacted in 1954, and its language has not changed in any respect since the words "under God" were added at that time. As I shall explain, *see infra* Part III, the majority's attempt to use the 2002 legislation as the legal basis for the incorporation of the two additional words into the Pledge in 1954 is patently without merit and is contrary to logic, reason, and binding Supreme Court law. The "reaffirmation" by the later Congress does not in any way affect the constitutionality of the "under God" amendment as recited by public schoolchildren in the present or in any other circumstances.

## A.   Religious Origins of the "Under God" Amendment

For most of its 117 year existence, the Pledge of Allegiance existed, and was recited across the nation, in a purely secular form. The overwhelmingly religious purpose driving the decision to amend the Pledge into its current form is apparent from the earliest efforts to do so. Those efforts began in 1951, when the Knights of Columbus, a "major Roman Catholic fraternal order,"[7] adopted a resolution requiring that the words "under God" be included in the Pledge of Allegiance when said at organizational meetings.[8] The following year, the Supreme Council of the organization passed a resolution urging the United States Congress to adopt the Knights' version of the Pledge, and within a few months Representative Louis Rabaut, a Catholic congressman from Michigan, sponsored a bill to do just that.

That first bill, however, did not gain much traction, perhaps because the group backing its adoption was composed of Roman Catholics, who were, at the time, disdained as both foreign and ignorant by many segments of American society.[9]

---

[7]EDWIN S. GAUSTAD, A DOCUMENTARY HISTORY OF RELIGION IN AMERICA 189 (1986).

[8]*See* JOHN W. BAER, THE PLEDGE OF ALLEGIANCE: A CENTENNIAL HISTORY, 1892-1992 at 62 (1992).

[9]*See, e.g.*, JOHN T. MCGREEVY, CATHOLICISM AND AMERICAN FREEDOM: A HISTORY 166-88 (2003) (describing the view of American intellectuals in

No Catholic had been nominated for President of the United States by a major political party until 1928, when the Catholicism of Al Smith, the first member of that religion to become his party's standard bearer, was a major issue in the presidential campaign. Smith lost the election to Herbert Hoover by nearly twenty percentage points, and no other Catholic was again nominated until after the Pledge had been amended. Following Rabaut's introduction of his bill, the Knights sent a second, identical resolution to every member of the House and Senate. ELLIS, *supra* note, at 131. Yet, "despite the [Knights'] best efforts . . . the movement to have the 'under God' clause added to the Pledge languished throughout 1953." *Id.* at 132. Thus, the Catholic effort to place God in the Pledge appeared to be dead.

The next year, however, the words "under God" received a full-throated endorsement from members of a more mainstream and popular Christian denomination — a major Protestant religion. On February 7, 1954, the Reverend George M. Docherty, a highly regarded Presbyterian minister, delivered a sermon on "the American way of life" to an august congregation at Washington's prestigious New York Avenue Presbyterian Church: many members of Congress were present, and seated in President Lincoln's former pew were President and Mrs. Eisenhower. *See* 100 Cong. Rec. 1700 (1954). Reverend Docherty seized this opportunity to encourage the

the 1950s that Catholicism and Catholic culture were anti-scientific and anti-democratic); John M. Breen, *Justice and Jesuit Legal Education: A Critique*, 36 LOY. U. CHI. L.J. 383, 405 n.93 (2005) (noting "the virulently anti-Catholic" sentiment of the 1940s); Thomas C. Berg, *Anti-Catholicism and Modern Church-State Relations*, 33 Loy. U. Chi. L.J. 121, 168-69 (2001) (noting that "explicit dislike of Catholicism" played an "overwhelming role in church-state debates . . . in the 1940s and 1950s"). For arguments that anti-Catholicism is still a strong force in American culture, see PHILIP JENKINS, THE NEW ANTI-CATHOLICISM: THE LAST ACCEPTABLE PREJUDICE(2003); MARK S. MASSA, ANTI-CATHOLICISM IN AMERICA: THE LAST ACCEPT- PREJUDICE (2003).

assembled national leaders to add the words "under God" to the Pledge of Allegiance, arguing that such a phrase was necessary to distinguish America from "militantly atheistic communism,"[10] and, more specifically, to distinguish the "Judaio-Christian" beliefs governing this nation from the "secularized Godless" philosophy that motivated our opponents in the "theological war" in which we were engaged. Contrary to the majority's characterization of the purpose underlying the proposed insertion as predominantly secular, Reverend Docherty explicitly denied that the phrase "under God" emphasized a difference in political philosophies as the majority contends. Rather, he said:

> We face today *a theological war*. It is not basically a conflict between two political philosophies — Thomas Jefferson's political democracy over against Lenin's communistic state.
>
> Nor is it a conflict fundamentally between two economic systems[,] between, shall we say, Adam Smith['s] "Wealth of Nations" and Karl Marx['s] "Das Capital."
>
> It is a fight for the freedom of the human personality. It is not simply, "Man's inhumanity to man." It is Armageddon, a battle of the gods. *It is the view of man as it comes down to us from the Judaio-Christian civilization in mortal combat against modern, secularized, godless humanity.*
>
> . . . [T]he pledge of allegiance . . . seems to me to omit this theological implication that is inherent within the "American Way of Life." It should be

---

[10]All quotations from the sermon are from George M. Docherty, Pastor, The New York Avenue Presbyterian Church, Sermon Marking Lincoln Sunday (Feb. 7, 1954), *available at* http://tinyurl.com/DochertySermon. All emphases have been added.

"One nation, indivisible, *Under God*." Once "Under God," *then* we can define what we mean by "liberty and justice for all." To omit the words "under God" in the pledge of allegiance is to omit the definitive character of the "American Way of Life."

Diverging for a moment from his theological thesis, Reverend Docherty then paused to address those who "might assert this [proposed alteration] to be a violation of the First Amendment to the Constitution." Reverend Docherty had at least some specific critics in mind, seeing as when he had made a similar proposal to amend the Pledge in a sermon two years earlier "several of [his] colleagues" in the clergy "declared it would violate the principle of separation of church and state."[11] In the Reverend's view, however, as expressed in his church lecture to the President and the assembled members of Congress, it was "quite the opposite," as the proposed insertion would not create a "state church in this land such as exists in England" nor would it discriminate between "the great Jewish Community, and the people of the Moslem faith, and the myriad denominations of Christians in the land."[12]

The Reverend was mindful, however, that he omitted a group from his list: "What then of the honest atheist?" he asked rhetorically. Here his answer was simple:

---

[11]Kenneth Dole, *Dr. Docherty Originated "Under God" in Flag Pledge*, WASH. POST, Mar. 12, 1955, at 10.

[12]This statement demonstrates that the Reverend was a far better theologian than he was a constitutional scholar, as the Supreme Court had explicitly held that the First Amendment prohibits more than simply the official establishment of a state church or the discrimination between various sects of Judeo-Christianity. Almost six years to the day before Docherty's sermon, the Supreme Court had held that "[t]he 'establishment of religion' clause of the First Amendment means at least this: Neither a state nor the Federal Government . . . . can pass laws which aid one religion, *aid all religions*, or prefer one religion over another." *Everson v. Bd. of Educ. of Ewing*, 330 U.S. 1, 15 (1947) (emphasis added).

[A]n atheistic American is a contradiction in terms. . . .

[T]hey really are spiritual parasites. . . . [They] are living upon the accumulated spiritual capital of a Judaio-Christian civilization, and at the same time, deny the God who revealed the divine principles upon which the ethics of this Country grow. . . .

. . . .

[I]f he denies the Christian ethic, [the atheist] falls short of the American ideal of life.

The Reverend's central message was clear: the American way of life "is defined by a fundamental belief in God. [It is a] way of life that sees man, not as the ultimate outcome of a mysterious concatenation of evolutionary process, but a sentient being created by God and seeking to know His will . . . ." Only by adding the words "under God" to the Pledge of Allegiance could that oath truly be a pledge "to the United States of America."

The assembled legislators in Reverend Docherty's pews were enraptured by his sermon. One was so inspired that he felt compelled to break the Sabbath in order to draft the historic bill amending the Pledge of Allegiance in time to introduce it the next morning: "The following day, one of Docherty's petitioners [sic], Representative Charles Oakman, introduced a resolution in the House that would codify the inclusion of 'under God' in the Pledge. Two days later, Senator Homer Ferguson presented an identical resolution to the Senate."[13] Both legislators explicitly stated that they introduced

---

[13]Brian Wheeler, Note, *The Pledge of Allegiance in the Classroom and the Court: An Epic Struggle over the Meaning of the Establishment Clause of the First Amendment*, 2008 B.Y.U. Educ. & L. J. 281, 286 (footnote omitted).

their proposed bills in direct response to Reverend Docherty's sermon. *See* 100 Cong. Rec. 7759 (Rep. Oakman); *id.* at 6231 (Sen. Ferguson). Later that same week, Representative Rabaut, who had introduced the bill a year earlier that was "the grandaddy of them all," *id.* at 7758, took to the floor of the House to comment on the inspiring impact of Docherty's "eloquently" delivered sermon. *See id.* at 1700. Indeed, Docherty's "sermon was so powerful that in its wake no fewer than seventeen bills were introduced to incorporate God into the Pledge of Allegiance."[14]

### B.   Congressional Enactment of the "Under God" Amendment

The strong religious sentiment driving the amendment to the Pledge only became more pietistic when the topic moved from the pulpit into the halls of Congress. The discussion of the proposed amendment could hardly be called a debate, as no one stood in opposition,[15] but a parade of legislators still

---

[14]Steven B. Epstein, *Rethinking the Constitutionality of Ceremonial Deism*, 96 COLUM. L. REV. 2083, 2119 (1996) (citing MARK SILK, SPIRITUAL POLITICS: RELIGION AND AMERICA SINCE WORLD WAR II 96 (1988)). All of the tributes paid to Reverend Docherty caused at least one group to feel slighted: "The [attention] drew a protest from Luke E. Hart, Supreme Knight of the Knights of Columbus . . . who pointed out that the Knights of Columbus was the first organization to use the modified pledge." *Who Placed "Under God" in Pledge to the Flag?* WASH. POST, Mar. 26, 1955, at 8.

[15]The closest thing to opposition came from Congressman Keating, who "enthusiastically support[ed]" the Pledge amendment but cautioned that "in the future we should tread very lightly in this field" out of respect for the integrity of "American literature" and its "priceless gem[s] of American prose." 100 Cong. Rec. 7760-61. Congressman Keating's statement reflects the fact that Francis Bellamy's son, who was Keating's constituent, strenuously opposed the effort to amend the Pledge his father had authored on the ground that his father would have objected to such a clear conflation of church and state. *Id.* at 7761; *see also* ELLIS, *supra* note 5, at 121, 135. Bellamy's great-granddaughter later echoed this sentiment, stating that her "great-grandfather . . . . [was a] deeply religious man, [but]

rose to offer spirited, deeply religious statements in support of the proposal. While it cannot fully recapture the fervent and undeniable religiosity so evident in the pages of the Congressional Record, even the limited report of the discussion that follows is extremely revealing. In an effort at completeness, this report includes statements from each and every legislator who commented on the proposed Pledge amendment in the Congressional Record.[16]

The discussion in Congress began five days after Reverend Docherty's sermon, when Congressman Rabaut made his way to the floor of the House of Representatives to declare that "[w]ithout these [new] words . . . the pledge ignores a definitive factor in the American way of life *and that factor is belief in God*." 100 Cong. Rec. 1700 (emphasis added). In the Congressman's view, anyone who did not wholeheartedly endorse that "belief in God" was not a true American. As for American atheists, Congressman Rabaut was unsparing in his condemnation:

> From the root of atheism stems the *evil* weed of communism and its branches of materialism and political dictatorship. *Unless we are willing to affirm our belief in the existence of God and His creator-creature relation to man*, we drop man himself to the significance of a grain of sand and open the floodgates to tyranny and oppression.

---

was also a strict believer in the separation of church and state . . . . He intended the pledge to be a unifying statement for [our] children. By adding the phrase 'under God' to the Pledge of Allegiance in 1954, Congress . . . . divided our nation further rather than uniting its citizens." Sally Wright, Letter to the Editor, *Writing the Pledge: The Original Intent*, N.Y. Times, July 14, 2002, at C14.

[16]The only legislator not quoted in the text is Congressman Eberharter, author of the 1942 Act that first codified the original Pledge, who rose only for a moment to express his "wholehearted support" for the proposed alteration. 100 Cong. Rec. 7758.

*Id.* (emphases added). At the close of the congressman's jeremiad against non-believers, he let the following words, lifted from Reverend Docherty's sermon, echo through the hall: "*An atheistic American . . . is a contradiction in terms.*" *Id.* (emphasis added).

Once the seventeen separate House bills seeking to amend the Pledge were consolidated and favorably reported by the Judiciary Committee, the House proceeded to a floor discussion during which many congressmen rose to express their views. Congressman Angell, who had authored one of the many bills, said, "there should be embodied in the pledge *our allegiance and faith in the Almighty God.* The addition of the words 'under God' *will accomplish this worthy purpose.*" *Id.* at 6919 (emphases added). Representative Pillion, author of a separate bill, gave a statement "in support of any and all bills that would serve to *recognize the power and the universality of God in our pledge of allegiance. . . .* The inclusion of God in our pledge would *acknowledge the dependence of our people, and our Government upon* the moral direction and the restraints *of religion.*" *Id.* at 7590-91 (emphases added). Congressman Bolton, author of yet another of the bills, stated that:

> The significant import of our action today . . . is that *we are officially recognizing* once again this Nation's adherence to our *belief in a divine spirit*, and that henceforth millions of *our citizens will be acknowledging this belief every time they pledge allegiance to our flag*.

*Id.* at 7757 (emphases added). Congressman Brooks rose to declare that the proposed law "*recognizes* that all things which we have in the way of life, liberty, constitutional government, and rights of man are held by us under *the divine benediction of the Almighty.*" *Id.* at 7758 (emphases added). Congressman Keating noted that:

> [W]e cannot too often be reminded of the spiritual values which alone have permanence . . . . When *the*

*forces of anti-God and antireligion so persistently spread their dangerous and insidious propaganda*, it is wholesome for us to have constantly brought to our minds the fact that . . . it is the strength of *the spirit . . .* to which *we must ultimately look for salvation . . . .*

*Id.* at 7760 (emphasis added). Congressman Oakman proudly introduced into the record a letter from a constituent praising his authorship of one of the proposed bills, which described the bill as "a realistic recognition of the theological and philosophical truth — *the existence of a Supreme Being.*" *Id.* Congressman O'Hara observed that "what we are engaged in today is *a sacred mission*" and that in amending the Pledge the legislators were achieving a "*victory for God.*" *Id.* at 7762 (emphases added). Congressman Wolverton commented that the proposed amendment "sets forth in a mere two words, but, very strong and meaningful words, the *fundamental faith and belief of America in the overruling providence of God* and our dependence at all times upon Him." *Id.* at 7763 (emphasis added). Congressman Rodino quoted scripture in order to best express "the spirit" of the proposed law, citing David the Psalmist for the proposition that Americans reciting the Pledge (including the public schoolchildren who were expected to recite it every day in the classroom, *see infra* Part II.C) "shall say to the Lord: Thou art my protector and my refuge: my God, in Him will I trust." *Id.* at 7764. Congressman Bolton rose to observe that the legislation "comes at a time in the world when we do well to once more publicly and *officially affirm our faith.*" *Id.* (emphasis added). At the close of the discussion, the final congressman to speak was Representative Addonizio, who said:

> We, who take the pledge of allegiance to the flag of the United States of America and raise our eyes toward that *symbol of our faith*, should bear in mind that our *citizenship is of no real value* to us . . .

> *unless we can open our souls before God* and before Him conscientiously say, "I am an American."

*Id.* at 7765 (emphases added).

The majority asserts that "[t]he words 'under God' were added as a description of 'one Nation' primarily to reinforce the idea that our nation is founded upon *the concept of a limited government*, in stark contrast to . . . communist forms of government." Maj. op. at 3909 (emphasis added). In my colleagues' view, any religious purpose associated with the amendment of the Pledge was merely incidental to the patriotic, anti-Communist purpose driving the law. However, had my colleagues actually acknowledged the existence of the detailed historical record instead of ignoring it, they could not have failed to recognize that their historical assertion is precisely backward: the anti-Communist sentiment associated with the amendment was clearly secondary to the overwhelming and predominant religious purpose motivating the amendment. For one thing, the majority's revisionist account ignores the fact that much of the anti-Soviet sentiment associated with the amendment was itself driven in large part by the congressmen's *religious* disagreement with the Soviets' purported atheism. For example, in rising to endorse the amendment, Congressman Wolverton stated that a virtue of the proposed amendment was that it "plainly denies the *atheistic* and materialistic concepts of communism with its attendant subservience of the individual." 100 Cong. Rec. 7762 (emphasis added). Indeed, the original author of the bill to amend the Pledge stated that "the evil weed of communism and its branches of materialism and political dictatorship" *stems* "*[f]rom the root of atheism.*" *Id.* at 1700 (emphasis added). The majority's revisionism is further refuted by that same original author, Congressman Rabaut, who explicitly stated: "You may argue from dawn to dusk about differing political, economic, and social systems, but *the fundamental issue* which is the unbridgeable gap between America and Commu-

nist Russia *is a belief in Almighty God*."[17] *Id.* (emphases added). This was seconded by Congressman Brooks, who declared that "*One thing* separates free peoples of the Western World from the rabid Communist, and this one thing is *a belief in God*." *Id.* at 7758 (emphases added). Indeed, even the official House Report accompanying the bill demonstrates that the desire to underscore a political philosophy of anti-Communism was at most an ancillary aim of the bill, as it was listed as a second and separate rationale following the legislation's primary stated rationale: to "acknowledge the dependence of our people and our Government upon the moral directions of the Creator." *See* H.R. REP. No. 83-1693 at 2 (1954), *reprinted in* 1954 U.S.C.C.A.N. 2339, 2340. Moreover, even that ancillary rationale stresses the religious underpinning of the anti-Soviet sentiment, as the Report goes on to state: "At the same time, [the bill] would serve to deny the *atheistic* and materialistic concepts of communism . . . . " *Id.*, 1954 U.S.C.C.A.N. 2340 (emphasis added).

After all of the congressmen made their intentions clear and the House moved to adopt its final bill, discussion opened across the Capitol in the well of the Senate. Initially, the Senate version of the bill stalled in the Senate Judiciary Committee, where it "seemed dead" because some "senators had concerns about the resolution's implications for the separation

---

[17]In a hapless attempt to find some iota of support for its "limited government" theory in the legislative history, the majority quotes a statement of Congressman Rabaut that was included in the House Report. Maj. op. at 3910. The majority suggests that when Congressman Rabaut discussed "our way of life and its origins," he was referring to the concept of "limited government." If his explicit statements on the House floor were not enough to establish that he was instead referring to a belief in God, the sentence in the House Report that immediately follows his statement would make that absolutely clear: "Since our flag is symbolic of our Nation, its constitutional government and the morality of our people, the committee believes it most appropriate that *the concept of God* be included in the recitations of the pledge of allegiance to the flag." H.R. REP. No. 83-1693 at 3 (1954) (emphasis added), *reprinted in* 1954 U.S.C.C.A.N. 2339, 2341.

of church and state." Ellis, *supra* note 5, at 134; *see also id.* at 257 n.40. However, in light of the zealous and unanimous parade of congressmen who endorsed the bill in the House, the Senate was forced to consider the matter. The senators who remarked on the bill from the floor of that chamber were fewer in number,[18] though no less fervent in their religiosity than their counterparts in the House. Senator Wiley, rising to congratulate Senator Ferguson for authoring the Senate bill, said that "in these days of great challenge to America, one can hardly think of a more inspiring symbolic deed than for *America to reaffirm its faith in divine providence*, in the process of restating its devotion to the Stars and Stripes." 100 Cong. Rec. 5915 (emphasis added). When the final resolution was reported to the Senate, Senator Ferguson explained its purpose as follows: "the Pledge of Allegiance to the Flag which stands for the United States of America should *recognize the Creator who we really believe is in control of the destinies of this great Republic*." *Id.* at 6348 (emphasis added).

Evidence of the legislation's overt religious purpose was not, as the majority claims, limited to individual statements proclaiming the "religious motives of the legislators who enacted the law." Maj. op. at 3911 n.27 (citing *Bd. of Educ. v. Mergens*, 496 U.S. 226, 249 (1990) (plurality opinion of O'Connor, J.)). To the contrary, the House and Senate Reports accompanying the proposed bills also bear testament to the new Pledge's indisputably religious purpose. The Senate Report stated that one of the reasons for adopting the "under God" amendment was its recognition of "the fundamental truth that a government deriving its power from the consent of the governed *must look to God for divine leadership*." S. Rep. No. 83-1287 at 2 (1954) (emphasis added), *reprinted in* 100 Cong. Rec. 6231. The House Report emphasized "the belief that the human person is important because

---

[18]Unlike the House, the Senate received and considered only one bill proposing that the words "under God" be inserted into the Pledge. *See* S.J.R. 126, 83rd Cong. (1954).

*he was created by God* and endowed by Him with certain inalienable rights which no civil authority may usurp. The inclusion of God in our pledge therefore would further *acknowledge the dependence of our people and our Government upon the moral directions* of *the Creator*." H.R. Rep. No. 83-1693 at 1-2 (1954) (emphasis added), *reprinted in* 1954 U.S.C.C.A.N. 2339, 2340.

With these official reports attached to the bills, both the Senate and the House unanimously adopted the new Pledge by voice vote and sent it to President Eisenhower for his approval. The culmination of the legislative proceedings was carefully timed so that the joint resolution could be approved in time for the President to sign it on Flag Day, four short months after Reverend Docherty's sermon. *See, e.g.*, 100 Cong. Rec. 7759 (discussing scheduling of legislation in relation to Flag Day). And so it was that on June 14, 1954, President Eisenhower officially added his signature to the bill amending the Pledge of Allegiance, thereby changing fundamentally the nature and purpose of the oath. After doing so, he proclaimed in his signing statement:

> From this day forward, the *millions of our school children will daily proclaim* in every city and town, every village and rural school house, *the dedication of our Nation and our people to the Almighty*. To *anyone who truly loves America, nothing could be more inspiring* than to contemplate this rededication of our youth, on each school morning, to our country's true meaning.[19]

Once the bill was signed into law, Senator Ferguson, Congressman Rabaut, the sixteen other sponsors of the "under

---

[19]Statement by the President Upon Signing Bill To Include the Words "Under God" in the Pledge to the Flag, Pub. Papers 563 (June 14, 1954) (emphases added), *available at* http://tinyurl.com/PubPapersUnderGod, *reprinted in* 100 Cong. Rec. 8618.

God" resolutions, and the Senate Chaplain gathered before an assembled audience at the Capitol and a national audience watching on television for what Walter Cronkite called a "stirring event."[20] As described in the Congressional Record, the legislators who amended the Pledge turned toward "the believer's flag[,] the witness of a great nation's faith" and recited the newly minted Pledge of Allegiance to "our Nation [and] to the Almighty." 100 Cong. Rec. 8617. "Then, appropriately, as the flag was raised a bugle rang out with the familiar strains of 'Onward, Christian Soldiers!' " *Id*.:

> Onward, Christian soldiers, marching as to war,
> With the cross of Jesus going on before.
> Christ, the royal Master, leads against the foe;
> Forward into battle see His banners go!

## C.   The 1954 Amendment and America's Schoolchildren

The foregoing history of the process by which the Pledge was amended — beginning in the pews of New York Avenue Presbyterian Church, continuing through speech after speech in the House and Senate declaring the need for America to "affirm our belief in the existence of God," *id.* at 1700, followed by the President's remarks regarding schoolchildren daily proclaiming their dedication to the Almighty, and concluding with the triumphant playing of *Onward Christian Soldiers* on the Capitol steps to baptize the newly amended national oath — demonstrates beyond any shadow of a doubt that the purpose driving the amendment was predominantly, and indeed overwhelmingly, religious in nature. But there is more. Not only was the message underlying the new Pledge clear — "true" Americans believe in God and non-believers are decisively *un*-American — but so too was its intended audience: America's schoolchildren.[21]

---

[20]*The Morning Show* (CBS television broadcast June 14, 1954), *reprinted in* 100 Cong. Rec. 8617.

[21]A parallel campaign to influence higher education to become less secular and more religious was led by a brilliant, young, and dedicatedly reli-

The legislators who set out to insert the words "under God" into the Pledge of Allegiance were fully aware that in 1954 the original Pledge was a commonplace scholastic ritual.[22] Indeed, a primary rationale for inserting the explicitly religious language into the Pledge of Allegiance, as opposed to into some other national symbol or verse, was that the Pledge was an ideal vehicle for the indoctrination *of the country's youth*. The amendment's chief proponents in Congress were not at all bashful about their intentions. Speaking from the well of the Senate, Senator Wiley endorsed the bill by saying, "What better training *for our youngsters* could there be than to have them, *each time they pledge allegiance* to Old Glory, *reassert their belief*, like that of their fathers and their fathers before them, *in the all-present, all-knowing, all-seeing, all-powerful Creator.*" *Id.* at 5915 (emphases added). Senator Ferguson, who authored the Senate bill, agreed that "we should remind the Boy Scouts, the Girl Scouts, and *the other young people of America, who take [the] pledge of allegiance to the flag more often than do adults*, that it is not only a pledge of words but also of belief." *Id.* at 6348 (emphasis added). In the House, Congressman Rabaut, the original author of the first bill to amend the Pledge, declared that "from their earliest childhood *our children* must know the real meaning of America," a country whose "way of life . . . sees

gious Yale graduate who authored a highly influential book entitled *God and Man at Yale*. *See* WILLIAM F. BUCKLEY, GOD AND MAN AT YALE (Regnery, 1951). Buckley subsequently became an intellectual leader of the conservative political movement and a prominent Catholic layman, who died only last year.

[22]Throughout the 1920s and 1930s, a "coordinated national propaganda campaign," envisioned by Bellamy, the Pledge's author, and carried out by various educational and civic organizations, transformed the Pledge into "a defining symbol of national patriotism." ELLIS, *supra* note 5, at 79; *see generally id.* at 50-80. Because this campaign followed an earlier movement at the turn of the century to put a "flag over every schoolhouse," and later in every classroom, *see id.* at 2-9, by the time Congress turned its attention to amending the Pledge in 1954, regular recitation of the Pledge by schoolchildren across America was a common occurrence.

man as a sentient being *created by God and seeking to know His will.*" *Id.* at 1700 (emphases added). His colleague, Congressman Angell, argued that "the *schoolchildren* of America" should understand that the Pledge of Allegiance "pledge[s] our *allegiance and faith in the Almighty God.*" *Id.* at 6919 (emphases added). Similarly, Congressman O'Hara noted that the new Pledge's "acknowledgment that *God is the foundation* of our Nation will be of incalculable value, all through the years, of ever keeping vividly before *our . . . children*[,] who from *earliest childhood*[ ] pledge their allegiance to the flag, that the *real source of our strength* in the future, as in the past, *is God.*" *Id.* at 7763 (emphases added). Indeed, the last words said before the House passed the bill inserting "under God" into the Pledge emphasized "the *millions of school children* who daily repeat the pledge of allegiance." *Id.* at 7766 (emphasis added). And of course, when President Eisenhower signed the law amending the Pledge, he declared that "[f]rom this day forward, the *millions of our school children* will daily proclaim in every city and town, every village *and rural school house*, the *dedication of our Nation and our people to the Almighty.*"[23] *Id.* at 8618 (emphases added). These statements reflect the unanimous expectation on the part of both houses of Congress and the President of the United States that the new religious version of the Pledge would be recited regularly by "the schoolchildren of America." *Id.* at 6919.

Nor was it only the federal government that promoted the newly amended Pledge through legislation. At the time Congress first considered the amendment to the Pledge, only six states — Delaware, Massachusetts, Mississippi, New Jersey,

---

[23]The President's words echoed the sentiments of his pastor, Reverend Docherty, who four months earlier had stated in his sermon proposing the amendment to the Pledge that the idea "came in a flash one day . . . when [his] children came home from school . . . [and described] what happened at school when they arrived there in the morning." Docherty, *supra* note 10, at 4.

Rhode Island, and Washington — had statutes requiring students to recite the Pledge in school,[24] even though the Pledge had, at that point, existed for over sixty years and had been "a defining symbol of national patriotism" for over three decades. *See* ELLIS, *supra* note 5, at 79. However, once Congress inserted the words "under God" into the Pledge in 1954, the number of states statutorily providing for its recitation skyrocketed: Within a few years of the congressional amendment, nine state legislatures passed laws either requiring or encouraging recitation of the Pledge in school with the newly inserted words "under God."[25] A steady march of legislatures

---

[24]*See* Act of Mar. 15, 1915, ch. 71, 1915 Wash. Sess. Laws 246; Act of April 15, 1925, ch. 180, 34 Del. Laws 440 (1925); Act of Apr 16., 1932, ch. 1927, 1932 R.I. Acts & Resolves 227; Act of May 2, 1932, ch. 145, 1932 N.J. Laws 260*, amended by* Act of Apr. 21, 1944, ch. 212, 1944 N.J. Laws 750; Act of May 13, 1935, ch. 258, 1935 Mass. Acts 306; Act of Dec. 28, 1953, ch. 26 § 8, 1953 Miss. Laws 120.

A number of other states had laws prior to 1954 that required students to be taught proper respect for the flag. *See* Act of Jul. 10, 1935, 1935 Ill. Laws. 1345; Act of Apr. 5, 1927, ch. 85, 1927 Neb. Laws 253. Others still had statutes requiring students to perform a "flag salute." *See* Act of Apr. 22, 1898, ch. 481, 1898 N.Y. Laws 1191; Act of Mar. 7, 1907, ch. 319, 1907 Kan. Sess. Laws 492; Act of Apr. 10, 1918, ch. 75, 1918 Md. Laws 121; Honoring Flag of U.S., ch. 164, 1923 Colo. Sess. Laws 550. That salute, however, was designed in 1890 by George Balch and was distinct from Bellamy's pledge of allegiance. *See generally* ELLIS, *supra* note 5, at 38-43; *see also* 100 Cong. Rec. 7761. In fact, New York, which in 1898 became the first state to pass a statute requiring a flag salute, allowed for any one of five different pledges of allegiance to be recited along with the salute, only the last of which was Bellamy's. ELLIS, *supra* note 5, at 54. Notably, none of the five pledges contained any reference to God or to religion. *Id.*

[25]The first states to act were those whose preexisting school-pledge statutes were rendered out of date by Congress's amendment. *See* Act of June 24, 1954, ch. 83, 1954 N.J. Laws 464; Adding Words "Under God" to Salute to Flag, ch. 51, 51 Del. Laws 66 (1957); Act of Mar. 23, 1960, ch. 391, 1960 Miss. Laws 618; Flag Exercises, Salute, National Anthem, ch. 238, 1961 Wash. Sess. Laws 2066. *But see* Act of June 14, 1977, ch. 333, 1977 Mass. Acts 345 (inserting "under God" over Governor's veto); Act of May 20, 1981, ch. 282, 1981 R.I. Pub. Laws 1102.

followed suit so that today *all but seven states* statutorily provide for the teacher-led daily recitation of the "under God" version of the Pledge.[26] As the proponents of the "under God"

---

Florida, New York, California, Idaho, and Wisconsin, however, were inspired by Congress's addition of the words "under God" to enact their very first school-pledge statutes quickly on the heels of Congress's amendment. *See* Patriotic Programs, Rules, and Regulations, ch. 29764, sec. 47, § 230.45, 1955 Fla. Laws 390; Act of Mar. 23, 1956, ch. 177, 1956 N.Y. Laws 775; Act of May 1, 1961, ch. 254, 1961 Cal. Stat. 1201; National Flag and Colors, National Anthem, "America," ch. 13, § 177, 1963 Idaho Sess. Laws 116; Act of May 23, 1963, ch. 65, sec. 2, § 40.47(1)(b), 1963 Wis. Sess. Laws 57.

[26]Hawaii, Iowa, Maine, Michigan, Nebraska, Vermont, and Wyoming do not have any statutes mentioning the national Pledge of Allegiance, nor do the District of Columbia or the commonwealth of Puerto Rico. The remainder of the states either require or encourage the daily recitation of the religious version of the Pledge in public schools. *See* ALA. CODE § 16-43-5 (2001); ALASKA STAT. § 14.03.130 (2008); ARIZ. REV. STAT. § 15-506 (2002); ARK. CODE ANN. § 6-16-108 (2007); CAL. EDUC. CODE §§ 52720, 52730 (West 2006); COLO. REV. STAT. § 22-1-106 (2006); CONN. GEN. STAT. ANN. § 10-230 (West 2002); DEL. CODE Ann. tit. 14 § 4105 (2007); FLA. STAT. ANN. § 1003.44 (West 2009); GA. CODE ANN. § 20-2-310 (2005); IDAHO CODE ANN. § 33-1602 (2008); 105 ILL. COMP. STAT. ANN. 5/27-3 (West 2006); IND. CODE ANN. § 20-30-5-0.5 (West 2007); KAN. STAT. ANN. § 72-5308 (West 2008); KY. REV. STAT. ANN. § 158.175 (West 2006); LA. REV. STAT. ANN. § 17:2115 (2001); MD. CODE ANN., EDUC. § 7-105 (West 2002); MASS. GEN. LAWS ch. 71, § 69 (2006); MINN. STAT. § 121A.11 (2008); MISS. CODE ANN. § 37-13-7 (2007); MO. REV. STAT. § 171.021 (Supp. 2008); MONT. CODE ANN. § 20-7-133 (2007); NEV. REV. STAT. § 389.040 (2007); N.H. REV. STAT. ANN. § 194:15-c (2008); N.J. STAT. ANN. § 18A:36-3 (West 1999); N.M. STAT. § 22-5-4.5 (Supp. 2008); N.Y. EDUC. LAW § 802 (McKinney 2000); N.C. GEN. STAT. §§ 115C-47(29a), 115-238.29F, 116-69.1, 116-235 (2007); N.D. CENT. CODE § 15.1-19-03.1 (2003); OHIO REV. CODE ANN. § 3313.602 (West 2005); OKLA. STAT. tit. 70, § 1210.229-6 (2002 & Supp. 2008); ORE. REV. STAT. § 339.875 (2007); 24 PA. CONS. STAT. ANN. § 7-771 (West 1992); R.I. GEN. LAWS §§ 16-20-4, -22-11 (2001); S.C. CODE ANN. § 59-1-455 (2004); S.D. CODIFIED LAWS § 13-24-17.2 (2004); TENN. CODE ANN. § 49-6-1001 (2002); TEX. EDUC. CODE ANN. § 25.082 (Vernon 2006); UTAH CODE ANN. § 53A-13-101.6 (West 2004); VA. CODE ANN. § 22.1-202 (2006); WASH. REV. CODE ANN. § 28A.230.140 (West 2006); W. VA. CODE ANN. § 18-5-15b (West 2002); WIS. STAT. § 118.06 (2008).

amendment stated early on, such "widespread support [for] the [new Pledge] . . . must bear testimony to *a religious revival of significance*."[27]

---

[27]Clayton Knowles, *Big Issue in D.C.: The Oath of Allegiance*, N.Y. TIMES, May 23, 1954, at E7 (emphasis added).

Indeed, a number of states incorporate their school-pledge requirements into statutes that simultaneously endorse *school prayer*. Kentucky provides that, "as an affirmation of the freedom of religion in this country . . . a local school district may authorize the recitation of the traditional Lord's prayer and the pledge of allegiance to the flag in public elementary schools." Act of Apr. 9, 1980, ch. 304, 1980 Ky. Acts 1029 (codified at KY. REV. STAT. ANN. § 158.175 (West 2006)). Until recently, New Hampshire had a nearly identical statutory provision. *See* Act of June 3, 1975, ch. 225, 1975 N.H. LAWS 195, *amended by* Act of May 18, 2002, ch. 77, 2002 N.H. LAWS 501 (codified at N.H. REV. STAT. ANN. §§ 194:15-a, -c (2008)). Similarly, North Dakota incorporates its pledge-recitation requirement into a statute setting aside time for silent prayer. *See* Act of Apr. 5, 2001, ch. 187, 2001 N.D. Laws 697 (codified at N.D. CENT. CODE § 15.1-19-03.1 (2003)). Louisiana has passed multiple acts over the past thirty years adding and altering school prayer provisions to a statute that also provides "for group recitation of the 'Pledge of Allegiance to the Flag.' " *See* Act of July 23, 1980, ch. 519, 1980 La. Acts 1242, *amended by* 1987 La. Acts 1530, *amended by* 1989 La. Acts 1204, *amended by* 1992 La. Acts 919, *amended by* 1999 La. Acts 2527, *amended by* 2002 La. Acts 1250 (codified at LA. REV. STAT. ANN. § 17:2115 (2001 & Supp. 2008)).

**Volume 3 of 4**

At the forefront of that revival was the state of California. While many other states, perhaps preoccupied with more pressing legislative business, took a decade or more to endorse state-directed, teacher-led, daily recitation of the religious version of the Pledge in public schools, California did so in 1961, becoming one of the first states to adopt a school-pledge statute after Congress inserted the words "under God."[28] California's Pledge-recitation bill was introduced on January 12, 1961, following an opening prayer in the California State Assembly to "Jesus Christ, our Lord and Redeemer."[29] Some legislators, apparently concerned over the religious content recently inserted into the Pledge by Congress, attempted to amend the proposed state bill in order to allow "any pupil" to be "excused from giving the pledge" if doing so "conflicts with [his] religious beliefs."[30] However, even this modest protection for religious minorities was removed from the final version of the bill, over the dissenting votes of seven members.[31] Thus, on May 1, 1961, when the final version of the bill was signed by Governor Edmund G. "Pat" Brown,[32] California joined those states ensuring by force of law that the state-directed, teacher-led recitation of the "under God" version of the Pledge of Allegiance would occur daily in classrooms throughout the state.

---

[28]*See* Act of May 1, 1961, ch. 254, 1961 Cal. Stat. 1201. Florida and New York were the only states to precede California in enacting new school-pledge statutes following the congressional amendment. *See supra* note 22.

[29]1961 CAL. LEG. ASSEMB. DAILY J. 223; *see also* Assemb. B. 292, 1961 Reg. (Gen.) Sess. (Cal. 1961).

[30]*See* Assemb. B. 292, 1961 Reg. (Gen.) Sess. (Cal. 1961) (as amended by S. Comm. on Education, Mar. 29, 1961, and again on Apr. 6, 1961).

[31]*See* Assemb. B. 292, 1961 Reg. (Gen.) Sess. (Cal. 1961) (as amended by Sen. on Apr. 11, 1961); *see also* 1961 CAL. LEG. SEN. DAILY J. 1559; 1961 CAL. LEG. ASSEMB. DAILY J. 2552.

[32]Not to be confused with the one-time seminarian and subsequent (and perhaps future) governor, Pat Brown's son, Edmund G. "Jerry" Brown Jr.

### D.    The 2002 "Reaffirmation"

Almost immediately after its amendment, the new Pledge was the subject of numerous constitutional challenges. *See infra* note 102. Those challenges continued consistently over the following decades, but met with little success until June 26, 2002, when this court held that the state-directed recitation of the "under God" version of the Pledge of Allegiance in California's public schools violated the First Amendment. *Newdow I*, 292 F.3d at 612. In response to that constitutional ruling, lawmakers immediately took to the floor in both houses of Congress to condemn this court's decision. Among them was Senator Robert Byrd, who proudly announced that he was "the only Member of Congress today, bar none, in either body, who was a Member of the House on June 7, 1954, when the words 'under God' were included in the Pledge of Allegiance." 107 Cong. Rec. S6103. His comments, like those of the other Senators who spoke that day, made clear that his outrage over the *Newdow I* decision was *not* based on any devotion to principles of limited government:

> I, for one, am not going to stand for this country's being ruled by a bunch of atheists. If they do not like it, let them leave. They do not have to worship my God, but I will worship my God and no atheist and no court is going to tell me I cannot do so whether at a school commencement or anywhere else.

*Id.*

That same afternoon, the Senate passed a resolution expressing its "strong[ ] disapprov[al]" of the *Newdow I* decision. S. Res. 292, 107th Cong. (2002), *reprinted in* 107 Cong. Rec. S6105. The reason for that disapproval is readily apparent from the statements offered in the resolution's support. Senator Robert Bennet, for example, announced that "[r]egardless of what the courts may say, the American people *still trust in God.* . . . [I]t is a correct statement of how we

feel, and it belongs in the Pledge of Allegiance to our flag." 107 Cong. Rec. S6106 (emphasis added). Numerous other senators expressed similar views,[33] including Senator Sam Brownback, who remarked upon the superiority of the United States, "a nation that honors God," to North Korea, "a country that does not honor God." *Id.* at S6109.

Although the majority asserts that "*virtually all* of the members of Congress agreed" that we had misunderstood its purpose when we decided *Newdow I*, maj. op. at 3913 (emphasis added), *not a single Senator* expressed the view that our court had misunderstood the 1954 Congress's purpose for enacting the "under God" amendment. Several Senators, however, explicitly stated their disagreement with any interpretation of the Constitution under which that religious purpose would be impermissible. For example, Senator George Allen declared that the Pledge "should remain in our schools" because "the purpose of the Establishment Clause . . . was not to expunge religion or matters of faith from all aspects of public life." *Id.* at S6108. Similarly, Senator John Ensign urged the Senate "to take it upon itself to correct what the Ninth Circuit has done" because "we need to reestablish in this country what this document — the Constitution of the United States — really says and really was about." *Id.* at S6102.[34]

---

[33]*See also id.* at S6107 (statement of Sen. Burns) ("We are a nation founded upon the acknowledgment of a Creator."); *id.* at S6112 (statement of Sen. Smith) ("There are countless more examples of religion in American public life. . . . . For this court to single out the pledge for including the phrase 'One Nation, Under God,' is simply incredible.").

[34]*See also id.* at S6104 (statement of Sen. Sessions) ("[*Newdow I*] is a shocking culmination of a decade-long trend of liberal activist courts that have been misreading the first amendment of the Constitution."); *Id.* S6106 (statement of Sen. Bennett) ("The word 'God' is sufficiently universal and nonspecific as to allow those who use it to ascribe any quality, any gender, any doctrine, any position that those people might wish to ascribe to it. It is inconceivable to me that the Ninth Circuit should suggest that the generic term 'God' is somehow endorsement of a specific religion."); *id.* at S6109 (statement of Sen. Brownback) ("[T]he Establishment Clause is clearly misinterpreted by the entire legal system today.").

Recognizing these strong sentiments, Senator Trent Lott stated when he introduced the resolution that additional measures should be taken to reaffirm the actions of the 1954 Congress:

> [F]or our children to be allowed *to invoke God's blessing* on our country *in the Pledge of Allegiance* is certainly something we want to do.

> If there is ever a time when we need this additional blessing, perhaps it is now more than ever in our lifetimes. . . . .

> In [this resolution], we state that we disapprove of the decision by the Ninth Circuit . . . .

> Beyond that, to further make it clear, the Senate should consider a recodification of the language that was passed in 1954. There was no uncertainty or ambiguity about what was done in 1954. The Congress, in fact the American people, spoke through their Congress. We should make it clear once again.

107 Cong. Rec. S6105 (emphasis added).[35]

---

[35]Each of the Senators quoted in the above paragraph and the one preceding it, including in footnotes 33 and 34, co-sponsored the Pledge recodification statute, which was passed by the Senate the day after these statements were made. *See* 107 Cong. Rec. S6225 (listing co-sponsors). Other Senators went even further in expressing a religious basis for their disapproval of *Newdow I* and their approval of including the phrase "under God" in the Pledge. For example, Senator Joseph Lieberman stated that it might become necessary "to amend the Constitution to make clear that . . . *we are one Nation because of our faith in God*, [so] that the American people, *children*, forever forward will be able to stand and recite the pledge." *Id.* at S6091 (emphasis added). Similarly, Senator Mary Landrieu stated that "we as a nation stand under God, acknowledging His presence . . . . [W]e collectively as a nation will in no way back down in acknowledging His presence and His divine creation." *Id.* at S6107.

And so they did. The next morning, Senator Byrd called the Senate to order and invited the Reverend Lloyd J. Ogilvie, the Senate Chaplain, to lead "[t]he prayer to Almighty God, the supreme Judge of the world." 107 Cong. Rec. S6177. In his invocation, Reverend Ogilvie declared that "[t]here is no separation between God and State," and proclaimed God as the "ultimate Sovereign of our Nation." *Id.* He then described the Pledge as an expression of America's trust in God: "It is with reverence that in a moment we will repeat the words of commitment to trust You which are part of our Pledge of Allegiance to our flag: 'One Nation under God, indivisible.' " *Id.* After the members of the Senate recited the Pledge, Senator Tom Daschle offered the chaplain both thanks and agreement: "I know I speak for all of our colleagues in thanking Chaplain Ogilvie for his wonderful prayer this morning. He spoke for all of us." *Id.*

The Senate then considered a recodification bill, entitled "An Act To reaffirm the reference to one Nation under God in the Pledge of Allegiance," later that day. 107 Cong. Rec. S6225.[36] The recodification bill served two ends: to express

---

Not one Senator repudiated the religious motivations of the 1954 lawmakers; indeed, more than one explicitly embraced them. *Id.* at S6102 (statement of Sen. Daschle) ("We added the language, 'under God,' in 1954. Then-President Dwight Eisenhower said: 'In this way, we are reaffirming the transcendence of religious faith in America's heritage and future; in this way, we shall constantly strengthen those spiritual weapons which forever will be our country's most powerful resource in peace and war.' I agree with President Eisenhower."); *id.* at S6109 (statement of Sen. Brownback) ("I thank those sincere leaders who in 1954 sought to reaffirm . . . our 'firm Reliance on the Protection of divine Providence.' "); *id.* at S6237 (statement of Sen. Allard) ("When President Eisenhower signed the law adding 'under God' to the pledge, . . . . [h]e was affirming that this nation has . . . consistently and thoroughly incorporated belief in and submission to God.").

[36]While the Pledge was the primary focus of the bill, it also contained a section, entitled "reaffirming that God remains in our motto," that reenacted the statute declaring "In God we trust" to be the National Motto. *See* Pub. L. No. 107-293, 116 Stat. 2057, 2060-61 (2002).

the approval of the 2002 Congress of the 1954 Congress's inclusion of "under God" in the Pledge, and to express its disapproval of the constitutional interpretation of the First Amendment by this court in *Newdow I*.[37] It did not make any change to the content of the Pledge or offer any different purpose for its adoption than the religious purpose that motivated the 1954 Congress. In support of the legislation, Senator Jeff Sessions made clear that he considered the Pledge an "expression of faith," that he approved wholeheartedly of what the 1954 Congress had done, and that the Senate should again express its approval of the inclusion of God in the Pledge. He stated that he disagreed not only with *Newdow I*, but with other limitations on religious expression in public schools:

> I am a cosponsor and helped draft this legislation. I would say this: This is not an itty bitty issue. This is a big issue. The Congress and States and cities have been expressing a desire to have, and be allowed to have, an expression of *faith* in the public life of America. The courts have been on a trend for decades now to constrict that. . . . .

> The Supreme Court . . . . has cracked down on some very small instances of public expression of faith. Our courts have made decisions such as constraining a valedictorian's address at a high school. Certainly our prayer in schools has been rigorously constricted or eliminated in any kind of normal classroom setting, as has the prayer at football games.

> I will just say we hope the courts will reconsider some of their interpretations of the establishment

---

[37]Senator Tim Hutchinson, the sponsor of the bill, explained its purpose: "[The Founders] were not advocating freedom from religion. . . . . By passing this legislation today the Senate will make clear that we understand the Founders' intention." 107 Cong. Rec. S6226.

clause and the free exercise clause of the first amendment and help heal the hurt in this country.

*Id.* at S6226 (emphasis added).

The Senate's bill passed without opposition,[38] and was then sent to the House for consideration.[39] In its report on the bill, the House Judiciary Committee examined the historical events listed in the legislative findings, and explained why those events were relevant. It concluded that our interpretation of the First Amendment was itself unconstitutional:

> Clearly, America has a rich history of referring to God in its political and civic discourse and acknowledging the important role faith and religion have played throughout our Nation's history. Thus the Ninth Circuit's analysis in the *Newdow* ruling cannot be supported by any reasonable interpretation of the Establishment Clause as their holding is inconsistent with the meaning given the Establishment Clause since America's founding.

H.R. Rep. 107-659, at 8 (2002).

On October 7, 2002, the Act "To reaffirm the reference to one Nation under God in the Pledge of Allegiance" was brought before the full House of Representatives. 107 Cong. Rec. at H7029. Representative Jim Sensenbrenner, who chaired the Judiciary Committee and submitted the House

---

[38]The vote was 99-0. Senator Jesse Helms was absent, but Senator Don Nickles announced on his behalf "that if present and voting [he] would vote 'yea.' " 107 Cong. Rec. S6226.

[39]In the meantime, the House had passed its own resolution condemning *Newdow I. See* H.R. Res. 459, 107th Cong. (2002) ("[I]t is the sense of the House of Representatives that . . . [t]he Ninth Circuit's ruling is inconsistent with the U.S. Supreme Court's First Amendment jurisprudence . . . [and t]he phrase 'One Nation, under God,' should remain in the Pledge of Allegiance . . . .").

Report, explained the purpose of the legislation. He, too, expressed his approval of the action of the 1954 Congress in inserting "under God" into the Pledge and said that he thought it necessary for the later Congress to endorse and approve what the earlier Congress had done:

> The *Newdow* ruling is troubling because its analysis . . . . is inconsistent with any reasonable interpretation of the Establishment Clause of the First Amendment. Thus, it has become necessary for Congress to reaffirm its understanding that the text of both the Pledge and our national motto are legally and historically consistent with a reasonable interpretation of the first amendment.

*Id.* Only two other congressmen offered remarks on the bill. The first, Representative Robert C. Scott, stated that he "agree[d] with the dissent" in *Newdow I*, although he feared that the proposed legislation would further jeopardize the legal status of the amended Pledge "because if the courts look at the importance that we apparently affix to 'one Nation under God' . . . then it diminishes the argument that the phrase has de minimis meaning." *Id.* at 7030. Representative Ronnie Shows then took to the floor to express his view that "[t]he values we teach at home and *church* are *universal* and should *not be left outside the schoolhouse door* . . . . I am happy that we are today considering a measure that reiterates the importance of our National Motto, and the presence of God in our lives." *Id.* (emphasis added). The House voted on the legislation the following day, and it passed by an overwhelming margin.[40] *Id.* at H7186. On November 13, 2002, President George W. Bush signed the bill into law.[41]

---

[40]The vote was 401 to 5, with 4 representatives answering "present" and 21 not voting. 107 Cong. Rec. H7186.

[41]Although President Bush signed the bill into law without comment, he had expressed his views on *Newdow I* the day after the case was decided:

As this series of events illustrates, "Congress chose to explain in great detail its purpose in reaffirming the language of the Pledge." Maj. op. at 3896. That 2002 Act's legislative history makes clear that Congress's view of the reference to "under God" in the Pledge had little to do with "political philosophy," as the majority disingenuously claims, *id.* at 3902, and much to do with the concept of religion, including promoting the concept of God in the public schools. As the House Report, which even the majority accepts as competent evidence of purpose, *see id.* at 3912, explicitly states, the Pledge "is a recognition of the fact that many Americans believe in God." H.R. Rep. 107-659, at 5. The purpose of the 2002 Act could not be clearer: Congress sought to condemn our decision in *Newdow I,* to defend the constitutionality of the original 1954 amendment that added "under God" to the Pledge, and to reaffirm "the presence of God in our lives," and in our Pledge.

In the end, the decision that the 2002 Congress went to such great lengths to condemn never took effect — though not, of course, because of Congress's legislative action. After our circuit declined to rehear the case en banc, without a single judge so much as suggesting that the 2002 Act had any relevance to the constitutional analysis, the Supreme Court granted certiorari and reversed on prudential standing grounds — a lack of standing of a non-custodial parent to assert the rights of his minor daughter — without addressing the merits of the Establishment Clause question. *See Elk Grove Unified*

> America is a nation that values our relationship with an almighty. . . . . I think that the Almighty is, obviously, [an] important part of my life, but [an] important part of the life of our country. And that's why the ruling of the courts was out of step with the traditions and history of America.

Press conference, June 27, 2002, *transcript available at* http://transcripts.cnn.com/TRANSCRIPTS/0206/27/bn01.html.

*Sch. Dist. v. Newdow*, 542 U.S. 1 (2004). As a result, the state-directed, teacher-led recitation of the "under God" version of the Pledge has ever since 1954 continued, uninterrupted, in public schools throughout the nation — just as the 1954 Congress intended.

### E. Jan Roe and Her Child's Constitutional Claim

Today, over six million students attend public school in the State of California.[42] At least 190,000 of those students are Buddhist, Hindu or followers of a Native American religion and thus do not believe in traditional monotheism — that is, the existence of a single, non-metaphorical, supervisory God.[43] Over half a million California students come from "secular" families[44] — a population that has "nearly doubled" across the country over the past two decades.[45] Most of these individuals "moved away from religious observance because they no longer believe in God or religious teachings."[46] Indeed, Califor-

---

[42]The precise enrollment figure is 6,275,469. *See* California Dept. of Ed., State of California Education Profile, Fiscal Year 2007-08 *available at* http://tinyurl.com/CalEdProfile07-08.

[43]*See* The Pew Forum on Religion & Public Life, *U.S. Religious Landscape Survey* 99 (2008) [*hereinafter Pew Survey*], *available at* http://tinyurl.com/Pew08ReligionSurvey; *see also* The Pew Forum on Religion & Public Life, *U.S. Religion Map and Religious Populations*, *available at* http://religions.pewforum.org/maps [*hereinafter* Pew Forum Map]. Adherents to the Buddhist and Hindu faiths together comprise three percent of the California population. The percentage of Californians who subscribe to these faiths is over three times the national average. *See Pew Survey* at 5; *see also* U.S. Census Bureau, *The 2007 Statistical Abstract*, t. 73, *available at* http://www.census.gov/prod/2006pubs/07statab/pop.pdf.

[44]Twenty-one percent of Californians are "unaffiliated" with any religion. *Pew Survey* at 100. Nationally, forty percent of people who describe themselves as "unaffiliated" further describe themselves as "secular unaffiliated." *Id.* at 5.

[45]Laurie Goodstein, *More Atheists Are Shouting It From the Rooftops*, N.Y. Times, Apr. 27, 2009, at A1.

[46]Duke Helfand, *Why Many Americans Change Faiths*, L.A. Times, Apr. 28, 2009, at A12.

nia and the West Coast have "the largest proportion of atheists and agnostics" of any region in the country.[47] In California's public schools, over one million students are not sure whether they believe in God, and fully 439,000 students are avowed atheists.[48]

One atheist student who attends a California public school is the daughter of Jan Roe. Ms. Roe's child was born at the turn of the millennium, and so in September of 2004 the time came for Ms. Roe, a resident of the Rio Linda Union School District, to put her five-year-old daughter on a school bus and send her off for her first day of kindergarten. In so doing, Jan Roe joined the millions of parents in California and across the United States who every September "entrust public schools with the education of their children." *Edwards v. Aguillard*, 482 U.S. 578, 584 (1987). These parents hope the school teachers will look over their young children and keep them safe, but, just as important, they "condition their trust on the understanding that the classroom will not purposely be used to advance religious views that may conflict with the private beliefs of the student and his or her family." *Id.*

When the five-year-old Roe child arrived for her first day of kindergarten, her teacher, a state employee, asked the young students to stand, to place their hands on their hearts, and to pledge their allegiance to "one nation, under God." Neither young Roe nor her mother, however, believe in God. Thus, having already learned that she should not tell a lie, young Roe simply stood silently, as her classmates recited in unison the version of the Pledge that requires its proponents to express their belief in God. Everyday thereafter, the children filed into school, and each morning they recited an oath of allegiance to "one nation, under God" — an oath that unde-

---

[47]*Pew Survey* at 8.

[48]*See* Pew Forum Map (seven percent of Californians "do[ ] not believe in God," five percent are "not too certain, not at all certain," or "unsure how certain" they are that God exists, and four percent "don't know").

niably "requires affirmation of a belief and an attitude of mind" to which young Roe does not subscribe: a belief that God exists and is watching over our nation. *Cf. W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 633 (1943). For eight months, the five-year-old Roe faced, every morning, the daily "dilemma of participating" in the amended Pledge, with all that implies about her religious beliefs, or of being cast as a protester for her silent refusal. *Lee v. Weisman*, 505 U.S. 577, 593 (1992). On some days she quietly endured the gaze of her teacher and her classmates as she refused to say the Pledge, standing in silence as the classroom's lone dissenter; on others she walked out of the room and stood in the hallway by herself, physically removed from the religious "adherents" — the "favored members of the [classroom] community," *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 310 (2000), who were able to swear their fealty to the United States without simultaneously espousing a state-sponsored belief in God that was antithetical to their personal religious views.

In April, 2005, Jan Roe filed this lawsuit on behalf of herself and her child. Her claim is straightforward: The Constitution of the United States, a nation founded by exiles who crossed an ocean in search of freedom from state-imposed religious beliefs, prohibits the purposefully designed, teacher-led, state-sponsored daily indoctrination of her child with a religious belief that both she and her daughter reject.

## III.   The 1954 Amendment and This Appeal

The history that I have just described permits only one conclusion regarding the constitutionality of the state-directed, teacher-led, daily recitation in public schools of the "under God" version of the Pledge of Allegiance as amended by Congress in 1954. In order to avoid reaching that conclusion, the majority repeatedly and deliberately misstates the issue that is before us.

First and foremost, the "hotly contested issue in this case" is *not*, as the majority asserts, "whether Congress' purpose in

enacting the Pledge of Allegiance was predominantly patriotic or religious." Maj. op. at 3885. For many years prior to 1942, indeed from since at least the 1930s, the Pledge of Allegiance was a patriotic and secular exercise widely recited in public schools and at various public events and in various public fora. It was officially adopted as such by Congress in 1942. It is undisputed and indeed indisputable that at that time the Pledge was solely patriotic and secular and contained no religious component or element. In 1954 Congress amended the Pledge by inserting into that patriotic and secular instrument the religious phrase "under God." The issue here is whether the *amendment* to the Pledge — the insertion of the phrase "under God" — was enacted for a predominantly religious purpose, not whether the Pledge as a whole was enacted for such a purpose.

Second, the issue is *not* "whether [plaintiff] Roechild can prevent other students . . . from saying the Pledge." Maj. op. at 3889; *see also id.* at 3888. Contrary to the majority's assertion, this case presents no issue about whether *young Roe* can prohibit *other five-year-olds* from doing anything at all. Rather, the issue is whether *the Constitution* prohibits young Roe's *state-employed teachers* from conducting the state-directed, daily recitation of the "under God" version of the Pledge in public schools. To be sure, as a member of the majority once wrote, prohibiting such recitations "deprives Christians [and other adherents to monotheistic religions] of the satisfaction of seeing the government adopt their religious message as [its] own, but this kind of government affiliation with particular religious messages is precisely what the Establishment Clause precludes." *Cammack v. Waihee*, 932 F.2d 765, 785 (9th Cir. 1991) (D. Nelson, J., dissenting) (second alteration original) (quoting *County of Allegheny v. ACLU*, 492 U.S. 573, 601 n.51 (1989)). Accordingly, the responsibility for any dissatisfaction felt by "other students" cannot be placed, as the majority shamefully seeks to do, upon the shoulders of a kindergartener; it results from the requirements of the Constitution itself.

Third, the majority's assertion that young Roe asks us "to prevent teachers from leading other students [in] reciting the Pledge of Allegiance," maj. op. at 3874, like its related claim that I "would have us strike down the Pledge," *id.* at 3919, is completely and utterly false. The issue presented by this case involves only the recitation of the words "under God" as a part of the Pledge of Allegiance — the words that Congress added to the Pledge in 1954 — and not the Pledge in its original, pre-amendment secular form. Had one more member of today's panel ruled in favor of the plaintiffs, our decision would have held only that the 1954 amendment to the Pledge was unconstitutional as applied in the context of public schools implementing a state-directed program of daily teacher-led recitations. Public schools could have complied with that ruling simply by having teachers lead students in daily recitations of the Pledge in its pre-1954 form, without the added religious phrase "under God." And our decision would not have held unconstitutional the recitation of any version of the Pledge — with or without the challenged phrase — outside of the public school context.

Finally, as must be obvious even to the majority, the issue in this case is *not* the purpose of the 2002 Pledge recodification, which merely reaffirmed the 1954 amendment and Congress's purpose in enacting it. The recodification also declared that our court's First Amendment analysis was erroneous and that *Newdow I* was wrongly decided. *See supra* Part II.D. The 2002 recodification is of no constitutional consequence, and *no one* but the two members of the majority has even purported to believe otherwise. Bafflingly, the majority declares that because the 2002 Congress adopted a provision that "reaffirmed the exact language that has appeared in the Pledge for decades," maj. op. at 3895, "[i]t is the 2002 statute . . . that sets forth our current Pledge," *id.* at 3894, and "[i]t is the 2002 Congress' purpose we are called upon to examine." *Id.* at 3928. The majority's reliance on the 2002 legislation to obviate the purpose of Congress in 1954 is no more than a transparent tactic intended to divert attention from an

obvious constitutional violation towards a substance-less event of no legal consequence.

The deliberate misstatement of the issue presented by a case is not an unusual tactic for a majority that seeks to mislead the reader, as well as other members of the judiciary, in order to prejudice the outcome of a constitutional question. Only twenty-four years ago, in *Bowers v. Hardwick*, 478 U.S. 186, 190 (1986), the majority misstated the issue before the Court as "whether the Federal Constitution confers a fundamental right upon homosexuals to engage in sodomy." The dissent correctly responded that the true issue was whether the Constitution protected "the fundamental interest all individuals have in controlling the nature of their intimate associations with others." *Id.* at 206 (Blackmun, J., dissenting). It took the Court seventeen years to overcome the majority's unconstitutional conclusion, which followed inevitably from its fallacious framing of the issue. The Court held in *Lawrence v. Texas*, 539 U.S. 558, 578 (2003), in unusually blunt terms, that "*Bowers* was not correct when it was decided, and it is not correct today." The framing of the issue here is even more blatantly erroneous and misleading than was its framing in *Bowers*, and the majority here must be as aware of that fact as, one may fairly surmise, was the majority in *Bowers*.

A.   Recent Contrivance of the Majority's Novel Theory

Before the majority at some unknown point following the argument in this case conjured up its idea that "[i]t is the 2002 Congress' purpose we are called upon to examine," maj. op. at 3928, *no one*, lawyer or judge, had thought to offer such a bizarre argument or to attach any constitutional significance to the action of the 2002 Congress. The history of *Newdow III* makes this clear, as does all of the ensuing Pledge litigation, including the case before us. Three months after the reaffirmation of the Pledge statute, this court issued an amended opinion superseding *Newdow I* and an order denying rehearing en banc, with two separate dissents and a concurrence in

the denial of rehearing en banc. *See Newdow v. U.S. Cong.*, 328 F.3d 482 (9th Cir. 2003) ("*Newdow III*"), *amending* 292 F.3d 597 (9th Cir. 2002) ("*Newdow I*"), *rev'd on other grounds sub nom. Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1 (2004). In striking contrast to today's majority, none of the twelve judges who participated in any of those opinions or orders thought the 2002 reaffirmation important enough even to mention.[49] When the case was decided by the Supreme Court shortly afterwards, the opinion of the Court did not include any reference to the 2002 legislation; in fact, it stated that "the Pledge as we know it today" was the result of the 1954 amendment. *Elk Grove*, 542 U.S. at 7. Three justices wrote concurrences that addressed the constitutional issue, but the 2002 legislation was mentioned in only one fleeting reference that simply noted its enactment. *See id.* at 26 (Rehnquist, C.J., concurring).

Nor prior to the issuance of today's opinion did any party, intervenor, amicus, or judge in the case presently before us,

---

[49]The majority's attempts to explain away the conspicuous absence of any mention of the 2002 legislation in *Newdow III* would be ludicrous and unworthy of response if the constitutional rights of religious minorities were not at stake. The majority grudgingly concedes that "the 2002 Act was *technically* passed before issuance of *Newdow III*" in 2003. Maj. op. at 3929 n.37 (emphasis added). Of course, saying that 2002 is "technically" before 2003 is like saying that a dog is "technically" not a cat — or, more pertinent here, that God is "technically" not a secular term. Undeterred, however, the majority goes on to explain that *Newdow III* "addressed the newly raised questions of whether Newdow had standing and authority to represent his child, and did not revisit the fundamental Establishment Clause analysis of *Newdow I*." *Id.* This is simply incorrect. Our court addressed "newly raised questions" about Newdow's standing in *Newdow II*, a published order issued on December 4, 2002. *See* 313 F.3d at 502. When we issued *Newdow III* two months later, not only did the amended majority opinion make substantive changes to the reasoning and holding of *Newdow I*, but six judges joined a dissent in the denial of rehearing en banc that conducted a new and independent constitutional analysis. In short, our court in 2003 *did* "revisit the fundamental Establishment Clause analysis of *Newdow I*," but everyone involved understood that the 2002 reaffirmation was *wholly irrelevant* to that analysis.

including the two in the majority, deem the 2002 reaffirmation to be of any legal significance or indeed even worthy of mentioning at any time during the litigation of this appeal. During the hour-long oral argument before this court, no judge, specifically including the two members of today's majority, asked a single question or made a single reference of any kind to the 2002 reenactment. In fact, no one, including any of the counsel arguing the case, noted, referred to, or commented on it during that argument. To put it simply, no one, including the two judges in the majority, thought at the time of argument that the 2002 reaffirmation was in any way relevant. Furthermore, in the more than 500 pages of briefing filed by the parties, the intervenors, and the twelve amici, there were only two places at which the 2002 legislation was even noted, and at those places it was noted and nothing more. The brief of the United States includes one sentence in its history section recording the passage of the 2002 recodification and one citation to that legislative act in connection with the recodification of the motto, "In God We Trust." In that brief, like in all others filed in this litigation, the filing party, here the United States, attached no legal significance to the 2002 reaffirmation of the 1954 amendment. In sum, the parties, intervenors, and amici entirely ignored the 2002 reaffirmation in their discussions over whether the inclusion of "under God" in the Pledge rendered its daily recitation in public schools unconstitutional as applied; they all simply deemed the reaffirmation irrelevant. Accordingly, contrary to the suddenly developed nostra sponte view of two judges of this court, nowhere in the briefs or the oral argument was there any suggestion by the United States or anyone else that "[i]t is the 2002 statute . . . that sets forth our current Pledge," *id.* at 30, that "[i]t is the 2002 Congress' purpose we are called upon to examine," *id.* at 68, or indeed that the 2002 legislation had any relevance whatsoever to the question of the constitutionality of the recitation of the phrase "under God" as part of the Pledge. No one involved in this case suggested, even remotely, that the 2002 enactment shed any light on the purpose of Congress in amending the Pledge in 1954, or that

a new or different purpose now underlies the inclusion of the words "under God" in the Pledge. Nor, of course, did anyone suggest that because Congress disagreed with us as to the meaning of the First Amendment, we should yield to Congress's view.

Other courts have also heard Establishment Clause challenges involving the Pledge of Allegiance in the years since the 2002 reenactment, but like our court, not one of them, not even a single judge, until today even mentioned the 2002 legislation when deciding such a claim. *See, e.g., Myers v. Loudon County Pub. Schs.*, 418 F.3d 395, 398 (4th Cir. 2005) (noting that "[t]he Pledge was amended in 1954" but making no reference to the 2002 statute); *Freedom from Religion Found. v. Hanover Sch. Dist.*, ___ F. Supp. 2d ___, 2009 WL 3227860 (D.N.H. Sept. 30, 2009) (discussing the intent of the 1954 Congress but making no reference to the 2002 statute); *Keplinger v. United States*, 2006 WL 1455747 (M.D. Pa. May 23, 2006) (Unpub.) (addressing the 1954 legislative history but making no reference to anything that occurred in 2002); *see also Croft v. Perry*, 604 F. Supp. 2d 932 (N.D. Tex. 2009) (in an Establishment Clause challenge to the Pledge of Allegiance to the Texas state flag, discussing the legislative history of the 1954 federal Pledge amendment but making no reference to the 2002 legislation).

Under these circumstances, one cannot help but wonder how, when, and why the majority decided to afford the 2002 reaffirmation the importance it attributes to it in today's opinion. Rarely, if ever, does a court decide a case, let alone an important constitutional issue, on a ground that no party mentioned, no party briefed, no party argued, the existence of which no intervenor or amicus including the United States deemed to be of any relevance, and as to which the court itself at no time made any inquiry or reference prior to issuing its decision. Certainly no court has ever done so on so spurious a ground as the 2002 reaffirmation, a ground supported by no colorable legal argument and contrary to so many decades of

constitutional and other federal law. The best guess as to the reason for the majority's sudden, last-minute reliance on the 2002 reaffirmation is its belated recognition that its principal arguments with respect to the 1954 amendment, on which it had hoped to rely in order to reach its desired result, are all without merit and are easily refuted under controlling Supreme Court law. Nevertheless, I am compelled to address its Hail Mary argument.[50]

### B.  Immateriality of the 2002 Legislation

The reasons that the majority may ultimately have been driven to rely on the 2002 enactment as a justification for the 1954 amendment's addition of the phrase "under God" will become obvious in Sections IV and V, *infra*, where it is explained why the Constitution and the applicable Supreme Court precedent dictate the conclusion that all three Establishment Clause tests preclude the state-directed, teacher-led, daily recitation of the "under God" version of the Pledge in public schools. The reasons that no one but the two members of the majority has ever attempted to justify the 1954 insertion of the words "under God" into the Pledge on the basis of the 2002 "reaffirmation" are evident as well.

The majority argues that "it makes sense that we must examine the purpose of the most recent Congressional enactment" because "[o]therwise, a perfectly valid measure . . . would forever be banned by the politically motivated statements of some legislators." Maj. op. at 3913-14. This argument ignores the actual content and legislative history of both the 1954 enactment of the "under God" amendment and the 2002 reaffirmation of that congressional action. Whether a

---

[50]In football, a Hail Mary is a last-minute desperation pass, the most famous being Doug Flutie's, then a quarterback for Boston College, in a game against Miami in 1984. Sports analogies describing judging appear to be all the rage these days. Some have merit. Others, especially some involving baseball, clearly do not.

subsequent Congress could have rehabilitated the "under God" amendment by repudiating the actions of the 1954 law-makers and then reenacting the amended Pledge for entirely different reasons is not a question presented here: the 2002 Congress did exactly the opposite. The legislation it passed did not purport to do anything more than express disagreement with *Newdow I*, assert that we misunderstood the meaning of the Establishment Clause, and reaffirm the earlier 1954 congressional action. Neither of the first two pronouncements constituted a lawful exercise of Congress's legislative powers and thus were without legal significance, and the third did not change in any way the facts or law regarding the constitutional question raised by Congress's adoption of the "under God" amendment in 1954, and thus had no effect upon the outcome of this case.

The 2002 Congress simply declared its approval of the 1954 amendment to the Pledge when, in response to *Newdow I*, it purported to reaffirm the earlier Congress's action, necessarily including the purpose that underlay it. Members of Congress stated their disapproval of *Newdow I*, in statements on the House and Senate floors and in the text of the reaffirmation itself, insisting that the 1954 law had been constitutionally adopted and applied. *See supra* Part II.D. Congress did not seek to nullify or change the earlier Congress's original purpose in 1954; at no time did it expressly state that the purpose in 1954 was other than religious, and at no time did it expressly offer any purpose other than religion for its act of affirmation. Certainly, at no point did it suggest that the phrase "under God" was not religious. Rather, what it essentially did was to react, as Congresses have done in the past, to a judicial decision that it did not like by passing legislation or resolutions that attempted to overrule the scope of constitutional protections that the courts had afforded. *See City of Boerne v. Flores*, 521 U.S. 507 (1997). It did so here by simply setting forth a set of "findings" reporting pre-1954 historical events and a series of judicial decisions, all but one post-

1954, in order to explain why our court's interpretation of the Constitution in *Newdow I* was in error.

In its findings, Congress noted a number of times prior to 1954 that the religious term "God" had been used, such as Jefferson's authoring of "Notes on the State of Virginia" and Lincoln's Gettysburg Address, as well as the resolution calling for the proclamation of Thanksgiving Day. Pub. L. No. 107-293, 116 Stat. 2057, 2057-58 (2002). It then noted judicial decisions it apparently deemed inconsistent with *Newdow I*, *id.* at 2058-60, and it ended with its finding that *Newdow I* was "erroneous," *id.* at 2060. Somewhere in the recitation of historical facts, the majority purports to discover an "absolutely clear" expression of Congress's secular purposes, maj. op. 3902, and an equally clear statement "that we had misunderstood Congress' purpose in our ruling in *Newdow III*."[51] *Id.* at 3913. The majority does not identify those "absolutely clear" statements, and for good reason: they do not exist.

Had Congress set forth its "secular reasons . . . directly in the statute," as the majority claims, maj. op. at 3895, one would expect that my colleagues could and would simply quote those reasons directly from the statute. Had Congress made an "absolutely clear" statement of its secular purposes, *id.* at 3902, one would expect that the majority could and would provide an equally clear explanation of what those purposes were. The majority does neither, as Congress never identified any secular purpose underlying its 1954 adoption of the "under God" amendment or its 2002 reaffirmation of that amendment. Instead, the majority variously states that the 2002 Congress's purpose in reaffirming the inclusion of the phrase "under God" in the Pledge was "to underscore the political philosophy of the Founding Fathers," maj. op. at 3876, "to add [a] note of importance . . . [to the] Pledge," *id.*,

---

[51]Because the 2002 legislation was enacted prior to our 2003 decision in *Newdow III*, I assume that the majority intended to refer to *Newdow I* rather than *Newdow III* when making this assertion.

"to inspire patriotism," *id.* at 3877, to "recogni[ze] . . . histori-
cal principles of governance," *id.* at 3889, "to describe an
attribute of the Republic," *id.* at 3891-94, to "reference . . . the
historical and religious traditions of our country," *id.* at 3893,
and to "inspir[e] and solemniz[e]," *id.* at 3914. At no point,
however, did Congress say in 2002 that it had any purpose in
reaffirming the 1954 amendment to the Pledge other than to
reaffirm the 1954 Congress's effort to promote religion, espe-
cially in the case of public schoolchildren. To the extent that
the majority has inferred any specific reasons from the 2002
Act's descriptions of various historical events, that methodol-
ogy would provide equal support for the conclusion that Con-
gress's purpose was to promote "the Glory of God and the
advancement of the Christian Faith"; to hold "that God is
just"; to "declare[ ] . . . [r]eligion . . . necessary to good gov-
ernment and the happiness of mankind"; and to "ac-
knowledg[e] . . . the many signal favors of Almighty God."[52]

The majority cannot support or even clearly express its
claim of a secular congressional purpose because at no point
was there any statement, in the 2002 Act or in its findings,
that there was *any purpose* other than religion that motivated

---

[52]*See* Pub. L. No. 107-293, 116 Stat. 2057, 2057-58 (2002) ("Congress
finds the following: (1) On November 11, 1620 . . . the Pilgrims signed
the Mayflower Compact that declared: 'Having undertaken, *for the Glory
of God and the advancement of the Christian Faith* and honor of our King
and country, a voyage to plant the first colony in the northern parts of Vir-
ginia,' . . . . (3) In 1781, Thomas Jefferson . . . in his work titled 'Notes
on the State of Virginia' wrote: '. . . . I tremble for my country when I
reflect *that God is just*; that his justice cannot sleep forever.' . . . . (5) On
July 21, 1789 . . . the First Congress of the United States also passed the
Northwest Ordinance . . . which *declared*: '*Religion*, morality, and knowl-
edge, being *necessary to good government and the happiness of mankind*,
schools and the means of education shall forever be encouraged.' . . . . (6)
On September 25, 1789, the First Congress unanimously approved a reso-
lution calling on President George Washington to proclaim a National Day
of Thanksgiving . . . by declaring, 'a day of public thanksgiving and
prayer, to be observed by *acknowledging*, with grateful hearts, *the many
signal favors of Almighty God* . . . .' " (emphases added)).

the 1954 enactment of the "under God" amendment or the 2002 reaffirmation of that earlier congressional action. The 2002 Congress certainly disagreed with *Newdow I*, but its disagreement was based on our interpretation of the Establishment Clause. *See supra* Part II.D. Congress did not object to our decision on the basis that we had misunderstood its purpose; rather, it objected to our conclusion that the purpose we found was constitutionally impermissible.

The Supreme Court has clearly and consistently stated that legislation seeking to change a court's constitutional decision exceeds congressional authority; if it did not, "no longer would the Constitution be 'superior paramount law, unchangeable by ordinary means.' " *Boerne*, 521 U.S. at 529 (quoting *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803)). Notwithstanding any legislation Congress might choose to enact, "[t]he power to interpret the Constitution in a case or controversy remains in the Judiciary." *Id.* at 524. Accordingly, we are bound to evaluate the "under God" version of the Pledge enacted in 1954, without regard to any view that Congress may have expressed as to its constitutionality in the 2002 reaffirmation or any view it may have expressed regarding any constitutional interpretation that we rendered in *Newdow I*:

> When [a court] has interpreted the Constitution, it has acted within the province of the Judicial Branch, which embraces the duty to say what the law is. . . . When the political branches of the Government act against the background of a judicial interpretation of the Constitution already issued, it must be understood that in later cases and controversies the Court will treat its precedents with the respect due them under settled principles, including *stare decisis*, and contrary expectations must be disappointed.

*Id.* at 536 (citing *Marbury*, 5 U.S. at 177).

Under these circumstances, it is difficult to comprehend how any reasonable judge could in good faith suggest that the 2002 recodification, even with its introductory recitation of historical events, provides any basis for disregarding the overwhelmingly predominant religious purpose of the 1954 amendment or substituting in its place some vague and inchoate secular purpose, especially knowing that no lawyer in this case and no judge in any similar case has ever offered so unsupportable a theory. Even were we to consider what the majority appears at times to contend is the additional purpose, "add[ing a] note of importance" to the Pledge, maj. op. at 3876, or any other similar purpose to which it seems at other times to allude, such as proclaiming that ours is a "limited government," any such additional purpose would be of minimal significance in light of the overwhelmingly predominant religious purpose evident from the entire legislative record let alone the plain meaning of the words "under God." The majority's approach is directly contrary to *McCreary County v. ACLU of Kentucky*, 545 U.S. 844, 871-72 (2005), in which the Supreme Court held that even the repeal of a prior enactment does not "erase[ it] from the record of evidence bearing on current purpose," and that a government action taken without "repeal[ing] or otherwise repudiat[ing]" the previous action carries even less weight.[53] The majority defies this binding precedent and seizes upon the 2002 recodification in order to make an "implausible claim that governmental purpose has changed." *McCreary*, 545 U.S. at 874. That argument "should not carry the day in a court of law any more than in a head with common sense." *Id.*

---

[53]The majority's attempts to distinguish *McCreary*, *see* maj. op. at 3896 n.19, are not only thoroughly unpersuasive, but completely irrelevant. Regardless of how many *factual* distinctions the majority could identify, this case would still be governed by the *legal* principles set forth in *McCreary*: whatever subsequent actions a governmental body takes, it cannot erase the past, and a failure to repeal or repudiate an earlier measure renders any such argument of little or no force whatsoever.

The majority's decision not only fails to disappoint the illegitimate expectations of the 2002 Congress, it surely exceeds those lawmakers' highest hopes. It acquiesces completely in the congressional disagreement with the judicial interpretation we previously rendered, accepting the interpretation of constitutional law set forth in the legislative findings to the 2002 reaffirmation. Maj. op. at 3896-3902. It would appear, then, that the majority is no more willing to follow the rule of separation of powers than it is to adhere to the fundamental tenets of the Establishment Clause.

## C. The Issue: The Constitutionality of the 1954 Amendment As Applied

"It cannot be the case that Congress may override a constitutional decision by simply rewriting the history upon which it is based." *United States v. Enas*, 255 F.3d 662, 675 (9th Cir. 2001) (en banc). Nor can a court reach a constitutional conclusion by rewriting the history of the government's actions, or by selectively declaring some of those actions obsolete, as today's majority does. Rather, it is the judiciary's responsibility to undertake an independent examination of both the historical facts and the law, and, ultimately, "to say what the law is." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803).

Because the 2002 legislation made no effort to modify the wording of the amended Pledge, did not seek to change or disavow the purpose for which the words "under God" were inserted into the previously non-sectarian Pledge, and could not erase the legislative history underlying the 1954 amendment even if Congress so wished, the 2002 reaffirmation could, even under the majority's interpretation, constitute nothing more than an ineffective effort by Congress to overrule a judicial interpretation of the Constitution. The majority therefore does a disservice to the Constitution and the judiciary by purporting to rely on that Act to justify its position regarding the "under God" amendment. We must look to the

Pledge as it was amended in 1954 and to the purpose for which that amendment was made. That has, correctly, been the view of our court and all other courts hearing Establishment Clause challenges involving the Pledge; it is the view of the parties to this action, of the intervenors, and of the amici; and it appeared to be the view of the two members of the majority until sometime after oral argument, when my colleagues must have thought that they had discovered, albeit belatedly, an argument that no one else had previously deemed worthy of consideration or had even mentioned — an argument that they hoped might somehow support the result that they desired to reach but could not otherwise attain. My colleagues would have far better performed their duty had they taken their chances and left it to the Supreme Court to revise the law governing the question now before us. For it is only if the Supreme Court were to decide to change its view of the Establishment Clause and overrule the precedent that now binds us, that the state-directed, teacher-led, daily recitation of the Pledge with the words "under God" included could be held to be in compliance with the Constitution.

## IV. Establishment Clause Tests

I now turn to the real issue in this case: Does the Establishment Clause, as it has been construed by the Supreme Court, preclude the state-directed, teacher-led, daily recitation of the version of the Pledge, as amended by Congress in 1954, in public schools? The answer is crystal clear. Today's majority not only ignores the historical record and the plain meaning of the words contained in the amendment to the Pledge; it also distorts — when it does not ignore — the applicable Supreme Court doctrine governing the constitutional issues before us. Although the Court's Establishment Clause jurisprudence is often derided as inconsistent,[54] the challenges in applying the

---

[54]*See, e.g., Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 861 (1995) (Thomas, J., concurring) ("[O]ur Establishment Clause jurisprudence is in hopeless disarray . . . ."); *Lynch v. Donelly*, 465 U.S. 668, 699 n.4 (1984) (Brennan, J., dissenting) ("It seems the Court is willing to alter its analysis from Term to Term in order to suit its preferred results.").

governing precedents ought not be treated as a license to disregard or rewrite the law that binds us, especially where those precedents unambiguously require a holding contrary to that which a majority of a panel of this court may desire to reach. The Supreme Court's decisions do not merely provide "constitutional 'signpost[s],' to be followed or ignored in a particular case as our predilections may dictate." *Wallace v. Jaffree*, 472 U.S. 38, 69 (1985) (O'Connor, J., concurring in the judgment) (internal citation omitted). Rather, as members of an intermediate appellate court, our duty when existing doctrine clearly governs a case is to apply the law as it is written; "only [the Supreme] Court may overrule one of its precedents." *Thurston Motor Lines, Inc. v. Jordan K. Rand, Ltd.*, 460 U.S. 533, 535 (1983) (per curiam).[55]

---

[55]Nor is the considered judgment of *this* court something that should be lightly cast aside, especially when we have already decided the merits of the *exact* issue before us, as is the case here. *See Newdow v. U.S. Cong.*, 328 F.3d 482 (9th Cir. 2003) ("*Newdow III*"), *amending* 292 F.3d 597 (9th Cir. 2002) ("*Newdow I*"), *rev'd on other grounds sub nom. Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1 (2004). No intervening decision by the Supreme Court or this court has changed the governing law or legal principles in any respect since we addressed a case seven years ago with the same facts and even many of the same parties as the one we address today. The majority's contrary argument — that legislation enacted *before* our decision in *Newdow III* constitutes a *subsequent* change in the law — is nothing short of nonsensical. Maj. op. at 3928-29 & n.37; *see also supra* n.49.

I agree that our prior decision is no longer binding, but it nonetheless "remains viable as persuasive authority, notwithstanding the Supreme Court's vacatur." *Roe v. Anderson*, 134 F.3d 1400, 1404 (9th Cir. 1998). It is thus entitled to at least some deference — certainly greater deference than it has received from the majority. In truth, the only reason this case is being decided differently today than it was seven years ago is that a random lottery drew the members of *this* panel to decide the issue.

> To those who question whether the results in constitutional and other cases depend on the membership of the panel, or whether the replacement of even a single Supreme Court justice can change the fundamental nature of the rights of all Americans with respect to matters as basic as . . . the nature of religious liberty, the result in the case currently before our panel . . . illustrat[es just] how the judicial system currently operates.

In the context of the Establishment Clause, circuit courts and scholars have recognized three separate "tests" that control our analysis: the *Lemon* test, the endorsement test, and the coercion test. *See, e.g.*, *Borden v. Sch. Dist. of E. Brunswick*, 523 F.3d 153, 175 (3d Cir. 2008); *Mellen v. Bunting*, 327 F.3d 355, 370-71 (4th Cir. 2003); *DeStefano v. Emergency Hous. Group, Inc.*, 247 F.3d 397, 410-16 (2d Cir 2001); *Doe v. Beaumont Indep. Sch. Dist.*, 240 F.3d 462, 468 (5th Cir. 2001). There is no need to evaluate the relative merits of the various tests. As the majority acknowledges, the law is clear that *each* is binding and that the failure to satisfy *any one* is fatal. *See, e.g.*, *Doe v. Santa Fe Indep. Sch. Dist.*, 168 F.3d 806, 818 (5th Cir. 1999), *aff'd* 530 U.S. 290 (2000) (applying the tests independently); *accord Newdow III*, 328 F.3d at 487 ("We are free to apply any or all of the three tests, and to invalidate any measure that fails any one of them."), *rev'd on other grounds sub nom. Elk Grove*, 542 U.S. 1 (2004). Here, the choice of test matters little, as the state-directed, teacher-led recitation of the "under God" version of the Pledge clearly fails to meet the constitutional standards under each of the tests, and thus is thrice unconstitutional.

A.  The *Lemon* Test and the "Under God" Amendment

Despite repeated criticisms from various flanks, "[t]he *Lemon* test remains the benchmark to gauge whether a particular government activity violates the Establishment Clause." *Access Fund v. U.S. Dep't of Agric.*, 499 F.3d 1036, 1042 (9th

---

*Carver v. Lehman*, 558 F.3d 869, 880 (9th Cir. 2009) (Reinhardt, J., concurring in the judgment), *amending* 528 F.3d 659 (9th Cir. 2008) (Reinhardt, J. joined by Ferguson, J.).

In this case, a simple change in two of the judges, or to put it more accurately, a change in only one — as the views of Judge Fernandez, the original dissenter, are clearly shared by Judge Bea — results in a regrettable abandonment of constitutional principles and an unfortunate infringement on our public schoolchildren's rights to religious freedom.

Cir. 2007). The Supreme Court applied the *Lemon* test in its most recent Establishment Clause case, *see McCreary County v. ACLU of Ky.*, 545 U.S. 844, 859-67 (2005), as well as its most recent Establishment Clause case involving public schools, *see Santa Fe,* 530 U.S. at 314. It has "particularly relied on *Lemon* in . . . case[s] involving the sensitive relationship between government and religion in the education of our children." *Sch. Dist. of Grand Rapids v. Ball*, 473 U.S. 373, 383 (1985). Indeed, with the exception of *Lee v. Weisman*, 505 U.S. 577 (1992), *see infra* Part IV.C, "[i]n no case involving religious activities in public schools has the Court failed to apply vigorously the *Lemon* factors." *Lee*, 505 U.S. at 603 n.4 (Blackmun, J., concurring).[56]

The test itself is well-established: "First, the statute [or practice] must have a *secular legislative purpose*; second, its principal or primary *effect* must be one that neither advances nor inhibits religion; finally, the statute [or practice] must not foster 'an *excessive entanglement* with religion.' " *Lemon v. Kurtzman*, 403 U.S. 602, 612-13 (1971) (internal citation omitted) (emphases added) (quoting *Walz v. Tax Comm'n*, 397 U.S. 664, 674 (1970)). The secular purpose must predominate; it cannot be "merely secondary to a religious objective." *McCreary*, 545 U.S. at 864. Failure to satisfy any one of the three prongs of the *Lemon* test is sufficient to invalidate the challenged law or practice. Particularly relevant to this case, a finding that a challenged statute or practice had a predominantly religious purpose "make[s] it unnecessary, and indeed inappropriate, to evaluate [its] practical significance." *Wallace*, 472 U.S. at 61. Thus, "[i]f the law was enacted for the purpose of endorsing religion 'no consideration of the second or third criteria [of *Lemon*] is necessary.' " *Edwards v. Aguillard*, 482 U.S. 578, 585 (1987) (second alteration in original)

---

[56]In *Lee*, the Court concluded that the challenged practice violated the coercion test. Having done so, there was no need for it to apply the *Lemon* test as well. Still, *Lee* stands alone in the Court's failure to employ *Lemon* rather than or in addition to one of the other two tests.

(quoting *Wallace*, 472 U.S. at 56)). Simply put, if the purpose of the statute or practice "is the advancement or inhibition of religion then the enactment exceeds the scope of legislative power as circumscribed by the Constitution." *Abington*, 374 U.S. at 222.

The majority does not disagree that *Lemon* is the law of the land, nor does it dispute that a statute or state-sponsored practice that has a predominantly religious purpose necessarily violates the Establishment Clause. Rather, the fundamental error the majority makes that permeates its entire analysis is that it fails to comprehend that the *Lemon* test must be applied to the 1954 amendment that adds "under God" to the Pledge and not to the Pledge in its entirety. The majority's attempt to ignore the amendment and instead base its analysis on "the Pledge as a whole," maj. op. at 3876, is contrary to the legal principles that bind us for two reasons: First and foremost, the Supreme Court has determined how statutes amending provisions similar to the one before us shall be examined under *Lemon* and we are obligated to follow its holding. Second, it is the words "under God" contained in the amendment that Jan Roe and her daughter challenge. They raise no question as to the constitutionality of the state-directed recitation of the Pledge as it existed prior to the 1954 amendment, or as it would exist today if the two offending words were stricken; it is only the addition of the religious phrase that they contest. Yet, as evidenced by its deliberate decision not to discuss or even to acknowledge the explicitly religious legislative history of the "under God" amendment to the Pledge, the majority simply refuses to examine the legislative enactment that was zealously supported and unanimously adopted by 531 Senators and Representatives, signed by the President of the United States, celebrated with the most bellicose and divisive of all religious hymns on the steps of the Capitol, and endorsed by forty-three state legislatures. Instead, my colleagues contend that our analysis should examine "the entire wording of the Pledge *as a whole*," *id.* at 3886 n.9 (emphasis added), i.e., the Pledge as it exists today, disregarding the fact

that it is only the application of the amendment that is challenged as unconstitutional.

Although the majority's willful blindness toward the existence and text of the amendment to the Pledge may be a necessary precondition to its reaching its desired outcome in this case, its refusal to follow controlling Supreme Court precedent reflects remarkable disdain for the law. The Supreme Court has explicitly held in a case that is indistinguishable from the one before us that our inquiry *must* center on the amendment and not the provision as a whole — in this case on the specific words Congress enacted in 1954 and inserted into the Pledge of Allegiance: "under God." In *Wallace v. Jaffree*, a secular and otherwise constitutional statute providing for a moment of silence in public schools was amended so as to add an explicitly religious provision stating that the moment of silence could be employed for prayer. The Supreme Court struck down that legislative amendment as violative of the Establishment Clause because of the "textual differences" introduced by the amendment: "The addition of [the words] 'or voluntary prayer' indicates that the State intended to characterize prayer as a favored practice." *Wallace*, 472 U.S. at 60. The majority seeks to evade its obligation to follow that binding precedent, but it is not free to set aside, overrule, or ignore it, or to avoid the conclusion that such binding precedent compels.

If the majority followed the Court's opinion in *Wallace*, as it is bound to do, it would be required to recognize that the previously secular Pledge of Allegiance was amended with the express purpose of promoting a state-sponsored belief in God and of indoctrinating schoolchildren with that belief. The only permissible conclusion my two colleagues could reach after acknowledging that fact would be that the amendment that results in the state-directed, teacher-led daily recitation of the *religious* version of the Pledge of Allegiance in public schools is, at the least, unconstitutional as applied.

1.

There is no escaping the fact that our decision today is controlled by the Supreme Court's directly on-point analysis in *Wallace v. Jaffree*, 472 U.S. 38 (1985). The case is what law students and their professors used to call a "spotted cow."[57] The majority goes through numerous contortions in an effort to escape the unavoidable conclusion reached by Chief Justice Burger in dissent: *Wallace* "render[s] the Pledge unconstitutional." *Id.* at 88 (Burger, C.J., dissenting).[58] These contortions, however, cannot hide the fact that two judges of our circuit are simply disregarding binding Supreme Court law.

In *Wallace*, the state of Alabama amended a statute that called for a moment of silence at the beginning of each school day by adding language clarifying that the moment of silence could be used for "voluntary prayer." *See Wallace*, 472 U.S. at 40 n.2. Unlike here, there was no practical difference in *Wallace* between the original statute and the revised version that incorporated the amendment; in fact, the Court did not question that under the original statute students could voluntarily pray during mandatory moments of silence if they so desired. *Cf. id.* at 59; *id.* at 72-74 (O'Connor, J., concurring in the judgment); *id.* at 85 (Burger, C.J., dissenting). Still, the Court struck down the statute containing the clarifying "voluntary prayer" amendment as an unconstitutional establishment of religion, reasoning that the "textual differences" between the original and the revised statute conclusively established the religious purpose of the later enactment. *Id.* at 58 (majority opinion). Laying the two statutes side by side,

---

[57] *See, e.g.*, *Picker Int'l, Inc. v. Parten*, 935 F.2d 257, 261 (11th Cir. 1991) ("a gray horse case or spotted cow case, meaning it's exactly like the case that is before the Court now.").

[58] By this brief statement, the Chief Justice obviously meant only that the Pledge was unconstitutional to the extent that it was pronounced with the words added by the amendment, as is the case with regard to plaintiff RoeChild and others similarly situated.

NEWDOW v. RIO LINDA USD

the Court noted that "[w]hen the differences between [the revised statute] and its . . . predecessor [were] examined," *id.*, it was readily apparent that the amendment "had *no* secular purpose,"*id.* at 56. As the Court explained:

> [T]he *only significant textual difference is the addition of the words 'or voluntary prayer.'* . . . Appellants have not identified *any secular purpose* that was not *fully served* by [the law] *before* the enactment of [the amendment]. Thus, only two conclusions are consistent with the text of the [new law]: (1) the statute was enacted to convey a message of state endorsement and promotion of [religion]; or (2) the statute was enacted for no purpose. No one suggests that the statute was nothing but a meaningless or irrational act.

*Id.* at 59 (emphasis added).

In reaffirming *Wallace*, the Supreme Court has held that "[t]he plain meaning of [a] statute's words . . . can control the determination of legislative purpose." *Edwards*, 482 U.S. at 594. Here, as in *Wallace*, it does. The only two operative words the amendment contains, the only two words it added to the Pledge, are the words "under God." The Pledge remains exactly the same except for the insertion of the two new words. Only the most extreme sophistry could permit a reading of those words, "under God," that carries anything but a predominantly religious meaning and a predominantly religious purpose.

To be precise, the ordinary and plain meaning of the word "God" is undeniably religious.[59] So it was in the beginning, is now, and ever shall be. Even the majority concedes that

[59] *E.g.*, RANDOM HOUSE DICTIONARY OF ENGLISH LANGUAGE 606 (1979) ("God . . . *n.* 1. the one Supreme Being, the creator and ruler of the universe.").

examining the words "under God" in isolation would reveal a meaning that "could not be anything but religious." Maj. op. at 3903. Yet despite acknowledging that the purpose inquiry requires us to examine "the plain meaning of the statute's words," *id.* at 3894, the majority purports somewhat incoherently to examine "*Congress' reasons* for 'the plain meaning of the statute's words,' " *id.* (emphasis added), and to find in the context of the religious phrase a meaning directly opposite to its plain meaning. In so doing, the majority declines to apply the meaning of the words themselves, but instead substitutes a statutory purpose of its own making.

The majority asserts that although "the words 'under God' have religious significance," maj. op. at 3890, the phrase "under God" in the Pledge conveys nothing more than the secular principle that "our nation is founded upon the concept of a limited government," *id.* at 3909, an odd proposition that occurred to none of the authors or supporters of the amendment. Indeed, a simple reading of the legislative history, and specifically the Congressional Record pertaining to the 1954 amendment, would make it clear to any reasonable person, even to one who could not grasp the plain meaning of the words "under God," that the phrase as used in the amendment is a religious phrase deliberately inserted in the Pledge of Allegiance by Congress for a religious purpose. The congressional authors and supporters of the amendment did not conceal their purpose; they proclaimed it proudly. Congress unequivocally professed its desire to promote religion and faith in a Supreme Being; it did not even hint at the idea that the amendment was intended to proclaim that this country had a government of limited powers.

The majority's concession that "under God" is in fact a religious phrase simply highlights the absurdity of its argument that, when added to the Pledge, the phrase suddenly became a reference to "limited government." *Id.* at 3909. Nothing in the plain meaning of the words "under God," the legislative history of the statutory amendment, or the history of the

events leading up to its adoption in any way suggests any such meaning. With all due respect to my colleagues, their "limited government" argument is pure poppycock, fabricated by the members of the majority in order to obfuscate the issues before us and supported by neither the words of the amendment nor the purpose expressed by Congress. Whether added to the Pledge, inserted into a high school civics textbook, or used in any other manner, the religious phrase "under God" sets forth the proposition, not that our government is one of limited powers, but that our country is subordinate to the deity that rules over us — as in "Lord, our God, ruler of the universe."[60] The majority's hapless attempt to give the phrase "under *God*" a predominantly secular construction serves only to underscore the fact that no relevant distinction between
*Wallace* and this case can be drawn, and that the majority's determination to reach the result it does knows no intellectual bounds.

As in *Wallace*, once the original statute and its amendment are compared, or as that case puts it, laid side by side, the amendment's religious purpose must become clear even to the members of the majority. In *Wallace*, Justice O'Connor found it particularly "notable that Alabama *already had* a moment of silence statute before it enacted" its amendment adding the words "voluntary prayer." *Wallace*, 472 U.S. at 77 (O'Connor, J., concurring in the judgment). So too, here, the United States *already had* a patriotic Pledge of Allegiance before Congress added the words "under God" to it in 1954. Indeed, it is hard to "identif[y] *any* secular purpose that was not fully served by" the original Pledge "before the enactment of" its amendment. *Id.* at 59 (majority opinion) (emphasis added). The majority contends that the original Pledge did not adequately express the secular notion of "limited government," but, as I have already pointed out, it is sheer sophistry to suggest that the words "one nation under God" somehow

---

[60]In Hebrew, *Adonai Eloheinu Melekh Ha-Olam.*

*mean* a nation with a "limited government," rather than a nation subordinate to a higher religious being, or that the words "under God" were added to the Pledge for some other secular purpose. Certainly *none* of the amendment's sponsors or supporters ever expressed so extraordinary an idea; indeed, they made it clear that their purpose was quite the opposite — to proclaim our nation's dedication to the Almighty. *See infra* Part IV.A.2.

The majority also suggests that the amendment to the Pledge advances the secular purpose of steeling Americans' hearts and minds against Communism. But, again, it is difficult to see how this secular purpose "was not fully served" by the *original* Pledge, *Wallace*, 472 U.S. at 59, which, like the current Pledge, emphatically began with the words, "I pledge allegiance to the flag *of the United States of America*." In the midst of the Cold War, could there possibly have been a more forceful renunciation of the foreign doctrine of Communism? The man who wrote the Pledge certainly did not think so. In the 1920s, Francis Bellamy, who at that time was very "preoccup[ied] with subversives and radicals" in America, "especially German-Americans . . . Communists, 'Bolshevists,' and anarchists," wrote a manifesto that "spelled out his vision of how the Pledge of Allegiance" — that is, the *original* Pledge of Allegiance, *without* the words "under God" — "could be used to *promote patriotism and ward off un-Americanism*." ELLIS, *supra* note 5, at 68-71 (emphasis added). Bellamy's understanding of the words that he authored confirms the obvious: a pledge of allegiance to a national flag is, by definition, supremely patriotic. Except in theocracies, such a pledge does not become *more* patriotic by amending it to include a personal affirmation of belief in God.[61]

---

[61]Interestingly, thirteen states plus the commonwealth of Puerto Rico have enacted their own official pledges of allegiance. One state, Tennessee, has enacted two. Each of these pledges expresses the declarant's patriotic pride in and love for his state or commonwealth. However, of all fifteen pledges, only five contain any mention of God or of religion. *Com-*

As the dissenting Chief Justice in *Wallace* stated, the court's opinion in that case "render[s] the [amended] Pledge unconstitutional . . . . That [must] be the consequence of [its] method of focusing on the difference between [the current statute] and its predecessor statute . . . ." *Wallace*, 472 U.S. at 88 (Burger, C.J., dissenting). Chief Justice Burger was correct, at least to the extent that public schoolchildren may not be subjected to the daily state-directed, teacher-led recitation of the version of the Pledge that includes the words "under God" as added by the statutory amendment. Rather, when the Pledge is recited by schoolchildren in such circumstances, it must be the traditional, purely patriotic version that they recited for decades prior to the enactment of the 1954 religious amendment.

The majority, however, seeks to avoid *Wallace*'s dispositive effect, employing three different tactics in its effort to escape the necessary consequence of its reasoning and holding. First, the majority argues that the plaintiffs here lack the standing to challenge the 1954 amendment that added "under God" to the Pledge. Maj. op. at 3880-81. Second, it implies that *Wallace* has been effectively overruled. *Id.* at 3887-92. Finally, it purports to apply *Wallace* without ever actually applying its reasoning or holding. *Id.* at 3892-93. Each of these tactics is more contorted than the one that precedes it,

---

*pare* ALA. CODE § 1-2A-2 (2009) (no mention of God); ARK. CODE ANN. § 1-4-102 (2008) (same); GA. CODE ANN. § 50-3-2 (2009) (same); MICH. COMP. LAWS § 2.29 (1979) (same); N.C. GEN. STAT. § 144-8 (2009) (same); OHIO REV. CODE ANN. § 5.013 (West 2009) (same); P.R. LAWS ANN. tit. 1, § 33a (2006) (same); S.C. CODE ANN. § 1-1-670 (2007) (same); S.D. CODIFIED LAWS § 1-6-4.1 (2008) (same), *with* KY. REV. STAT. ANN. § 2.035 (West 2008) ("grace from on High"); LA. REV. STAT. ANN. § 49:167 (2003) ("under God"); MISS. CODE ANN. § 37-13-7 (2008) ("under the guidance of Almighty God"); TEX. GOV'T CODE ANN. § 3100.101 (Vernon 2008) ("under God"). Tennessee has two state pledges of allegiance, one of which mentions God and one of which does not. *See* TENN. CODE. ANN. § 4-1-329 (2009).

and none even colorably provides any basis for freeing the majority from its obligation to follow binding Supreme Court law.

The majority's first attempt to avoid the result compelled by *Wallace* is simply a diversion. The majority haplessly argues that Jan Roe and her daughter lack the standing to challenge the 1954 amendment "because nothing in the Pledge actually requires anyone to recite it," and therefore plaintiffs cannot show that its wording "causes them to suffer any concrete and particularized injury." Maj. op. at 3881.[62] The majority repeatedly emphasizes that no direct challenge to the wording of the Pledge is before us on appeal, and explains that "[o]nly California Education Code § 52720 and the School District's Policy are at issue in this case." *Id.* at 3880. How, then, does the majority manage to "hold that *the Pledge of Allegiance* does not violate the Establishment Clause"? *Id.* at 3877 (emphasis added). Has the majority admitted to rendering an unconstitutional advisory opinion?

The answer, of course, is that the plaintiffs have challenged the "under God" version of the Pledge *as applied* to them through the School District's policy. *Accord* maj. op. at 3884 ("Because the School District's Policy states that recitation of the Pledge will fulfill the policy, we also examine the Pledge itself."). Accordingly, all of the effort the majority expends discussing the Roes' standing with respect to the 1954 amendment is *entirely beside the point*. No one disputes that Jan Roe and her daughter do have standing to challenge the *application* to them of the amendment at issue: the state-directed, teacher-led, daily recitation of the religious version of the Pledge in California's public schools. "The Supreme Court

---

[62]The majority goes on to explain why it believes that Michael Newdow, who is *no longer a party* to this lawsuit, does not have standing to challenge the Pledge amendment. Maj. op. at 3880-81. Newdow's claims were dismissed by the district court, the dismissal was not appealed, and the claims are therefore not before us on this appeal.

has repeatedly found federal jurisdiction for challenges to the activities of state agencies administering federal programs . . . . It has not mattered a jurisdictional whit that the agency was enforcing federal statutes, as well as pursuing state ends."[63] *Green v. Dumke*, 480 F.2d 624, 628 (9th Cir. 1973) (citing cases). Here, Congress explicitly intended the "under God" version of the Pledge of Allegiance to be employed as a tool of religious indoctrination by state employees in state institutions — i.e., public school teachers in public schools. In so doing, it embarked on "a federal-state cooperative venture," *id.*; *see also id.* at n.6, a venture that when carried out every morning in Roe's daughter's classroom creates precisely the constitutional injury Roe and her daughter allege. The majority's confused and internally inconsistent discussion of standing thus at best misperceives the nature of the inquiry before us. At worst, it is a deliberate attempt to obfuscate the fact that *Wallace* squarely controls the merits of this case.

Before embarking on its second effort to avoid *Wallace*, the majority notes that the *Wallace* Court found evidence of an impermissible religious purpose not only in the "textual difference" between the original statute and the subsequent amendment, but also in the legislative history of the amendment; the amendment sponsor's testimony in district court; the court documents filed by the governor who signed the amendment into law; and a prayer statute passed one year after the amendment's adoption. Maj. op. at 3886. One might expect, based on this explanation of *Wallace*, that the majority would go on to examine not only the textual difference between the 1954 amendment and the original Pledge statute, but also the legislative history of the 1954 amendment; the public comments of Representative Rabaut, the amendment's sponsor, and the statements of President Eisenhower, who signed the amendment into law; as well as the other religiously-motivated laws passed within two years of the

---

[63]Standing is, of course, a "jurisdictional question." *E.g.*, *Steel Co.*, 523 U.S. at 86.

amendment's adoption. *See infra* Part IV.A.2; *see also supra* Parts III.B-C. Each of those sources compels the same conclusion: the 1954 Congress added "under God" to the Pledge for an overwhelmingly religious purpose. None of these sources, however, is examined by the majority.

Unwilling to reach the result that *Wallace* would dictate, the majority, after ignoring the sources of information that *Wallace* identified as relevant, goes even further. It abandons its acknowledgment that *Wallace* requires an examination of the two words introduced by the Pledge amendment, and reverts to its original claim that we must "examine the Pledge as a whole." Maj. op. at 3886. Although the majority does not provide a coherent explanation for its abrupt change in course, it appears to contend that *Wallace* has been tacitly overruled by later Supreme Court decisions. Specifically, the majority appears to assert that more recent Supreme Court cases have made "context" the touchstone of the *Lemon* analysis and that "context" now refers *solely* to the objects or words *immediately surrounding* the religious item or phrase being challenged — here, the twenty-nine other words in the Pledge of Allegiance surrounding the words "under God." In short, the majority's statement that the issue is the constitutionality of the Pledge as a whole, rather than the constitutionality of the amendment, is directly contrary to *Wallace*.

As an initial matter, I note that it is the Supreme Court's "prerogative alone to overrule one of its precedents." *State Oil Co. v. Khan*, 522 U.S. 3, 20 (1997). My colleagues have no authority to "conclude [that the Supreme Court's] more recent cases have, by implication, overruled an earlier precedent." *Agostini v. Felton*, 521 U.S. 203, 237 (1997). To the contrary, "the Court of Appeals on its own authority should [not] take[ ] the step of renouncing" Supreme Court decisions; "[i]f a precedent of th[e Supreme] Court has direct application in a case . . . the Court of Appeals should follow the case which directly controls," even if it believes, mistakenly or otherwise, that the controlling Supreme Court authority "appears to rest

on reasons rejected in some other line of decisions."[64] *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989). Here, far from being implicitly "rejected in some other line of decisions," *Wallace*'s reasoning and holding as to how to evaluate, for Establishment Clause purposes, an amendment to a statute, has been consistently and repeatedly *reaffirmed* by the Supreme Court in the intervening decades since it was decided.[65] So, disregarding all those cases, my colleagues simply proceed with their untenable argument in derogation of another set of controlling Supreme Court decisions.

In suggesting, probably out of a feeling of necessity, that *Wallace* has been overruled by some new definition of "context," my colleagues do not rely on a *majority* opinion from the Supreme Court, or even on an opinion by a minority composed of one or more justices, involving an amendment to a statute. Rather, they rely on Justice Breyer's one-judge opinion concurring in the judgment in *Van Orden v. Perry*, 545 U.S. 677, 698 (2005) (Breyer, J., concurring in the judgment), relating to an entirely different matter. Maj. op. at 3891, 3893. In *Van Orden*, Justice Breyer analyzed the constitutionality of the placement of a monument of the Ten Commandments on government property and considered a number of factors, such as its relationship to other monuments on the same prop-

---

[64]Until now, the decisions of our circuit have reflected a strict adherence to this principle. *See, e.g., United States v. Grisel*, 488 F.3d 844, 847 (9th Cir. 2007) (en banc) ("The fact that the Supreme Court has expressed some ambivalence about its own jurisprudence does not give us the power to change it."); *Hart v. Massanari*, 266 F.3d 1155, 1171 (9th Cir. 2001) ("A decision of the Supreme Court will control that corner of the law unless and until the Supreme Court itself overrules or modifies it. Judges of the inferior courts may voice their criticisms, but follow it they must.").

[65]*See, e.g.*, *McCreary*, 545 U.S. at 859-60 & n.9 (2005); *Santa Fe*, 530 U.S. at 316 (2000); *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 532 (1993); *Texas Monthly, Inc. v. Bullock*, 489 U.S. 1, 9 (1989); *Edwards*, 482 U.S. at 583-89 (1987); *Witters v. Wash. Dep't of Servs. for the Blind*, 474 U.S. 481, 485-86 (1986).

erty. However, that case is in no way relevant to the question presented in *Wallace* or to the case presently before us. Justice Breyer's concurrence did not relate to the interpretation of a statute and certainly not to how courts should determine the purpose and intent of amendments to statutory provisions, which, of course, was the question in *Wallace* and is the question here. Indeed, given that hanging copies of the Ten Commandments in public-school classrooms indisputably violates the Constitution, *see Stone v. Graham*, 449 U.S. 39 (1980) (per curiam), it is clear that Justice Breyer's concurrence in *Van Orden* regarding the placement of a monument containing those commandments on the grounds of the Texas State Capitol has no bearing whatsoever on the state-directed, teacher-led daily recitation of the religious version of the Pledge in public schools. Moreover, this court has already held in *Card v. City of Everett*, 520 F.3d 1009, 1021 (9th Cir. 2008), that *Van Orden* must be limited to facts "closely analogous" to the placement of monuments on public land. Not only are the facts in *Van Orden* wholly unlike the facts in the case before us, but the legal questions involved are far different. Thus, the factors to which we look in our consideration of context must, as our court has already held, *id.*, necessarily be considerably different.

Under the majority's new constitutional definition of "context," the government may undertake any religious act so long as the preexisting nonreligious acts that are somehow related to the new act remain in effect. This approach is entirely inconsistent with common sense as well as with Establishment Clause jurisprudence.[66] For example, if Congress

---

[66]Indeed, one of the members of the majority should be well aware of why the approach is unreasonable:

> The majority's context argument is that Good Friday's placement on the roll of public holidays amidst secular days diminishes its endorsing effect. . . . . Such an argument cannot be maintained. . . . . [U]nder the majority's context rationale, the state could decide tomorrow that all of holy week or any of the numerous

decided to carve the face of Jesus onto Mount Rushmore, that act would certainly be unconstitutional despite the presence on that Mount of four nonreligious faces. It is the religious nature of the governmental action, not the previously secular context within which that action is placed, that determines the constitutionality of such a change. Under the majority's reasoning, it would be of no consequence whether Congress had inserted the words "under God," or the words "under Jesus," or "under the Father, the Son, and the Holy Ghost" into the Pledge of Allegiance, given the Pledge's otherwise secular or patriotic context. The Pledge is a patriotic not a religious exercise, the majority tells us, and therefore a religious message may be inserted. Yet surely, not even the majority would hold that the insertion of the two additional religious phrases set forth above would be consistent with the Establishment Clause.

Finally, after spending eight pages attempting to replace *Wallace*'s reasoning with its new definition of "context," and a total of twenty-nine pages arguing that we must examine the Pledge "as a whole," the majority ultimately purports to acknowledge that it must apply *Wallace* to the "under God" amendment itself — an effort to which it devotes a mere two sentences. Maj. op at 3893-94. One "who has a good conscience doesn't walk so fast."[67] Indeed, the only two sentences

---

saints' days should be holidays and that their placement on the holiday roll would be balanced by all the other secular holidays. . . . . [But t]he reason that the holiday roll is filled with patriotic and secular days is because the state may not make any laws respecting the establishment of religion.

*Cammack v. Waihee*, 932 F.2d 765, 787 (9th Cir. 1991) (D. Nelson, J., dissenting).

[67]GEORG BÜCHNER, WOYZECK (Karl Emil Franzos ed., 1879), *reprinted and translated in,* DAVID GLEYRE RICHARDS, GEORG BÜCHNER AND THE BIRTH OF THE MODERN DRAMA 226 (1977).

in which the majority explains how *Wallace* applies to this case are rife with error and without legal support:[68]

> Focusing, as we must, on how the text of the statute is *used*, *Van Orden*, 545 U.S. at 701 (Breyer, J. concurring), we see that the addition of "or voluntary prayer" to the statute in *Wallace* was *used* to encourage students to participate in a religious exercise — the very prayer enacted [one year later]. Here, the addition of "under God" was *used* to describe an attribute of the Republic, "one Nation under God" — a reference to the historical and religious traditions of our country, not a personal affirmation through prayer or invocation that the speaker believes in God.

*Id.* In the end, the majority's "analysis" consists only of a conclusion announced ex cathedra.

In sum, the majority fails in its duty to follow *Wallace*; it cannot declare the case overruled or replace the Court's reasoning with its own contrary rationale. Under *Wallace*, the majority is required to examine, rather than ignore, the text of the *amendment*. An examination of that text and the plain meaning of its words clearly reveals the explicitly religious purpose motivating the amendment to the Pledge. The words "under God" are undeniably religious, and the addition to the Pledge of Allegiance of words with so plain a religious meaning cannot be said, simply because it might assist the majority in obtaining its objective, to be for a purpose that is predominantly secular. The words certainly were *not* inserted for the purpose of "reinforc[ing] the idea that our nation is founded

---

[68]As an example of its legal errors, it asserts that the phrase "under God" in the Pledge is not a personal affirmation of the speaker's belief in God, despite the Supreme Court's explicit recognition in a case that binds us here that "[the] pledge requires affirmation of a belief." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 633 (1943).

upon the concept of a limited government." Maj. op. at 3909. As I have stated earlier in this dissent and as I reiterate here, the suggestion by the majority that the purpose of inserting the phrase "under God" into the Pledge was to remind us that we have a "limited government" finds no support in the record and is wholly without merit.

*Wallace* explicitly requires us to compare the original statute to the amended form and to examine what the amendment has added. Where the addition is religious, the *addition* must be invalidated. Here, *Wallace* unquestionably requires us to strike down as unconstitutional the state-directed, teacher-led daily recitation of the "under God" language in the Pledge of Allegiance in the public schools. Omitting the two words added by the 1954 amendment and returning to the recitation of the secular version of the Pledge that was used in public schools for decades prior to the adoption of the amendment would cure the violation of the Establishment Clause at issue here.

2.

As I have explained above, the majority, in determining the purpose of the amendment, refuses to give the words "under God" their plain meaning, as required by *Wallace*, 472 U.S. at 58, by *Edwards*, 482 U.S. at 594, and by *McCreary*, 545 U.S. at 862, and indeed by elementary principles of statutory interpretation. As I have also explained, the majority has refused to follow controlling Supreme Court law with respect to examining the "context" of the amendment. *Compare Wallace*, 472 U.S. at 58-61 *with* maj. op. at 3886-92. In addition, the majority's treatment of legislative history, which would alone be dispositive of the constitutionality of the "under God" amendment as applied, is even more startling, and is at least as defiant of binding precedent. Fully cognizant of the damning evidence contained in the pages of the Congressional Record and of the conclusion that the evidence compels, the majority boldly asserts that we are legally *prohibited* from so

much as considering the numerous, indeed unanimous, pro-religion statements offered by every senator and representative who spoke on the subject of including the words "under God" in the Pledge of Allegiance. Maj. op. at 3895, 3912. All who spoke, as noted earlier, favored the insertion of the words and none opposed the proposal. The majority cites *McCreary*, 545 U.S. at 867-68, for the proposition that we may not consider "the statement of one or more individual members of Congress, but [only] what the committees putting forth the amendment actually stated."[69] Maj. op. at 3912. Nothing in *McCreary* remotely supports that assertion. What that binding Supreme Court precedent *does* state is that we must "rel[y] on a statute's text *and the detailed public comments of its sponsor[s]*, when we [examine] the purpose of a state law" challenged on Establishment Clause grounds.[70] *McCreary*,

---

[69]The majority cites *Mergens* as additional support for this proposition, but fails to acknowledge that the portion of *Mergens* on which it relies did not command a majority of the Supreme Court. Maj. op. at 3912 (citing *Bd. of Educ. v. Mergens*, 496 U.S. 226, 248-49 (1990) (opinion of O'Connor, J.)); *see also id.* at 3895 (same). Moreover, that plurality opinion simply stated that courts should not attempt to divine the "*possibly* religious motives of the legislators who enacted [a] law" when those motives are *unclear or inconclusive*. *Mergens*, 496 U.S. at 249 (opinion of O'Connor, J.) (emphasis added). The legislative history in *Mergens* at most showed only what "*some* senators *may* have thought." *Id.* at 243 (majority opinion). This case of course is the polar opposite. *See supra* Part II.

[70]Even in "ordinary" cases of statutory interpretation that do not implicate constitutional questions, the Supreme Court regularly examines both the official reports accompanying a bill as well as the statements of legislators memorialized in the Congressional Record. *See, e.g.*, *Atherton v. FDIC*, 519 U.S. 213, 228-30 (1997); *cf. Carpenters Health & Welfare Trust Funds v. Robertson*, 53 F.3d 1064, 1067 n.7 (9th Cir. 1995). Indeed, Justice Scalia has criticized, in dissent, the Court's practice of "often [relying on] legislative history" comprised of "[t]he Congressional Record or committee reports." *Koons Buick Pontiac GMC, Inc. v. Nigh*, 543 U.S. 50, 73 (2004) (Scalia, J., dissenting). Were this court to adopt Justice Scalia's approach and rely strictly on a textual analysis, the resolution of the inquiry before us would be even more clear, if that is possible. Giving "God" its standard, plain meaning, no one could deny that the term "under God" is a religious term, a term that must be presumed to have been inserted into the previously nonreligious Pledge for religious purposes. *See Am. Tobacco Co.*, 456 U.S. at 68.

545 U.S. at 862 (emphasis added) (citing *Edwards*, 482 U.S. at 586-88). I agree with the majority that "[w]hat motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it." Maj. op. at 3911 n.27 (quoting *United States v. O'Brien*, 391 U.S. 367, 384 (1968)). However, the Supreme Court has stated that in the ordinary course of determining "the interpretation of legislation, the Court *will* look to statements by legislators for guidance as to the purpose of the legislature."[71] *O'Brien*, 391 U.S. at 383 (emphasis added). Accordingly, when not only one legislator makes a speech expressing an explicitly religious purpose for enacting a law but *"scores of others" unanimously, vociferously and zealously echo that very same* purpose, we are not permitted to ignore such powerful evidence of legislative intent. When "openly available data support[ ] a commonsense conclusion that a religious objective permeated the government's action," *McCreary*, 545 U.S. at 863, the congressional purpose may be said to be undeniably religious.

Were the majority willing to follow controlling Supreme Court precedent and to acknowledge the legislative history of the Pledge that is detailed in this opinion, it could not deny that the history uniformly and overwhelmingly demonstrates a predominant religious purpose for the 1954 amendment. Here, the legislative history shows *lockstep unanimity* — each and every senator and representative to comment on the addition of the words "under God" to the Pledge unequivocally and zealously proclaimed religious motivations for his actions. *See supra* Part II. The unanimous, uncontradicted words of our legislators are clear: "under God" was inserted

---

[71]The majority fails to acknowledge this statement in *O'Brien* despite quoting the sentence that immediately follows it. Maj. op. at 3911 n.27. Although the majority's selective and misleading quotations might suggest otherwise, *O'Brien* only cautioned against relying on the statements of "*fewer than a handful* of Congressmen" to divine legislative intent. 391 U.S. at 384 (emphasis added).

in the Pledge to further the religious views and principles of millions of Americans, to reinforce their belief that God exists and to promote faith in his Being, indeed to reflect that we are subordinate to his Will. To those citizens who might be in doubt, the words were intended to let them know that such were the views and principles of all "true Americans," to indoctrinate them firmly in those American beliefs, and to try to resolve the doubts they might possess. Most pertinent here, the words were inserted in the Pledge so that schoolchildren throughout the land would repeat them daily and become imbued with the religious concepts that guided the authors and sponsors of the amendment, the other members of Congress, and the President of the United States. As Senator Wiley proclaimed, the lawmakers believed that there could be no "better training for our youngsters . . . than to have them, each time they pledge allegiance to Old Glory, reassert their belief, like that of their fathers and their fathers before them, in the all-present, all-knowing, all-seeing, all-powerful Creator." 100 Cong. Rec. 5915. Accordingly, as President Eisenhower declared when he signed the Pledge amendment into law, the lawmakers intended that "[f]rom [that] day forward, the millions of our school children [would] daily proclaim in every city and town, every village and rural school house, the dedication of our Nation and our people to the Almighty." *Id.* at 8618.

Indeed, when the drafters of the enactment offered a legal justification in defense of that statute's validity under the First Amendment, they did not deny that the amendment was religious in nature, but simply contended that the religious act on the part of the government was not prohibited by the Establishment Clause. Specifically, the Senate Report asserts:

> Adoption of the resolution would in no way run contrary to the provisions of the first amendment to the Constitution. This is not an act establishing a religion. *A distinction exists between the church as an institution and a belief in the sovereignty of God.*

> The phrase "under God" recognizes only the guid-ance of God in our national affairs . . . . Neither will this resolution violate the right of any person to dis-believe in God or reject the existence of God. The recognition of God in the pledge of allegiance to the flag of our Nation *does not compel any individual to make a positive affirmation in the existence of God* in whom one does not believe.[72]

As any law student will quickly recognize, both of the justifi-cations put forward in the Senate Report declaring the enact-ment constitutional have since that time been flatly rejected by the Supreme Court: It is indisputable that the First Amend-ment prevents more than simply the establishment of a state-sponsored "Church as an institution" and that the Bill of Rights' protections extend beyond those instances in which the government actually "compels an individual to make a positive affirmation" of a religious belief. *See, e.g.*, *Everson v. Bd. of Educ. of Ewing*, 330 U.S. 1, 15 (1947); *Abington*, 374 U.S. at 233 (Brennan, J., concurring)("[N]othing in the text of the Establishment Clause supports the view that the prevention of the setting up of an official church was meant to be the full extent of the prohibitions against official involvements in religion."); *see also Engel v. Vitale*, 370 U.S. 421, 430 (1962) ("The Establishment Clause . . . does not depend upon any showing of direct governmental compulsion and is violated . . . whether . . . laws operate directly to coerce nonobserving individuals or not."). Moreover, when we con-sider, as we do here, the application of the amendment to the state-directed, teacher-led, daily recitation of the amended Pledge in public schools, it is clear that the plaintiff and other like-minded children *are* compelled "to make a positive affir-mation in the existence of God in whom [they do] not

---

[72]S. Rep. No. 83-1287, at 2 (1954) (emphases added), *reprinted in* 100 Cong. Rec. 6231; *accord* H.R. Rep. No. 83-1693, at 3, *reprinted in* 1954 U.S.C.C.A.N. 2339, 2342 (citing *Zorach v. Clauson*, 343 U.S. 306, 312-13 (1952)).

believe," or to become "outsiders, not full members of the . . . community."[73] Either way, they are deprived of their constitutional rights. *See infra* Part III.C. When the unconstitutional rationales for Congress's enactment are stripped away, nothing remains, and the explanation in the Senate Report as to why including the religious phrase "under God" in the Pledge is constitutional is shown to be without legal foundation.[74]

---

[73]*Santa Fe*, 530 U.S. at 309 (quoting *Lynch*, 465 U.S. at 688 (O'Connor, J., concurring)).

[74]The legislators inserted their "justification" into the legislative record in order to respond to concerns about the proposed enactment's constitutionality. Such concerns were raised as early as Reverend Docherty's first sermon, delivered in 1952, suggesting that the words "under God" be added to the Pledge. *See supra* note 11. I also noted previously the concerns that existed in Congress, where some senators on the Senate Judiciary Committee "had concerns about the resolution's implications for the separation of church and state." ELLIS, *supra* note 5, at 134 & 257 n.40. Once the bill was taken up by Congress, its constitutionality was questioned widely by the public. *See, e.g.*, Andrew Menick, Letter to the Editor, L.A. TIMES, June 10, 1954, at A4 ("The pledge is an oath of loyalty . . . . It is not a confession of religious belief nor should it be . . . ."); C.S. Longacre, Letter to the Editor, WASH. POST, May 23, 1954, at B4 ("The current bill pending in Congress to insert the phrase 'under God' into the American Pledge of Allegiance has dangerous implications . . . . I see grave danger in . . . [the] law by a civil government that is pledged under our Constitution not to legislate upon religious matters."); Kenneth H. Bonnell, Letter to the Editor, L.A. TIMES, May 30, 1954, at B4 ("I protest the inclusion of the words 'under God' in the pledge of allegiance. The inclusion of these words is a violation of the principle of separation of church and state."); Richard S. Sartz, Letter to the Editor, WASH. POST, May 27, 1954, at 16 ("The insertion of 'under God' into the pledge [is] indeed . . . disturbing . . . . [The] freedom of religion in[ ] our Constitution . . . mean[s] freedom to believe according to one's own convictions, whether or not this include[s] the worship of a God.").

In the legislators' defense, many of the core Supreme Court precedents clarifying the Establishment Clause's requirements and demonstrating the deficiency of Congress's purported constitutional justification for the amendment were handed down after 1954. Prior to that time, the extent of the Constitution's prohibition against religious activity by the government was less explicitly delineated. *Cf. Everson v. Bd. of Educ. of Ewing*, 330 U.S. 1, 15 (1947); *supra* note 12. The supporters of the amendment obvi-

Finally, to the extent that "the circumstances surrounding [the] enactment," *Santa Fe*, 530 U.S. at 315, are relevant here, the circumstances further support the obvious conclusion that the words "under God" exist in the Pledge to serve an overwhelmingly religious purpose. For starters, we have an enactment that was literally drafted in the pulpit: As the primary legislative sponsors of the 1954 Act all proudly proclaimed, Reverend Docherty "put God in [the] Pledge."[75] There can be no denying the tremendous impact of the Reverend who declared "theological war . . . against modern, secularized, godless humanity" — a war that Congress adopted as its own when it rewrote the Pledge of Allegiance. The majority dismisses the impact Docherty had on his powerful congregation — which included the man who wrote the primary "under God" bill as well as the President who signed it — because "Reverend Docherty was never elected to office." Maj. op. at 3911 n.27. He was never elected, but Congress enthusiastically endorsed his proposal and wrote it into law, telling the nation plainly and clearly that it was his, and why it was adopting it. Moreover, in directing us to look at the "circumstances
*surrounding*" a statute's enactment, *Santa Fe*, 530 U.S. at 315 (emphasis added), the Supreme Court tells us not to limit our inquiry to the motivations of the elected officials who actually enacted the statute. Nor are we supposed to ignore the socio-political climate of the time: During the two years surround-

---

ously did not comprehend the full extent of the Establishment Clause's prohibitions and thus had no reason to attempt to conceal that their purpose was predominantly, indeed entirely, religious. In fact, for that reason, they proclaimed their purpose proudly. Of course, the legislators' inaccurate view of the law has no bearing on the merits of the plaintiffs' claim in this case. The congressmen who segregated the schools in Washington, D.C. did so without the benefit of *Brown v. Board of Education*, 347 U.S. 483 (1954), or *Bolling v. Sharpe*, 347 U.S. 497 (1954), but the segregation of the schools was certainly impermissible after those rulings all the same.

[75] Kenneth Dale, *Put God in Flag Pledge, Pastor Urges*, WASH. POST, Feb. 8, 1954, at 12; *see also supra* p. 24.

ing the adoption of the revised version of the Pledge, Congress passed a law adding the words "In God We Trust" to all paper money, replaced "E Pluribus Unum" with "In God We Trust" as the national motto, mandated an annual National Day of Prayer that continues to this day,[76] constructed a prayer room onsite at the Capitol building, and entertained, though it ultimately rejected, a constitutional amendment that read: "This nation devoutly recognizes the authority and law of Jesus Christ, Saviour and Ruler of Nations, through whom are bestowed the blessings of Almighty God." *See* Ellis, *supra* note 5, at 126. In this historical context, "[i]nserting the words 'under God' into the Pledge of Allegiance . . . must be understood as only one of many actions taken in the early years of the Eisenhower presidency that were designed to inject religious faith into public life." *Id.* at 126-27. The public recognized this reality far more clearly than do my two colleagues in the majority: Thousands of citizens wrote to their congressmen expressing their view that the new version of the Pledge "reflected a spiritual awakening in our country." 100 Cong. Rec. 7761.[77]

---

[76]In 2009, the President of the United States drew criticism from some quarters for his decision to mark the National Day of Prayer by communing privately with his God instead of using his elected office to exhort *others* to pray. *See Obama's Decision to Observe National Day of Prayer Privately Draws Public Criticism*, Fox News, May 6, 2009, http://tinyurl.com/FoxNewsPrayerDay. Others, however, saw the President's decision not to proselytize for his personal religious views as a restoration of the constitutionally mandated distinction between our elected political leaders and our pastors, priests, rabbis and imams. *See* Kristi Keck, *Obama Tones Down National Day of Prayer Observance*, CNN, May 6, 2009, http://tinyurl.com/CNNPrayerDay.

[77]It is worth noting that, these statements in the Congressional Record notwithstanding, national opinion regarding the new version of the Pledge was hardly unanimous. According to a Gallup poll, twenty-one percent of the country opposed the change, with sixty-nine percent in favor and ten percent expressing no opinion. George Gallup, *'Under God' Favored in Flag Oath*, L.A. Times, May 11, 1953, at 25. In the 1950s, a twenty-one percent disapproval rating reflected approximately thirty-five million Americans opposed to inserting "under God" into the Pledge. *See* Frank

Hobs & Nicole Stoops, U.S. Census Bureau, *Demographic Trends in the 20th Century* 11 (2002), *available at* http://www.census.gov/prod/2002pubs/censr-4.pdf.

Nor was there unanimity among religious denominations regarding the legislation. In light of the strong Christian overtones surrounding the Pledge amendment, "Jews were substantially less likely to support the change, [though] a clear majority [still] favored [it]." ELLIS, *supra* note 5, at 131 (2005). The American Unitarian Association went so far as to pass a resolution expressing its disapproval of the revision to the Pledge on the ground that it "was an invasion of religious liberty." *Congress Proposals Hit by Unitarians*, N.Y. TIMES, May 22, 1954, at 29. Speaking before the association, Washington author and civic leader Agnes Meyer said that "[t]he frenzy which has seized America to legislate Christianity into peoples [*sic*] consciousness by spurious methods . . . will harm the Christian religion more than the persecution it is now suffering under the tyranny of Communists." *Surpass Orthodoxy, Christianity Urged*, N.Y. TIMES, May 23, 1954, at 30.

**Volume 4 of 4**

In sum, even aside from the plain meaning of the words "under God" and the context in which we are required to examine them, the legislative history of the amendment to the Pledge and the surrounding circumstances provide overwhelming evidence that the state-directed, teacher-led, daily recitation of its religious version in public schools cannot possibly pass muster under any sound application of the *Lemon* test. The unanimous statements made by every legislator to speak in the House and Senate and included in the official legislative reports unabashedly announced that the purpose of including the words "under God" in the Pledge was to "acknowledge the dependence of our people and our Government upon the moral directions of the Creator." *See* H.R. Rep. No. 83-1693, at 2 (1954), *reprinted in* 1954 U.S.C.C.A.N. 2339, 2340. In light of the clear and open declaration of purpose, there can be no denying that "the enactment exceeds the scope of legislative power as circumscribed by the Constitution," *Abington*, 374 U.S. at 222, or at the least does so when and as it is applied to state-directed, teacher-led, daily recitation of the amended Pledge in public schools.

3.

The majority argues that the purpose of the amendment of the Pledge of Allegiance in 1954 was not predominantly religious because the words "under God" are simply a reference to the limited powers of our national government. That is, of course, an argument dreamt up by my colleagues that can nowhere be found in the Congressional Record. In addition, my colleagues have apparently forgotten that it is the *Constitution* that sets forth the limitations on government power, not, as far as our laws are concerned, God. The limitations on the power of our government are found in the Ninth and Tenth Amendments, which reserve certain powers to the states and reserve all other powers not granted to the federal government to "We the People." *See* U.S. Const. pmbl., art. I §§ 8, 9, amends. IX, X. The Bill of Rights also limits the actions the government may take. There is, however, no men-

tion of God in the Constitution, nor of the theory that the government has limited powers because it is "under God." Indeed, the words "limited government," as the majority uses them, appear to constitute an assertion that God granted certain rights to the people and limited the rights that government could possess. Maj. op. at 3904-05. Right or wrong, this is in itself an expression of a religious viewpoint, perhaps one with which most people might agree, but an expression that nevertheless would not further the majority's argument that the purpose of adding "under God" to the Pledge was secular and not religious.

The "omission of a reference to the Deity [from the Constitution] was not inadvertent; nor did it remain unnoticed." Leo Pfeffer, *The Deity in American Constitutional History*, 23 J. Church & State 215, 217 (1981). Although many early Americans strenuously opposed the Framers' commitment to secularism and their decision to break with tradition by omitting God from the text of the Constitution, "[t]he advocates of the secular state won, and it is their Constitution we revere today." Isaac Kramnick & R. Laurence Moore, The Godless Constitution 28 (2d ed. 1997).[78] The decision by the Founding Fathers cannot be reversed, nor the structure of the Constitution changed, as the majority suggests Congress did by inserting two words into the Pledge of Allegiance. Nor, certainly, was that the intent of Congress when it sought to promote a belief in God by making that belief a part of the Pledge.

---

[78]*See also, e.g.*, *Van Orden*, 545 U.S. at 724 & n.23 (Stevens, J., dissenting) (citing J. Hutson, Religion and the Founding of the American Republic 75 (1998) (noting the dearth of references to God at the Philadelphia Convention and that many contemporaneous observers of the Convention complained that "the Framers had unaccountably turned their backs on the Almighty" because they "found the Constitution without any acknowledgment of God")); *Marsh v. Chambers*, 463 U.S. 783, 807 (1983) (Brennan, J., dissenting) ("Even before the First Amendment was written, the Framers of the Constitution broke with the practice [followed in] the Articles of Confederation and many state constitutions, and did not invoke the name of God in the document.").

The majority's contrived efforts to distort both history and binding Supreme Court law are inconsistent with our duty as judges, as defined by the Court. "[I]t is . . . the duty of the courts to 'distinguis[h] a sham secular purpose from a sincere one.' " *Santa Fe*, 530 U.S. at 308 (second alteration in original) (quoting *Wallace*, 472 U.S. at 75 (O'Connor, J., concurring in the judgment)). This duty necessarily bars the courts themselves from superimposing a sham secular purpose onto an explicitly religious statute, as the majority does today.[79] Twenty years ago, Justice O'Connor declared that she had "little doubt that our courts are capable of distinguishing a sham secular purpose from a sincere one." *Wallace*, 472 U.S. at 75 (O'Connor, J., concurring in the judgment). Little did she anticipate that it would be a court that would create the sham secular purpose. The majority opinion demonstrates either that Justice O'Connor's confidence in the ability of the courts to distinguish a religious from a secular purpose was misplaced, or that, even though their constitutional duty is clear, courts will in some circumstances not only be unwilling to perform it, but will themselves engage in the very actions against which she was confident that they would protect us.[80]

To the extent that, notwithstanding all the controlling legal principles to the contrary, one could accept the concept advanced by the majority that *a* purpose of the insertion of the words "under God" in the Pledge was to somehow celebrate our history or remind us that we have a "limited government" (and it is unlikely that a reasonable judge could do so) it defies reason to contend that the use of the term God did not

---

[79]To be clear, I do not "call[ ] the 2002 Congress' purpose a sham," as the majority claims. Maj. op. at 3913. It is the majority, not Congress, that has engaged in the fabrication of a sham secular purpose. The majority's vague, unsupported, and self-contradictory assertions notwithstanding, the 2002 Congress did not state that either its purpose or that of the 1954 Congress was anything other than religious. *See supra* Part III.B.

[80]*See also Myers v. Loudoun County Pub. Schs.*, 418 F.3d 395 (4th Cir. 2005); *Sherman v. Cmty. Consol. Sch. Dist. 21 of Wheeling*, 980 F.2d 437 (7th Cir. 1992).

have a religious purpose as well. One would have to ignore all the applicable law and all the relevant facts to reach such a conclusion. That the predominant purpose was religious is demonstrated beyond dispute by the legislative history of the amendment. *See supra* Part II.A-C. Such a conclusion is also evident from simple logic and reason. The term "God" is a religious term in every sense of the word, as the majority admits. Moreover, the majority suggests no other instance in which the word "God" was used by a legislative body for a predominantly non-religious purpose. To conclude that Congress would use the term "God" for a predominantly secular purpose when amending the Pledge of allegiance surely defies common sense.

Under the plain meaning of the words of the amendment to the Pledge, its context, the legislative history of its enactment, and all of the surrounding circumstances, there can be no doubt that the purpose of adding the words "under God" to the Pledge of Allegiance was predominantly, if not exclusively, religious and that the daily recitation in public schools of the Pledge in its amended form violates the *Lemon* test,[81] and thus the Establishment Clause.

### B.    The Endorsement Test and the "Under God" Amendment

Although an objective application of the *Lemon* test that adheres to Supreme Court precedent requires, without more, a ruling in favor of Jan Roe and her child, I turn now to the remaining Establishment Clause tests to show that the Roes would prevail under each of them as well, and that with respect to each the majority's reasoning seriously misperceives or misrepresents the nature and function of the First Amendment.    The    second    Establishment    Clause    test

---

[81]The daily recitations also violate the "effects" prong of the *Lemon* test. I will discuss "effects," however, in connection with the endorsement test. *See infra* Part IV.B.

announced by the Supreme Court, the endorsement test, is in essence "a gloss on *Lemon* that encompasse[s] both the purpose and effect prongs." *Kitzmiller v. Dover Area Sch. Dist.*, 400 F. Supp. 2d 707, 714 (M.D. Pa. 2005). Under the endorsement test, "we must examine both what [the government] intended to communicate . . . and what message [it] actually conveyed. The purpose and effect prongs of the *Lemon* test represent these two aspects of the meaning of the [government's] action . . . . An [impermissible] answer to either question should render the challenged practice invalid." *Lynch v. Donelly*, 465 U.S. 668, 690 (1984) (O'Connor, J., concurring). Accordingly, where, as here, a clear violation of the first *Lemon* prong exists, so too does a violation of the endorsement test. Still, the endorsement test is valuable in that it captures even more forcefully than *Lemon* the powerful sense of alienation nonadherents experience when the government embraces and broadcasts a religious belief:

> [T]he religious liberty protected by the Establishment Clause is infringed when the government makes adherence to religion relevant to a person's *standing in the political community*. Direct government action endorsing religion or a particular religious practice is invalid under this approach because it "*sends a message to nonadherents that they are outsiders*, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members of the political community."

*Wallace v. Jaffree*, 472 U.S., 38, 69 (1985) (O'Connor, J., concurring in the judgment) (emphases added) (quoting *Lynch*, 465 U.S. at 688 (O'Connor, J., concurring)); *accord Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 309-10 (2000) (same). How much greater must be the sense of exclusion in the case of a child in a schoolroom — a schoolroom where his classmates are the insiders and, because he is a non-

adherent, he will no longer be a "full member of the . . . community." *Id.*

In conducting the endorsement analysis, "[t]he relevant question[ ] is whether an objective observer, acquainted with the text, legislative history, and implementation of the statute, would perceive it as a state endorsement of [religion]." *Santa Fe*, 530 U.S. at 308 (quoting *Wallace*, 472 U.S. at 76 (O'Connor, J., concurring in the judgment)). How could anyone "acquainted with the text and legislative history" of the statute that amended the Pledge in order to indoctrinate our children conclude anything other than that the state-directed, teacher-led daily recitation of the "under God" version of the Pledge "conveys a message of exclusion to all those who do not adhere to the favored beliefs"? *Lee v. Weisman*, 505 U.S. 577, 606 (1992) (Blackmun, J., concurring). An atheist familiar with the Pledge's legislative history could hardly ignore the legislation's chief proponents' statements that "[a]n atheistic American is . . . a contradiction in terms," 100 Cong. Rec. 1700, that "the forces of anti-God and antireligion . . . spread . . . dangerous and insidious propaganda," *id.* at 7760, or that "evil" stems "[f]rom the root of atheism," *id.* at 1700. How could atheist, agnostic, Hindu, or Buddhist children asked every day by their state employed teachers to recite the amended version of the Pledge feel anything but "that they are outsiders,"[82] *Santa Fe*, 530 U.S. at 309, when an author of the "under God" amendment to the Pledge publicly proclaimed that people's "*citizenship is of no real value* . . . unless [they] can open [their] souls before God and before Him conscientiously say, 'I am an American,' " or when the President of the United States has declared that anyone who "*truly loves America*" will proudly say the Pledge as amended? 100 Cong. Rec. 7765, 8618 (emphases added). The effect on young schoolchildren of the amendment under the policy of the Rio

---

[82]*See infra* note 89 (describing the range of religious beliefs with which the "under God" version of the Pledge conflicts).

Linda school district, and the policies of school districts throughout the nation, is undeniable.

The majority agrees that some schoolchildren may perceive the amended Pledge as an endorsement of religion, but argues that under *Good News Club v. Milford Central School*, 533 U.S. 98, 119 (2001), "a child's understanding cannot be the basis for our constitutional analysis." Maj. op. at 3922. The majority's reliance on *Good News* is directly contrary to that opinion's express rationale. In *Good News*, the Court held that a private group's use of a public school's facilities for after-school religious events would not violate the Establishment Clause, despite "the possibility that elementary school children may witness the [group's] activities on school premises." *Good News*, 533 U.S. at 119. It expressly distinguished cases involving messages conveyed "by state teachers *during the schoolday* to children required to attend." *Id.* at 117 (emphasis original). Unlike in those cases, because "members of the public writ large [were] permitted in the school after hours pursuant to [its] community use policy," the Court did not limit its analysis to whether endorsement would be perceived by children, but also considered the perception of the school's activities among the adult members of the community. *Id.* at 118. In short, *Good News* looked to the entire audience, not just to the children voluntarily in it.

Here, young Roe's state-employed teachers conduct the state-directed daily recitation of the Pledge in a public school classroom during school hours. Five-year-olds are not the "youngest members of the audience," they are the *entire* audience; "the public writ large" does not attend kindergarten classes. In fact, as the Supreme Court pointed out in *Good News*, "in the normal classroom setting" the children are "all the same age." 533 U.S. at 118. In an as-applied challenge like the one before us, a practice must be analyzed in terms of those who actually experience its effects. As the majority is well aware, we are here examining only the effects of the daily classroom recitation of the religious version of the

Pledge on public schoolchildren and are not considering the constitutionality of the use of that version of the Pledge in other circumstances. Indeed, because it is alleged that the recitation of the Pledge in the classroom is designed to indoctrinate schoolchildren with a religious belief, *see supra* Part II.C, it would make no sense to analyze its constitutionality in terms of its hypothetical effect on adults.

It is, in fact, the children's lackof understanding of the full meaning of the Pledge that renders it such a powerful tool of indoctrination. A study conducted twenty years after the Pledge was amended to include the words "under God" found that "grade school children make sense of the Pledge of Allegiance by focusing on a word they understand, *most commonly 'God,'* which leads them to such conclusions as *'The most important part is . . . talking about God,'* or *'We better be good cause God is watching us even if He is invisible.'* "[83] This result is precisely what the members of Congress who amended the Pledge intended when they confidently stated that "each time the[ children] pledge allegiance to Old Glory, [they will] reassert their belief . . . in the all-present, all-knowing, all-seeing, all-powerful Creator." 100 Cong. Rec. 5915. It is also precisely what the Establishment Clause seeks to prohibit. For under our Constitution, the indoctrination of religious beliefs, including belief in God, is "committed to the private sphere," *Lee*, 505 U.S. at 589 — i.e., to family and the Church (read, Synagogue, Mosque, Temple, et al.). Under no circumstances is that function to be commandeered by the State.

It was over a half-century ago that Justice Jackson wrote the words that transformed the relationship of the state to the

---

[83]Emily Buss, *Allocating Developmental Control Among Parent, Child and the State*, 2004 U. Chi. Legal F. 27, 52 n.66 (omission in original) (emphasis added) (quoting Eugene H. Freund & Donna Givner, *Schooling, The Pledge Phenomenon, and Social Control* 12 (Am. Educ. Research Assoc. Working Paper, 1975)).

individual, words that have ever since marked our First Amendment jurisprudence: "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, [or] religion . . . ." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). Unfortunately, today the majority is clearly charting its course by a far different constellation with a far less enduring First Amendment.

## C. The Coercion Test and the "Under God" Amendment

Because the state-directed, teacher-led daily recitation of the "under God" version of the Pledge "violate[s] both the *Lemon* test and the Endorsement test, we are not required to determine that [it] also run[s] afoul of the Coercion Test to hold [it] antithetical to the Establishment Clause." *Doe v. Santa Fe Indep. Sch. Dist.*, 168 F.3d 806, 818 (5th Cir. 1999), *aff'd* 530 U.S. 290 (2000) (applying Establishment Clause tests independently). The coercion test, set forth in *Lee v. Weisman*, 505 U.S. 577 (1992), did not replace the *Lemon* analysis or the endorsement test. *See id.* at 587 ("[W]e do not accept the invitation . . . to reconsider our decision in *Lemon v. Kurtzman*."); *id.* at 604 (Blackmun, J., concurring) ("[N]othing in [*Lee* is] inconsistent with the essential precepts of the Establishment Clause developed in our precedents."). Rather, *Lee* created a third test with a separate threshold that a statute or practice must also meet in order to comply with the Establishment Clause: "*[A]t a minimum*, the Constitution guarantees that government may not coerce anyone to support or participate in religion or its exercise. . . ." *Id.* at 587 (majority opinion) (emphasis added). Accordingly, if a statute or practice fails to pass the coercion test, that is reason enough to hold it unconstitutional. *See id.* at 604 (Blackmun, J., concurring) ("Although our precedents make clear that proof of government coercion is not necessary to prove an Establishment Clause violation, it is sufficient.").

## 1.

The Supreme Court has been especially sensitive to the use of coercion in cases involving "young impressionable children" in public school. *Sch. Dist. of Abington Twp. v. Schempp*, 374 U.S. 203, 307 (Goldberg, J., concurring). As it stated in *Edwards v. Aguillard*, 482 U.S. 578, 585 (1987), when evaluating state-sponsored religious activity in the classroom we "must [be] mindful of the particular concerns that arise in the context of public elementary and secondary schools." The Supreme Court has never lost sight of the special danger presented by the promotion of religious views by public school teachers: In over six decades of adjudicating Establishment Clause challenges, the Supreme Court has *never once* upheld a statute or practice that promotes religion or religious beliefs in public schools or that coerces students to express or adopt any religious views.[84]

In *Lee*, the Supreme Court emphasized the "heightened concerns with protecting freedom of conscience from subtle coercive pressure in the elementary and secondary public schools." 505 U.S. at 592. The coercive pressure inherent in the school setting played a central role in the Court's analysis:

> Our decisions in [*Engel* and *Abington*] recognize, among other things, that prayer exercises *in public*

---

[84]The Court has, in a separate line of cases, sometimes upheld various institutional or financial relationships between public schools and religious institutions. *See, e.g.*, *Zelman v. Simmons-Harris*, 536 U.S. 639 (2002) (tuition aid). But in every single case involving advancement of religious expression or religious beliefs in public schools, the Court has found the challenged practice to violate the Constitution. *See Santa Fe*, 530 U.S. 290 (prayer at football game); *Lee*, 505 U.S. 577 (graduation prayer); *Edwards*, 482 U.S. 578 (mandatory equal time for teaching creationism); *Wallace*, 472 U.S. 38 (moment of silence for voluntary prayer); *Stone*, 449 U.S. 39 (posting ten commandments in classroom); *Epperson*, 393 U.S. 97 (1968) (prohibition on teaching evolution); *Abington*, 374 U.S. 203 (bible reading); *Engel*, 370 U.S. 421 (school prayer).

*schools* carry a particular risk of indirect coercion. The concern may not be limited to *the context of schools*, but *it is most pronounced there*. . . . What to most believers may seem nothing more than a reasonable request that the nonbeliever respect their religious practices, *in a school context* may appear to the nonbeliever or dissenter to be an attempt to employ the machinery of the State to enforce a religious orthodoxy.

*Id.* (emphasis added; citations omitted). Because of that inherent pressure, the Court's solicitude for the injury experienced by "the dissenter of high school age" was not lessened by the fact that it occurred at a graduation ceremony for which attendance was ostensibly voluntary. *Id.* at 593-94.

Here, the plaintiff on appeal is a five-year-old child compelled by law to attend school. Every day her teacher, a state employee, leads her and her classmates in a state-directed exercise explicitly designed to inculcate a religious belief in each of them — a belief in God. Such deliberate indoctrination exploits the fact "that children mimic the behavior they observe[,] or at least the behavior that is presented to them as normal and appropriate," *FCC v. Fox Television Stations, Inc.*, 129 S. Ct. 1800, 1813 (2009), and "that children are disinclined at this age to step out of line or to flout 'peer group norms,' " *Abington*, 374 U.S. at 290 (Brennan, J., concurring). As the Supreme Court has repeatedly explained, the very nature of coercive activity is that it exerts enormous "pressure upon religious minorities *to conform* to the prevailing officially approved religion" and its practices, even though they reject that officially endorsed religious belief. *Engel*, 370 U.S. at 431 (emphasis added).

A child subjected to state-sponsored, teacher-led religious indoctrination has two choices: participation or refusal. The fact that a young, impressionable schoolchild recites the religious Pledge does not necessarily mean that he does so "will-

ingly." *Contra* maj. op. at 3874. To the contrary, rather than label himself an oddball, a troublemaker, and an outcast, rather than subject himself to humiliating name calling, harassment and derision, he may simply prefer to conform, formally pledging his adherence to a religious belief that is antithetical to his true philosophical views. For these children who conform unwillingly, coercion has had its effect: They have chosen to forego their constitutional rights rather than to face the consequences of not doing so. But the coercive effect is no less severe for those students who adhere to their principles and refuse to affirm a state-held religious belief that is contrary to their own. Those students, including Jan Roe's daughter, must either remain silent or leave the classroom, neither of which options avoids the injury they suffer or cures the constitutional violation to which they have been subjected. *See Abington*, 374 U.S. at 224-25. Rather, children who choose either of these options are separated from their classmates either literally or by the silence they maintain, and, as a result, every day are in fact " 'outsiders, not full members of the . . . community.' " *Santa Fe*, 530 U.S. at 309 (quoting *Lynch v. Donnelly*, 465 U.S. 668, 688 (1984) (O'Connor, J., concurring)).

The majority takes inconsistent positions regarding the coercive effect of religious indoctrination in public school classrooms. First, it asserts that allowing children the option of "participating in . . . religious exercises" in public schools demonstrates "one of the great principles of our nation." Maj. op. at 3919. Later, however, it acknowledges that providing such an "option" does not render the state's conducting of a religious practice constitutional, because the coercive pressure still remains. *Id.* at 3923. Under binding Supreme Court law, the latter position is unquestionably correct. The Free Exercise Clause "has never meant that a majority could use the machinery of the State to practice its beliefs." *Abington*, 374 U.S. at 226. If it attempts to do so, "the fact that individual students may absent themselves [or remain silent] . . . furnishes *no defense* to a claim of unconstitutionality under the

Establishment Clause." *Id.* at 224-25 (emphasis added). As the Court expressly stated in *Lee*, the government may not "place objectors in the dilemma of participating, with all that implies, or protesting. . . . . To recognize that the choice imposed by the State constitutes an unacceptable constraint only acknowledges that the government may no more use social pressure to enforce orthodoxy than it may use more direct means." *Lee*, 505 U.S. at 593-94.

The intense social and psychological pressure at issue, pressure that is enormous when brought to bear against a five-year-old child, leaves no doubt that a public school classroom is a coercive environment, as defined in *Lee*. Indeed, the majority ultimately concedes that every day that young Roe goes to school she is "coerced to participate" in the state-directed, teacher-led recitation of the "under God" version of the Pledge of Allegiance. Maj. op. at 3923. And so it must, as all nine of the Justices in *Lee* agreed that impermissible coercion occurs in a public-school classroom where attendance is mandatory, if that classroom is used to promote religious beliefs or expression.[85]

2.

Given that the majority inevitably concedes, as it must, that the classroom environment at issue in this case exerts significant coercive pressure to conform on children such as young Roe, and that allowing her the option of remaining silent or leaving the room would not cure the constitutional violation,

---

[85]The *Lee* majority ruled that a high school graduation ceremony was a coercive environment because there was "public pressure, as well as peer pressure, [to] attend[ ]" even though attendance was not strictly mandatory. *Lee*, 505 U.S. at 593; *see also Santa Fe*, 530 U.S. at 310-12 (holding the same for football games). The four dissenting justices would not apply the coercion analysis to such a "voluntary" setting as a high school graduation ceremony, but even they agreed that a public classroom where attendance is mandatory is an inherently coercive environment. *Lee*, 505 U.S. at 642-43 (Scalia, J., dissenting).

it is left with only two equally unpersuasive arguments as to why the daily recitation of the "under God" version of the Pledge does not violate the coercion rule. First, the majority contends that the Pledge is not a "religious *exercise*." *Accord Elk Grove*, 542 U.S. at 31 (Rehnquist, C.J., concurring in the judgment). Second, the majority argues that the recitation of the Pledge is a "*patriotic* activity." Maj. op. at 3926-27 (emphasis added).

The majority's analysis can in fact be boiled down to one sentence: "the Pledge is not a prayer." Maj. op. at 3923. To meet the coercion standard, my colleagues first conclude that "*Lee*'s indirect coercion analysis" applies "*only* if the government coerces students to engage in a religious *exercise*." *Id.* at 3926 (emphasis added). This may be the majority's determination in this case, but it most certainly is *not* the holding of the Supreme Court in *Lee*.

To the contrary, in *Lee* the Court held that "[i]t is beyond dispute that, at a minimum, the Constitution guarantees that government may not coerce anyone to support or participate in religion *or* its exercise . . . ." *Lee*, 505 U.S. at 587 (emphasis added). Apparently the same convenient willful blindness that prevents the majority from reading the Pledge's legislative history prevents it from reading the word "or" in the preceding sentence. Otherwise, it would surely be forced to concede that *Lee*'s coercion analysis applies when the government coerces someone "to support or participate in religion," and not just "to [participate in] religious exercises." If the *Lee* majority's word is not good enough for the majority in this case, Justice Scalia's dissent, one part of which reflected the agreement of all members of the Court, should be sufficient. In that part, Justice Scalia said, "I have no quarrel with the Court's general proposition that the Establishment Clause 'guarantees that government may not coerce anyone to support or participate in religion . . . .' " *Id.* at 642 (Scalia, J., dissenting) (quoting *id.* at 587 (majority opinion)).

If the unanimous conclusion reached by the Court in *Lee* still does not persuade my colleagues that their holding today is erroneous, perhaps they should simply read once again the very cases that they contend support their overly narrow reading of *Lee*. The majority asserts with regard to those cases that *"all"* of the activities "have been invalidated by the Supreme Court as unconstitutional school-sponsored religious *exercises*." Maj. op. at 3888 (emphasis added). But if the anticoercion rule applied only in the case of "religious exercises," as the majority contends, then at least two important decisions would have to be erased from the U.S. Reports.

In *Edwards v. Aguillard*, which was a coercion case,[86] the Supreme Court struck down as violative of the Establishment Clause a statute mandating "instruction in 'creation science' " in public schools. 482 U.S. at 581. A lecture in creation science, the Court held, supports religion through "the presentation of a religious viewpoint." *Id.* at 596. Of course, such a lecture contains none of the attributes of a "religious exercise" that have been identified by the majority. It does not "invite divine intercession," "express personal gratitude," or "ask forgiveness." *See* maj. op. at 3889. It is "led by a teacher, not by a clergyman or other religious leader." *See id.* at 3892. Students listening to the instruction "do not kneel, nor don yarmulkes, veils, or rosaries," *see id.*, or make "a solemn avowal of divine faith and supplication for the blessings of the Almighty." *See id.* at 3926 (quoting *Engel*, 370 U.S. at 424-25). If there is a definition of "religious exercise" broad enough to encompass the teaching of "scientific critiques of

---

[86]In *Edwards*, the Supreme Court explicitly relied on the fact that the State, through its public school system, "exert[ed] great authority *and coercive power* through mandatory attendance requirements, and because of the students' *emulation of teachers* as role models and the children's *susceptibility to peer pressure*." *Edwards*, 482 U.S. at 584 (emphases added). Indeed, the Court in *Lee* itself cited *Edwards* as an example of a case that demonstrates the "subtle coercive pressure in the elementary and secondary public schools." *Lee*, 505 U.S. at 592 (citing *Edwards*, 482 U.S. at 584).

prevailing scientific theories," *Edwards*, 482 U.S. at 593, the majority has not provided it.

Similarly, *Stone v. Graham*, 449 U.S. 39 (1980) (per curiam), is another coercion case that did not involve a religious exercise. In that case, the Court struck down a statute that "require[d] the posting of a copy of the Ten Commandments . . . on the wall of each public classroom in the State." *Id.* at 39. Surely, merely sitting in a room that has a copy of the Ten Commandments hanging on the wall does not constitute a "religious exercise." *See* maj. op. at 3889 (a religious exercise "is always active"). In fact, the Court held that by being compelled to sit in the classroom with the Ten Commandments affixed to the wall, the students were subjected to a "religious practice." *Stone*, 449 U.S. at 42. The Court struck down the statute because its "effect" was "to *induce* the schoolchildren to read, meditate upon, perhaps to venerate and obey, the [Ten] Commandments." *Id.* (emphasis added).

Thus, there are at least two Supreme Court cases that invalidated state practices supporting religion in the public schools as coercive, and therefore violative of the Establishment Clause, even though those practices did not constitute a "religious exercise." Accordingly, *Lee* must be understood to hold, as it explicitly states, "that government may not coerce anyone to *support* or *participate in religion or* its exercise," *Lee*, 505 U.S. at 587 (emphasis added), and not simply, as the majority states, that the government may not coerce anyone to engage in religious *exercises*.[87]

---

[87]In addition to being contrary to *Lee*'s text and the Supreme Court's holdings in *Edwards* and *Stone*, the majority's decision to limit the coercion test to religious exercises is also unworkable. It is highly significant that nowhere in the majority's opinion does it provide a *definition* of a religious exercise, despite its acknowledgment that "oftentimes what one person considers secular, another considers religious." Maj. op. at 3919. By basing its holding on this undefined yet in its view determinative concept, the majority forces *courts* to decide on a case-by-case basis what is

What might the Supreme Court have had in mind when it described government action that coerces someone "to support or participate in religion"? Here, too, *Lee* provides the answer: "The First Amendment's Religion Clauses mean that religious *beliefs* and religious *expression* are too precious to be either proscribed or prescribed by the State." *Id.* at 589 (emphasis added). The notion that the State cannot coerce religious *belief* or *expression* is as old as the Court's first Establishment Clause case, *see Everson v. Bd. of Educ. of Ewing*, 330 U.S. 1, 15 (1947) ("The 'establishment of religion' clause of the First Amendment means at least this: Neither a state nor the Federal Government . . . . can force nor influence a person . . . *to profess a belief or disbelief* in any religion." (emphasis added)), and as current as its most recent decision, *see McCreary County v. ACLU of Ky.*, 545 U.S. 844, 881 (2005) ("This is no time to deny the prudence of understanding the Establishment Clause to require the government to stay neutral on religious belief, which is reserved for *the conscience of the individual*." (emphasis added)), with an unbroken line of cases in between. In fact the very first case to strike down religious practices in public schools said, "When the power, prestige and financial support of government is placed behind a particular religious *belief*, the indirect *coercive pressure* upon religious minorities to conform to the prevailing officially approved religion is plain." *Engel*, 370 U.S. at 431 (emphases added).

---

and is not a religious exercise. In so doing, the majority recreates "the abhorred licensing system [that] . . . the First Amendment was intended to ban from this country" — a system in which judges must trade the black robes of neutrality for the ecclesiastical vestments of religious arbiters. *Cf. First Nat'l Bank v. Bellotti*, 435 U.S. 765, 801 (1978) (Burger, C.J., concurring). Today's majority thus creates an entirely new constitutional dilemma as, under its rule, federal courts will necessarily "risk greater 'entanglement' " with religion "by attempting to enforce" the modified coercion test crafted today, a test that depends on what is or is not a religious exercise. *Widmar v. Vincent*, 454 U.S. 263, 272 n.11 (1981).

As the Supreme Court has made clear, the Pledge requires an affirmation of a belief. *See W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 633 (1943) ("[The] pledge requires affirmation of a belief and an attitude of mind."). Until its amendment in 1954, the Pledge was solely an affirmation of belief in, and loyalty to, one's country. But the "under God" amendment added another component. Under the 1954 amendment, there is no conceivable way that the plain text, let alone the history, of the Pledge as amended can be read in any way other than as an affirmation of what the author of the amendment referred to as "the definitive factor in the American way of life[:] . . . *belief in God*." 100 Cong. Rec. 1700 (emphasis added). One simply cannot in good faith daily affirm loyalty to a nation "under God" if one does not believe that God exists, questions whether there is a God, or believes in polytheism.

No one can deny that the Pledge requires the speaker to engage in a performative act that binds him to a particular belief — a belief in a nation "under God."[88] Indeed, even the majority appears to concede that one cannot recite the amended Pledge without "affirming a belief in God." Maj. op. at 3923. A student reciting the Pledge of Allegiance to "one nation, under God" personally adopts that language, which expresses an undeniable and unavoidable religious tenet: God exists, and he is watching over our country. The conception of "God" espoused in that statement is inconsistent even with

---

[88]*See* BLACK'S LAW DICTIONARY 119 (8th ed. 2004) ("pledge, n. 1. A formal promise or undertaking."); WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY, UNABRIDGED (1996) ("pledge, vb . . . . 4a: to assure or promise the performance of . . . b: to promise seriously: undertake"). Because of this fundamental characteristic of an oath of allegiance, reciting the Pledge differs from "reciting historical documents . . . [or] singing officially espoused anthems which include *the composer's* professions of faith." Maj. op. at 3927 (quoting *Engel*, 370 U.S. at 435 n.21) (emphasis added). The simple fact that the Pledge *is a pledge* means that its recitation requires a profession of one's own belief in a nation "under God," not an acknowledgment of someone else's.

many *theistic*, let alone atheistic or agnostic, religious philoso-phies.[89] It is impossible to pledge allegiance to a "nation under God" without professing an unmistakably "religious belief," *Lee*, 505 U.S. at 589: there is a God whom our nation is under, or to whom our nation is subordinate. Anyone coerced to express such a belief is, by definition, coerced to affirm a

---

[89]Although supporters of the Pledge often tout its "nonsectarian" nature, *see, e.g.*, *Elk Grove*, 542 U.S. at 42 (O'Connor, J., concurring in the judg-ment), the God that the Pledge describes has clearly defined attributes that are rejected by many of the world's largest religions, and many millions of religious Americans. As multiple scholars have noted, the Pledge amendment "commits the state to a variety of religious beliefs, for exam-ple, that there is a God[, ]rather than no god or many gods." Mark Strasser, *Establishing the Pledge: On Coercion, Endorsement, and the* Marsh *Wild Card*, 40 IND. L. REV. 529, 555 (2007). "The Pledge also affirms [that] . . . God exercises some sort of broad superintending authority that an entire nation can be 'under.' The nature of this authority is not further specified . . . but . . . . [a] 'Nation under God' does not plausibly refer to . . . God as a name or metaphor for all the goodness immanent in the universe [or in nature]." Douglas Laycock, *Theology Scholarships, The Pledge of Alle-giance, and Religious Liberty: Avoiding the Extremes But Missing the Lib-erty*, 118 HARV. L. REV. 155, 226 (2004). Millions of devoutly religious individuals do not subscribe to these beliefs. For example, the world's 900 million Hindus — 766,000 of whom live in the United States — and this country's 106,000 adherents of Native American religions might take issue with the explicitly monotheistic nature of the Pledge. Further, the declaration that there is a "superintending" God likely would not sit well with the world's 350 million Buddhists, including the one million in this country — not to mention our two million atheists, agnostics, humanists, and secularists and quarter million other believers in some form of spiritu-alism. The very fact that the religious belief now embodied in the Pledge is antithetical to the beliefs of millions of Americans, religious and irreli-gious alike, is why the Constitution prohibits the government from taking sides, and certainly from coercing schoolchildren to adopt and proclaim an officially prescribed belief.

Global populations are based on percentages in CIA, THE WORLD FACTBOOK (2008), *available at* http://tinyurl.com/WorldFactbook-World, and on the global population clock, U.S. Census Bureau, *U.S. and World Population Clocks*, http://www.census.gov/main/www/popclock.html (last visited Sept. 10, 2008). American populations are based on U.S. Census Bureau, *The 2007 Statistical Abstract*, t. 73, (2007) http://www.census.gov/compendia/statab/2007/population/religion.html.

belief in God and thus "to support . . . religion." *Id.* at 587. Thus, the majority's attempt to limit the coercion test to a religious *exercise* fails.

3.

In its second attempt to avoid the strictures of *Lee*, the majority argues that the prohibition against coercing schoolchildren to embrace religion does not apply to the recitation of the amended Pledge because that recitation is simply a "patriotic exercise designed to foster national unity and pride." Maj. op. at 3877 (quoting *Elk Grove*, 542 U.S. at 6); *see also id.* at 62. I do not dispute that the recitation of the Pledge both as originally written and as amended is a patriotic exercise or that the version codified in 1942 was indeed "designed to foster national unity and pride."[90] But where a religious message is inserted into a patriotic exercise, or into any other secular exercise, in order to promote religion and, more particularly, to inculcate in children a religious belief, the exercise *as*

---

[90]I note that the state-sponsored recitation struck down in *Lee* itself was at least as patriotic as the Pledge of Allegiance:

God of the Free, Hope of the Brave:

For the Legacy of America where diversity is celebrated and the rights of minorities are protected, we thank You. May these young women grow up to enrich it.

For the liberty of America, we thank You. May these new graduates grow up to guard it.

For the political process of America in which all its citizens may participate, for its court system where all may seek justice we thank You. May those we honor this morning always turn to it in trust.

For the destiny of America we thank You. May the graduates of Nathan Bishop Middle School so live that they might help to share it.

May our aspirations for our country and for these young people, who are our hope for the future, be richly fulfilled.

*Lee*, 505 U.S. at 581-82.

*amended* runs afoul of the Establishment Clause. Surely, as noted earlier, if Congress had amended the Pledge so as to describe the United States as "one nation under Jesus," "one nation under Jesus Christ," or "one nation under the Father, the Son, and the Holy Ghost," even the majority, one might hope, would not contend that, because the recitation of the Pledge was and is a patriotic exercise, no unconstitutional coercion would result from the state-directed, teacher-led daily recitation of the Pledge in its amended form. The analysis can be no different for the recitation of the amended version of the Pledge, with the inserted phrase "under God."[91] In all those instances, the Pledge would be equally patriotic. It is irrelevant for purposes of the Establishment Clause whether a state-directed effort to indoctrinate schoolchildren with a belief in religion, or in this case, more specifically a belief in God, is incorporated into a patriotic or some other secular exercise or constitutes a stand-alone message all by itself. It is the content of the religious message not the vehicle in which it is contained that matters. Government is simply not permitted to engage in the indoctrination of religious beliefs, whatever the means by which it may choose to deliver them. The solution is obvious: excise the offending material from the patriotic or secular message. That is particularly easy to do where, as here, the religious component of the message has been separately inserted by a legislative amendment into existing, non-offending patriotic or other secular material.

The majority's reading of *Lee* ignores the fundamental principles underlying decades of Establishment Clause jurisprudence. In so doing, the majority deems religious indoctrination in public schools permissible under the coercion test so

---

[91]The Supreme Court has always held that atheists (and, *a fortiori*, agnostics) enjoy the same First Amendment protections as everyone else. *See, e.g.*, *Wallace v. Jaffree*, 472 U.S. 38, 52-55 (1985); *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968); *Sch. Dist. of Abington Twp. v. Schempp*, 374 U.S. 203, 216 (1963); *Torcaso v. Watkins*, 367 U.S. 488, 495 (1961).

long as it is not part of a religious activity. This holding is dangerous and far-reaching, as well as unprecedented and unfounded. After today, if this court were to take the majority's holding seriously, or purport to follow it in relevant cases, public-school students in this circuit could be subjected to regular lectures promoting Christianity as the true religion, *cf. Edwards*, 482 U.S. 578 (creationism instruction), or required to enroll in "character development" programs that extolled the superiority of Jesus over all others as a spiritual leader. They would no longer have a claim under *Lee v. Weisman* because the practices they would be challenging would be included within otherwise lawful secular programs. Surely this utter evisceration of the coercion test is not what the Supreme Court intended when it vindicated Deborah Weisman's constitutional rights. Moreover, religious minorities of all stripes would quickly suffer under the rule the majority propounds, were we to apply it beyond the narrow confines of the Pledge of Allegiance. It should be apparent to all that regardless of the majority's heart-felt desire to justify the coercive recitation of the amended Pledge by California's public schoolchildren and its willingness to ignore the controlling law in order to reach that objective, a proper application of the coercion test precludes not only religious exercises but all other state sponsored efforts to inculcate religious beliefs in America's public schoolchildren, even if inserted in the middle of a course in mathematics or incorporated in any other secular or patriotic activity.

### D.    Application of the Tests to the 2002 Legislation

I have explained why the 2002 reaffirmation of the Pledge statute is of no relevance, as it simply sets forth Congress's view that the 1954 amendment was constitutional and that our interpretation of the Constitution in *Newdow I* was erroneous — and thus it offers no different purpose for the adoption of the amendment. *See supra* Part III. However, the foregoing review of the *Lemon*, endorsement, and coercion tests demonstrates why, even had Congress advanced a secular purpose

for both the 1954 "under God" amendment and its 2002 reaffirmation — including the secular messages that the majority purports to believe that Congress intended to convey: that we live under "limited government," or more generally that we should recognize our nation's "historical principles of governance" — the amendment as applied in the case of the state-directed, teacher-led, daily recitation of the Pledge would still have failed to comply with the Establishment Clause. It would have failed the *Lemon* test because its *principal* purpose would still have been religious, and because the "principal or primary *effect*" of the amendment, the affirmation of a personal belief in God, would still have unquestionably "advance[d] . . . religion." *Lemon*, 403 U.S. at 612-13 (citation omitted) (emphasis added). It would have failed the endorsement test because such recitations would still have sent the message to nonadherents of religion and to nonadherents of religions that embrace monotheism "that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members of the political community." *Santa Fe*, 530 U.S. at 309-10 (quoting *Lynch*, 465 U.S. at 688 (O'Connor, J., concurring)). Finally, it would have failed the coercion test because such recitations would still have coerced schoolchildren "to support or participate in religion," and to profess a belief, whether held by them or not, in God. *Lee*, 505 U.S. at 587. In short, the "under God" version of the Pledge is, under all three tests, unconstitutional as applied, not only when considered in light of Congress's actual purpose in adopting the amendment in 1954, but even when considered in light of the purpose that the majority would erroneously impute to Congress in reaffirming the amendment in 2002.

## V. The Inapplicability of Alternative Theories

As the foregoing analysis demonstrates, the state-sponsored, teacher-led daily recitation of the "under God" version of the Pledge in public schools is unconstitutional under any Establishment Clause doctrine that might be

applied. Ordinarily, one would expect an outcome required by binding Supreme Court precedent to end the debate. However, faced with the formidable outcry that would surely arise in defense of the "under God" version of the Pledge were the Constitution to be faithfully applied, judges both on this court and others, in an effort to sustain the unsustainable, have cast about in search of alternative theories — theories not grounded in any Establishment Clause principles announced by the Supreme Court. Such theories include the notions that appellate courts must uphold the state-sponsored recitation of the "under God" version of the Pledge on the basis of statements made in Supreme Court dicta or in individual concurring or dissenting opinions of some of the various justices, on the ground that the religious version of the Pledge is constitutional under the putative doctrine of ceremonial deism, and for the reason that any harm caused by its recitation in public schools is *de minimis* and therefore not worthy of our attention. These alternative theories, one or two of which today's majority may be relying on, at least in part, and the other of which is relied on by our colleagues on other circuits, provide no legitimate support for holding the "under God" version of the Pledge constitutional as applied. I will start with the least dangerous, the nose-counting dicta and dissents theory. The two which could cause serious harm to the First Amendment rights of minorities, and with at least one of which the majority appears to flirt at times, I will save for last.

### A.	Supreme Court Dicta

The majority proudly asserts that by its decision today we "join our sister circuits who have held [that] similar school policies do not violate the Establishment Clause." Maj. op. at 3877. My colleagues properly do not, however, embrace the *reasoning* relied upon by the two other circuits that have so held. Both of those circuits predicate their conclusions on Supreme Court dicta or the views expressed by individual Supreme Court justices. *See Myers v. Loudon County Pub. Schs.*, 418 F.3d 395, 402 (4th Cir. 2005); *Sherman v. Cmty.*

*Consol. Sch. Dist.*, 980 F.2d 437, 446-48 (7th Cir. 1992). Because that is the only basis, other than that on which today's majority relies, on which any circuit court has upheld state-directed, teacher-led daily recitations of the "under God" version of the Pledge, I explain why the majority here could not legitimately "join our sister circuits" in their erroneous reasoning.

The argument set forth by the Fourth and Seventh circuits is essentially this: The Supreme Court has authored "repeated dicta . . . respecting the constitutionality of the Pledge," *Myers*, 418 F.3d at 402, and those dicta "proclaim[ ] that [the] practice is consistent with the establishment clause," *Sherman*, 980 F.2d at 448; appellate courts, therefore, should follow the purported rule established in the dicta because "[i]f the Justices are just pulling our leg" we should "let them say so." *Sherman*, 980 F.2d at 448. Cleverly or not cleverly worded as this argument may be, it fails in both its major and minor premises: First, the so-called dicta "respecting the constitutionality of the Pledge," *Myers*, 418 F.3d at 402, in fact *do not say* that the Pledge is "consistent with the establishment clause," *Sherman*, 980 F.2d at 448. Second, the Supreme Court's *holdings* issued *after* each of the dicta was written do not support adherence to the "rule" that our colleagues on the Fourth and Seventh Circuit have read into preexisting dicta. It is those subsequent holdings that must control the reasoning and decisions of the courts of appeals.

The assertion that the Supreme Court has "*proclaim[ed]* that [the Pledge] is consistent with the establishment clause," *id.* (emphasis added), is *inconsistent* with the language of the purported dicta on which that assertion is based. Proponents of the dicta argument assert that "[t]he Supreme Court has spoken repeatedly on the precise issue we address today." *Myers*, 418 F.3d at 409 (Motz, J., concurring in the judgment); *id.* at 402 (majority opinion) (relying on "repeated dicta from the Court"). However, in over six decades of Establishment Clause jurisprudence, the Supreme Court has in

fact made *only two* statements regarding the Pledge of Allegiance in its opinions.[92] The first of these appeared in *Lynch v. Donelly*, a case decided in 1984. In that case, the Court simply notes, in a preliminary discussion, that the "under God" language in the Pledge is one among many "examples of reference to our religious heritage" that is reflected in numerous well-established national customs and practices. *Lynch v. Donnelly*, 465 U.S. 668, 676 (1984). Contrary to what the Fourth and Seventh Circuits assert, the statement in *Lynch* in no way expresses the view that the Pledge passes any of the three Establishment Clause tests or that the practice of daily, state-directed, teacher-led recitation of the amended Pledge by public schoolchildren is constitutional. The *sole* mention of the Pledge amounts to no more than a single prefatory historical reference, after which it is not discussed again.[93]

Moreover, as the author of that historical reference wrote soon thereafter, in his view intervening Supreme Court law — specifically, the Supreme Court's decision in *Wallace v. Jaffree* — rendered the version of the Pledge that includes the

---

[92]Obviously, in addition to the two cases to which I refer — *Lynch v. Donelly* and *County of Allegheny v. ACLU* — the Supreme Court mentioned the Pledge of Allegiance in *Elk Grove v. Newdow*, a case closely related to the one presently before us. However, the Court in that case, in the words of its Chief Justice, "avoid[ed] reaching the merits of the constitutional claim." *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 18 (2004) (Rehnquist, C.J., concurring in the judgment). *Elk Grove* therefore sheds little light on the issue before us. That case certainly does not contain any statements, in dicta or otherwise, suggesting that the state-directed, teacher-led daily recitation of the religious version of the Pledge of Allegiance in public schools passes constitutional muster. That is the precise question the Court left unanswered.

[93]*Lynch* also includes a dissent from Justice Brennan who did *not* declare that the Pledge was constitutional but said that, although he was inclined toward that view, he was "uncertain" about the question. *Lynch*, 465 U.S. at 716. He based his ruminations on the theory of "ceremonial deism," a doctrine that has never been adopted by the Supreme Court and that would not be an appropriate basis for the majority's holding today. *See infra* Part V.B.

phrase "under God" unconstitutional. Dissenting from the Court's holding in *Wallace*, a case that ought to govern the majority's analysis today, Chief Justice Burger wrote just one year after authoring the opinion in *Lynch*:

> Congress amended the statutory Pledge of Allegiance 31 years ago to add the words 'under God.' Do the several opinions in support of the judgment today render the Pledge unconstitutional? *That would be the consequence of their method of focusing on the difference between [the challenged statute] and its predecessor statute . . . .*

*Wallace*, 472 U.S. at 88 (Burger, C.J., dissenting) (citation omitted); *see also id.* at n.3. Thus *Wallace* rendered any thought that the Chief Justice might have harbored that the amended Pledge was constitutional no longer valid. A dictum, let alone a mere reference, recognized by its own author as having no further validity cannot bind us at all and certainly could not do so in the face of subsequent holdings that strip the reference of any force or effect. Such subsequent opinions include not only *Wallace* but also *Edwards v. Aguillard*, *Lee v. Weisman*, and *Santa Fe v. Doe*, each of which made substantial contributions to Establishment Clause jurisprudence, and each of which contained holdings that conflict with the tenets underlying Chief Justice Burger's "dictum" in *Lynch*.

The second purported dictum "proclaiming" the Pledge's constitutionality is the following statement from *County of Allegheny v. ACLU*:

> Our previous opinions have considered *in dicta* the motto and the pledge, characterizing them as consistent with the proposition that government may not communicate an endorsement of religious belief. *Lynch*, 465 U.S., at 693 (O'Connor, J., concurring); *id.*, at 716-717 (Brennan, J., dissenting). We need not return to the subject . . . because there is an obvi-

> ous distinction between creche displays and refer-
> ences to God in the motto and the pledge.

492 U.S. 573, 602-03 (1989) (emphasis added). This passage is a far cry from an assertion by the Supreme Court, in dicta or otherwise, that the Pledge "is consistent with the establishment clause." *Sherman*, 980 F.2d at 448. To the contrary, despite the Court's unusual characterization of statements in a prior concurrence and dissent as "[o]ur previous opinions," the Supreme Court in *Allegheny* simply reported the fact that a concurrence and a dissent in *Lynch* state in dicta that the amended Pledge is constitutional. However, neither that concurrence nor dissent spoke for the Court, and those are the *only* two opinions *Allegheny* cites when it refers to "[o]ur previous opinions" characterizing the Pledge, in dicta, as constitutional. The Court in *Allegheny* itself expressly *declined* to comment on the validity of those prior "dicta" or on the Pledge's constitutionality, recognizing that the issue was irrelevant to the case before it. *Id.* Furthermore, like the "dictum" in *Lynch*, the statement in *Allegheny* was written in 1989, predating *Edwards v. Aguillard*, *Lee v. Weisman*, and *Santa Fe v. Doe*, core holdings that govern our analysis today. Finally, neither the "dictum" in *Allegheny* nor the "dictum" in *Lynch* expressed a view on the merits of the constitutional question before us. A plain reading of the "dicta" and of subsequent Supreme Court decisions makes it apparent that the dicta argument relied upon by the Fourth and Seventh Circuits provides a very slim reed indeed — in fact, no reed at all.

There is also no merit to the minor premise asserted by the Fourth and Seventh Circuits that appellate courts should treat dicta as controlling. As all courts and judges have recognized, Supreme Court dicta, like all others, are not binding, and they certainly cannot serve as a justification for ignoring supervening Supreme Court precedent. Dicta or not, an intermediate court of appeals is required to follow binding Supreme Court cases unless and until the Supreme Court overrules them. Moreover, the only reason Supreme Court dicta enjoy greater

weight than the dicta of lower courts is that they are a "prophecy of what the Court might hold." *United States v. Montero-Camargo*, 208 F.3d 1122, 1132 n.17 (9th Cir. 2000) (internal quotations omitted). Prophecies may be of some value when there are no binding precedents that govern the outcome; they are of no relevance, however, when relying on them would require an intermediate appellate court to ignore Supreme Court law that is handed down after those prophecies, that is contrary to them and that controls the decision. If the value of a Supreme Court dictum lies in its forecasting ability, then surely when "what the Court might hold" turns out to be the opposite of what the Court later *does* hold the dictum must lose whatever authority it might once have had.

Perhaps aware that the author of one of the two "dicta" acknowledged that his view had been rejected in a subsequent opinion of the Court, that the other "dictum," like the first, does not actually speak to the merits of the issue in this case, and that the two dicta together do not carry any weight in light of the various intervening developments in the law, proponents of the dicta argument must rely on other data to bolster their claim that the Supreme Court has implicitly instructed lower courts how to decide the issue presently before us. The Fourth Circuit, in search of such additional data, based its validation of the "under God" version of the Pledge not just on the overruled purported dicta in *Lynch* and *Allegheny*, but also on the views of "*individual Justices*" whom it characterizes as "hav[ing] made clear that the Establishment Clause . . . does not . . . make unconstitutional the daily recitation of the Pledge in public school." *Myers*, 418 F.3d at 405 (emphasis added). The Fourth Circuit goes on to cite a string of individual concurrences and dissents from various justices before emphatically declaring "*not one Justice has ever suggested that the Pledge is unconstitutional.*" *Id.* at 406 (emphasis in original).

Although some might consider a nose count of every justice ever to have sat on the Supreme Court, past or present,

alive or dead, an absurd method of deciding a constitutional question concerning fundamental rights — or any other question for that matter — I need not comment on the propriety of the Fourth Circuit's approach because it fails on its own terms.[94] Only the judicial equivalent of Enron accounting could yield a conclusion that "not one justice" has ever stated that the Pledge is unconstitutional under the Supreme Court precedents that we, as intermediate court judges, are bound to follow. In fact, quite the opposite: the only current Justice to have ever directly addressed the merits of the issue before us concluded that

---

[94]I will, however, note at least one problem with that methodology: When justices write for themselves, as opposed to the Court, they are free at any point to change their minds, abandoning positions they once held without first obtaining the agreement of four of their colleagues. As a result, the fact that a justice holds a certain view on a question not presently before him is far from conclusive evidence as to how that same justice would rule when actually faced with the relevant issue and furnished with briefs and oral argument by all of the interested parties. For example, the Fourth Circuit relies in part on the fact that Justice Brennan, "among the most stalwart of separationists" of Church and State, *Sherman*, 980 F.2d at 447, stated in *Lynch* that "the references to God contained in the Pledge of Allegiance can best be understood . . . as a form of 'ceremonial deism,' protected from Establishment Clause scrutiny." *See Myers*, 418 F.3d at 405 (citing *Lynch*, 465 U.S. at 716 (Brennan, J., dissenting)).

Putting aside for a moment that Justice Brennan explicitly said in that same opinion that he was "uncertain" about the Pledge's constitutionality, *Lynch*, 465 U.S. at 716 (Brennan, J., dissenting), it is worth noting that he also opined at one point that "[t]he saying of invocational prayers in legislative chambers, state or federal, and the appointment of legislative chaplains, might well represent no involvements of the kind prohibited by the Establishment Clause," *Abington*, 374 U.S. at 299-300, yet twenty years later, when actually presented with that issue, authored a strenuous dissent from the majority's decision holding legislative prayers constitutional, directly acknowledging that he "was wrong" in *Abington. See Marsh v. Chambers*, 463 U.S. 783, 796 (1983) (Brennan, J., dissenting). Thus, when lower courts base constitutional analyses on nose counts of individual Justices, not even our dicta-enhanced powers of "prophecy" may be sufficient in divining the appropriate count.

> [a]dherence to *Lee* would require [a court] to strike down the Pledge policy, which, in most respects, poses more serious difficulties than the prayer at issue in *Lee*. A prayer at graduation is a one-time event, the graduating students are almost (if not already) adults, and their parents are usually present. By contrast, very young students, removed from the protection of their parents, are exposed to the Pledge each and every day.
>
> . . . .
>
>    . . . . Whether or not we classify affirming the existence of God as a "formal religious exercise" akin to prayer, it must present the same or similar constitutional problems.

*Elk Grove*, 542 U.S. at 46, 48 (Thomas, J., concurring in the judgment). Justice Thomas unequivocally rejected the holding issued by today's majority that *Lee* turns entirely on whether a challenged practice constitutes a "formal religious exercise." *Cf. supra* Part IV.C. Lest there be any confusion, Justice Thomas made his point crystal clear: "[A]s a matter of our precedent, the Pledge policy is unconstitutional." *Elk Grove*, 542 U.S. at 49.

   Six other Justices have reached the same conclusion, four of them in opinions written *after* the two "dicta" in *Lynch* and *Allegheny* upon which the Fourth and Seventh Circuits so heavily rely. In *Lee*, Justice Scalia, joined by three of his colleagues, declared: "[S]ince the Pledge of Allegiance has been revised since *Barnette* to include the phrase 'under God,' recital of the Pledge would appear to raise the same Establishment Clause issue as the invocation and benediction [invalidated today] . . . . Logically, that ought to be the next project for the Court's bulldozer." *See Lee*, 505 U.S. at 639 (Scalia, J., dissenting, joined by Rehnquist, C.J., and White and

Thomas, JJ.). Similarly, in *Allegheny*, Justice Kennedy, writing for himself and three other Justices, wrote:

> [B]y statute, the Pledge of Allegiance to the Flag describes the United States as "one Nation under God." To be sure, no one is obligated to recite this phrase, but it borders on sophistry to suggest that the "reasonable" atheist would not feel less than a "full member of the political community" every time his fellow Americans recited . . . a phrase he believed to be false.

492 U.S. at 672 (Kennedy, J., dissenting, joined by Burger, C.J., and White and Scalia, JJ.) (internal citations omitted); *see also Wallace*, 472 U.S. at 88 (Burger, C.J., dissenting);[95] *Engel v. Vitale*, 370 U.S. 421, 450 & n.9 (1962) (Stewart, J., dissenting).[96] For those keeping score, an accurate nose count would thus contain more justices asserting that the Pledge is *unconstitutional* under existing Supreme Court precedents than justices expressing the contrary view.[97] Were these jus-

---

[95]Quoted *supra* p. 4045.

[96]"In 1954 Congress added a phrase to the Pledge of Allegiance to the Flag so that it now contains the words 'one Nation *under God* . . . .' I am at a loss to understand the Court's *ipse dixit* that th[is] official expression[ ] of religious faith in and reliance upon a Supreme Being 'bear[s] no true resemblance to the unquestioned religious exercise [of] the State of New York [invalidated] in this [case].' "

[97]As indicated in the text, at least seven justices have concluded that the Pledge is unconstitutional under governing Supreme Court precedent. Only six have expressed the contrary view. Four of those justices did so in a single dissent authored by Justice Brennan. *See Lynch v. Donelly*, 465 U.S. at 694 (Brennan, J., dissenting, joined by Marshall, Blackmun, and Stevens, JJ.). As I have already discussed, *see supra* note 93, that dissent explicitly expressed its "uncertainty" as to the Pledge's constitutionality, but opined that the words "under God" might be upheld on the basis of "ceremonial deism," a doctrine never embraced by a majority of the Supreme Court. *See infra* Part V.B. Moreover, Justice Brennan's statement was written in 1984, well before the Establishment Clause's jurisprudential landscape was altered by *Wallace v. Jaffree* as well as *Edwards v. Aguillard*, *Lee v. Weisman*, and *Santa Fe v. Doe*.

tices to apply currently binding Supreme Court law, they would, without doubt, hold, unlike the majority today or the other two circuits to have decided the issue, that state-sponsored, teacher-led recitation of the "under God" version of the Pledge of Allegiance in public schools does not pass constitutional muster.

How, then, does the Fourth Circuit conclude that "*not one Justice has ever suggested that the Pledge is unconstitutional*"? *Myers*, 418 F.3d at 405 (emphasis in original). The answer to this question is quite revealing: The court construes the votes of Justice Thomas and the other justices cited above as "pro-Pledge" votes because those justices *disagree*

---

The other two justices who expressed the view that the post-1954 version of the Pledge is consistent with governing Establishment Clause precedents were Chief Justice Rehnquist and Justice O'Connor. *See Elk Grove*, 542 U.S. at 25-33 (Rehnquist, C.J., concurring in the judgment); *id.* at 33-45 (O'Connor, J., concurring in the judgment). However, these opinions were based on blatantly incomplete and erroneous information on a critical issue. Chief Justice Rehnquist wrote, "The [Pledge] amendment's sponsor, Representative Rabaut, said its purpose was to contrast this country's belief in God with the Soviet Union's embrace of atheism. 100 Cong. Rec. 1700 (1954). *We do not know what other Members of Congress thought about the purpose of the amendment.*" *Id.* at 25-26 (emphasis added). Remarkably the late Chief Justice appears to have been aware of only the single page of the Congressional Record that he cites in his opinion, and indeed appears to have read even that page very selectively. Had he been aware of the remainder of the remarks made by congressmen and of the reports in the Congressional Record, he would have known of the history detailed earlier in this opinion, and would certainly have had to wrestle with that history in his reasoning. Perhaps he, like today's majority, would have found some way to reach the desired outcome nonetheless, but surely an individual opinion that demonstrates so sweeping an unawareness of the historical record cannot be given significant weight. Justice O'Connor's opinion is similarly flawed because it mistakenly relied on Chief Justice Rehnquist's uninformed historical account. *See id.* at 33 (O'Connor, J., concurring in the judgment) ("[T]he history presented by the Chief Justice illuminates the constitutional problems this case presents . . . .").

*with* existing Supreme Court precedents, which some of them have stated they would overturn. In other words, these justices believe that *intermediate appellate courts* are required to hold the Pledge unconstitutional, regardless of whether they would exercise their *own* prerogative as Supreme Court justices to overrule the precedents that bind *us* today. Their opinions may not, of course, be counted in favor of the holding reached by the Fourth and Seventh Circuits.

Although my colleagues have not made the error made by "our sister circuits" that they are proud to join, they could not have reached the result they do without disregarding clearly binding Supreme Court law, as recognized by a number of Supreme Court justices, past and present. Disregarding that binding Supreme Court law is not within the authority of circuit court judges. Accordingly, my colleagues seriously err in reaching the result they do in this case.

## B.    Ceremonial Deism

It is unclear whether by its vague, disjointed, and indirect allusions to "ceremonial deism" the majority intended to rely on that theory. Ceremonial deism is itself a hazily defined, never formally adopted doctrine under which it may be asserted that phrases that would otherwise constitute unconstitutional establishment of religion have, with respect to the particular usage at issue, become so interwoven into America's social fabric that they no longer convey a religious message of sufficient potency to offend the Constitution. The majority implicitly invokes this "doctrine" when it cites *Marsh v. Chambers*, 463 U.S. 783 (1983), for the proposition that "the nation's historical practices can outweigh even obvious religious concerns under the Establishment Clause."[98]

---

[98]As one of the members of the majority had once recognized, this principle has limited applicability, especially for a state practice with a history as brief as that of the recitation of the "under God" version of the Pledge in public schools:

Maj. op. at 3916. It also appears to endorse or at least approve Justice Brennan's dissent in *Lynch v. Donelly*, which explicitly relied upon ceremonial deism, *id.* at 22 n.11, although Justice Brennan himself expressed some uncertainty about his position.[99]

Whatever the merits of the majority's "ceremonial references to God" approach in other contexts, Supreme Court precedent precludes us from applying to this case the doctrine discussed by Justices Brennan and O'Connor and implicitly followed by the Court in *Marsh*: that in certain circumstances a practice with a sufficient historical acceptance is less susceptible to, or more immune from, challenge on Establishment Clause grounds. *Marsh* approved the time-honored opening of a legislative session with a chaplain's prayer. A teacher-led daily recitation of the religious version of the Pledge of Allegiance in public schools is, however, far different from the opening ceremony of a legislative session, and so the Court made clear in *Lee*. *Lee* explained that

> [i]nherent differences between the public school system and a session of a state legislature distinguish this case from *Marsh v. Chambers*, 463 U.S. 783 (1983). . . . The atmosphere at the opening of a ses-

---

*County of Allegheny* points out that not 'all accepted practices 200 years old and their equivalents are constitutional today.' . . . . If 200 years does not necessarily suffice to sanitize an otherwise violative establishment of religion, then the fact alone that [a] practice has occurred for 50 years is similarly of little value.

*Cammack v. Waihee*, 932 F.2d 765, 786 (9th Cir. 1991) (D. Nelson, J., dissenting) (quoting *County of Allegheny*, 492 U.S. at 605).

[99]As indicated in a portion of Justice Brennan's dissent, the decision in *Marsh v. Chambers* is the closest the Supreme Court has ever come to adopting the rationale underlying ceremonial deism. In that case, the Court, without explicitly using the phrase "ceremonial deism," upheld the practice of opening legislative sessions with a formal prayer on the ground that the practice had a long and uninterrupted history in this country.

sion of a state legislature where adults are free to enter and leave with little comment and for any number of reasons cannot compare with the constraining potential of the . . . school [environment, where] student[s must] attend. The influence and force of a formal exercise in a school . . . are far greater than the prayer exercise we condoned in *Marsh*. The *Marsh* majority in fact gave specific recognition to this distinction and placed particular reliance on it in upholding the prayers at issue there. 463 U.S. at 792. Today's case is different. [In school], teachers and principals must and do retain a high degree of control over the precise contents of the program, . . . the movements, the dress, and the decorum of the students. . . . Our Establishment Clause jurisprudence remains a delicate and fact-sensitive one, and we cannot accept the parallel relied upon by petitioners and the United States between the facts of *Marsh* and the case now before us. Our decisions in *Engel v. Vitale* and *School Dist. of Abington v. Schempp* require us to distinguish the public school context.

505 U.S. at 596-97 (internal citations omitted). Thus, *Lee* precludes the use of ceremonial deism to justify state-sponsored religious activity in public school classrooms, including teacher-led daily recitations of the "under God" version of the Pledge of Allegiance.

There are two other reasons that the application of ceremonial deism to the amended version of the Pledge is not consistent with the principles underlying that so-called legal doctrine. First, historically speaking, the contention asserted by Justice O'Connor that the Pledge has settled into a secular social niche because it is a "practice [that] has been employed pervasively without engendering significant controversy" is simply inaccurate. *Elk Grove*, 542 U.S. at 38 (O'Connor, J., concurring in the judgment); *cf. Allegheny*, 492 U.S. at 631 (O'Connor, J., concurring). When the bill amending the

Pledge was first introduced in 1954, thirty-five *million* Americans opposed the addition of the words "under God" to the traditional oath.[100] Today, that number is even larger: When this court issued its opinion in 2002 striking down the daily, teacher-led recitation of the "under God" version of the Pledge as unconstitutional, over thirty-*nine* million Americans *agreed* with our decision.[101] Moreover, in the five and a half decades since the Pledge was amended to convey an explicitly religious purpose, numerous legal challenges have been filed seeking to remedy the purported constitutional harm suffered by millions of Americans who do not subscribe to a belief in God as prescribed by the "under God" version of the Pledge. Indeed, these challenges began shortly after the Pledge was amended and have been pursued consistently throughout the intervening decades.[102] The fact that judges or justices may be willing to *ignore* the "significant controversy" the Pledge has engendered does not mean that the controversy does not exist or has not continued uninterruptedly over time.[103]

---

[100]*See supra* note 77.

[101]*See* Linda Lyons, *The Gallup Brain: "One Nation Under God,"* GALLUP, Mar. 23, 2004 (reporting that 14% of Americans expressed "support for court ruling Pledge unconstitutional"), *available at* http://tinyurl.com/GallupUnderGod.

[102]*See, e.g.*, *Lewis v. Allen*, 159 N.Y.S.2d 807 (N.Y. Sup. Ct. 1957), *aff'd by*, 207 N.Y.S.2d 862 (N.Y. App. Div. 1960), *aff'd by*, 200 N.E.2d 767 (N.Y. 1964); *Smith v. Denny*, 280 F. Supp. 651 (E.D. Cal. 1968), *appeal dismissed*, 417 F.2d 614 (9th Cir. 1969); *Sherman v. Cmty. Consol. Sch. Dist.*, 714 F. Supp. 932 (N.D. Ill. 1989), *vacated in part by*, 980 F.2d 437 (7th Cir. 1992); *Myers v. Loudoun County Sch. Bd.*, 251 F. Supp. 2d 1262 (E.D. Va. 2003), *aff'd*, 418 F.3d 395 (4th Cir. 2005); *Myers v. Loudoun County Sch. Bd.*, 500 F. Supp. 2d 539 (E.D. Va. 2007); *Freedom Found. v. Cong.*, 2008 U.S. Dist. LEXIS 63473 (D.N.H. Aug. 7, 2008); *see also* Gladwin Hill, *Suit Asks Change in Pledge to Flag*, N.Y. TIMES, June 20, 1963, at 20 (detailing Los Angeles suit); *Suit Over Allegiance Pledge Stirs County*, L.A. TIMES, Oct. 23, 1963, at A1 (same); *Mother Seeks Removal of 'God' in Flag Pledge*, N.Y. TIMES, Apr. 7, 1964, at 9 (detailing Baltimore suit); *New Suit Filed By Mrs. Murray*, WASH. POST, Sept. 16, 1964, at B4 (detailing Honolulu suit).

[103]Surely, the simple fact that the Supreme Court has repeatedly declined to address the Pledge issue cannot support the proposition that it

Second, even if we were free to do so, this court could not reasonably adopt the doctrine of ceremonial deism in this case because that doctrine, at least as it would be applied here, would necessarily be predicated on a fundamentally illogical premise. Specifically, it makes no sense to state that in the context of the daily recitation of the amended Pledge in public schools the phrase "under God" has, over time, "lost through rote repetition any significant religious content." *Lynch*, 465 U.S. at 716 (Brennan, J., dissenting). Prayers are regularly the subjects of "rote repetition," and, if anything, grow only more religious over time. Those Christians who have recited the Lord's Prayer for the past two thousand years would be shocked to learn that, by virtue of their doing so, the prayer has lost its religious significance. So too would Jews who have recited the Sh'ma, the Jewish declaration of faith, two times a day for approximately the same length of time, or Muslims who turn toward Mecca five times daily and repeat the Shahadah, reciting the words "There is no God but God, and Muhammad is his prophet." The amended Pledge was *intended* to be regularly recited in schools across the nation in order to teach "the schoolchildren of America" to have "faith in the Almighty God," 100 Cong. Rec. 6919 (1954), and to "train[ ] . . . our youngsters[,] . . . each time they pledge allegiance[,] . . . [to] reassert their belief . . . in the all-present, all-knowing, all-seeing, all-powerful Creator," *id.* at 5915. Moreover, fifty years after the Pledge was amended to incorporate an explicitly religious message, forty-three state legislatures had passed laws either encouraging or outright

_____

has attained longevity as a constitutionally valid practice. *Cf. Lewis* 200 N.E.2d 767, *cert. denied* 379 U.S. 923 (1964); *Sherman*, 980 F.2d 437, *cert. denied* 508 U.S. 950 (1993); *Newdow*, 292 F.3d 597, *rev'd on other grounds sub nom.*, *Elk Grove*, 542 U.S. 1 (2004). Such an approach would allow the Court itself, through the mere exercise of its certiorari discretion, to dictate constitutional results. *Cf.* ANTONIN SCALIA, A MATTER OF INTERPRETATION 45, 47 (1998) ("*Panta rei* is not a sufficiently informative principle of constitutional interpretation. . . . If the Courts are free to write the Constitution anew, they will, by God, write it the way the majority wants[.]").

requiring daily recitation of the amended version of the Pledge in public schools. Surely the drafters and promoters of the 1954 "under God" amendment, the Congress that so enthusiastically enacted the religious mandate, and the hundreds of state legislators who directed the incorporation into the school day of the religious version of the Pledge, did not promote its daily recitation by public school students in order to have the words "under God" become of less and less religious significance each year.

Next, no one would suggest that the remainder of the Pledge has lost its patriotic meaning as the years have gone by. It would seem particularly unreasonable, therefore, to suggest that the religious phrase in the Pledge would somehow lose its meaning through repetition while the patriotic themes would retain their force and continue to grow even stronger over time. *See Sherman*, 980 F.2d at 448 (Manion, J., concurring); *cf. Van Orden*, 545 U.S. at 696 (Thomas, J., concurring) ("Repetition does not deprive religious words or symbols of their traditional meaning. Words like 'God' are not vulgarities for which the shock value diminishes with each successive utterance."). Perhaps most disappointed of all if the word "God" were to lose its religious significance would be Reverend Docherty, the original proponent of the amendment, and President Eisenhower, who said when he signed the bill incorporating the phrase "under God" in the Pledge that "millions of our school children will daily proclaim . . . the dedication of our Nation and our people to the Almighty" and added that "nothing could be more inspiring than" the "rededication of our youth" that would occur "on each school morning."[104] Thus, another argument for ceremonial deism would appear to be wholly without merit here.

---

[104]Statement by the President Upon Signing Bill To Include the Words "Under God" in the Pledge to the Flag, Pub. Papers 563 (June 14, 1954), *available at* http://tinyurl.com/PubPapersUnderGod, *reprinted in* 100 Cong. Rec. 8618.

The logical flaws inherent in the theory of ceremonial deism as applied to the recitation of the amended Pledge in public schools, as well as the erroneous historical assumptions on which application of that "doctrine" to the issue before us depends, explain why whatever the utility of the doctrine may be in other circumstances, it is of no possible use here. These infirmities may also explain why the theory has never actually been adopted elsewhere. As Thomas Paine so accurately observed, "a long habit of not thinking a thing *wrong*, gives it a superficial appearance of being *right*, and raises . . . a formidable outcry in defence of custom." THOMAS PAINE, COMMON SENSE 1 (Courier Dover Pub. 1997) (1776). In most cases, ceremonial deism represents mainly the judiciary's less than courageous response to that outcry. Applying the doctrine makes it possible to conclude that in some instances state-sponsored religious practices are not unconstitutional simply because they enjoy broad and longstanding support from a religious majority. One observer has written that the doctrine can only invite abuse and, over time, will "yield[ ] an ever expanding sphere of activities courts [will] f[i]nd to be permissible forms of" state-sponsored religious endorsement. Epstein, *supra* note 14, at 2087. Here, fortunately, we need not speculate about the wisdom or availability of such a policy: As described *supra* at 4055, the Supreme Court has made it clear that the principle of ceremonial deism may not be applied in the case of religious practices in public schools.

### C. The De Minimis Theory

The doctrine of ceremonial deism that the majority appears at times to embrace bears a close relationship to a final rescue theory supported by some members of this court and others. *See, e.g.*, *Newdow v. U.S. Cong.*, 328 F.3d 466, 490 (9th Cir. 2003) (Fernandez, J., dissenting);[105] *Rapier v. Harris*, 172

---

[105]The day after *Newdow I* was decided, a disagreement broke out on the floor of the House of Representatives over Judge Fernandez's embrace of the *de minimis* theory in his dissent. *See* 107 Cong. Rec. H4125-27.

F.3d 999, 1006 n.4 (7th Cir. 1999). This theory, which is often referred to as the theory of the "*de minimis* constitutional violation," would, if applicable, support the conclusion that the state-sponsored, teacher-led daily recitation of the "under God" version of the Pledge of Allegiance in public schools constitutes no more than an *insignificant* violation of the Constitution causing insignificant injury that can be overlooked or ignored. Like ceremonial deism, the *de minimis* theory operates on an ad hoc basis to protect the religious preferences of the majority when those preferences conflict with the constitutional rights of the minority.[106] Of course, the

---

Representatives Robert C. Scott and Sheila Jackson-Lee discussed the dissent with approval, but Representative Henry Hyde vehemently disagreed with its approach: "I do not think that it is trivial. I think acknowledging the primacy of almighty God is of transcendent importance, and I guess de minimis is in the minds of the analysts; but I could not disagree more." *Id.*

[106]Although today's majority does not embrace the *de minimis* theory, its decision is animated by the same misplaced concern. The majority seems offended that young "Roe . . . asks us to prohibit the recitation of the Pledge by *other* students," the majority of students, who believe in a monotheistic God and have no problem regularly affirming His existence. Maj. op. at 3874 (emphasis in original); *see also id.* at 3889. In the majority's eyes, its decision today protects the *rights of the religious majority* from the interfering objections of children like young Roe who harbor minority views regarding religion. In this respect, my colleagues overlook the fundamental principle that

> [t]he very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts. One's right to life, liberty, and property, to free speech, a free press, freedom of worship and assembly, and other fundamental rights may not be submitted to vote; they depend on the outcome of no elections.

*W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 638 (1943). Indeed, "[i]t is the highest calling of federal judges to invoke the Constitution to repudiate unlawful majoritarian actions and, when necessary, to strike down statutes that would infringe on fundamental rights . . . ." *Newdow v. U.S. Cong.*, 328 F.3d 466, 471 (9th Cir. 2003) (Reinhardt, J., concurring in denial of petition for rehearing en banc).

more disenfranchised the religious minority, the more likely
it is that such a defense will succeed. But our constitutional
protections are of little value if courts refuse to employ them
on behalf of members of the most marginalized and detested
religious groups, such as atheist children like young Roe. In
a 2005 survey conducted by the Pew Research Center, fully
fifty percent of Americans said that they had either a "mostly
unfavorable" or "very unfavorable" opinion of atheists.[107] This
is twice the number of people who harbored similar antipathy
toward Muslims, the next least appreciated religious minority.
Indeed, "atheists are ranked lower than any other minority or
religious group when Americans are asked whether they
would vote for or approve of their child marrying a member
of that group."[108] Any plaintiff who has ever pursued an
Establishment Clause challenge can attest to the very real
prejudice atheists experience in America. *See, e.g.*, ELLIS,
*supra* note 5, at x. It is no accident that today's plaintiffs are
known only by aliases; in the United States, in the twenty-first
century, members of a religious minority suing for their con-
stitutional rights still face genuine danger of harassment or
physical abuse. *See id.*; *cf. Santa Fe Indep. Sch. Dist. v. Doe*,
530 U.S. 290, 294 n.1 (2000) (describing "intimidation" and
"harassment" against plaintiffs).

Embracing the *de minimis* theory here would countenance
an injury to the disfavored atheist minority, as well as to oth-
ers with "different" views, in order to sustain the religious
preferences of the God-fearing majority. This illustrates the
inevitable result of defining injury in the absence of empathy:[109]

---

[107]Pew Research Center, *Fewer Say Islam Encourages Violence* 13
(2005), *available at* http://people-press.org/reports/pdf/252.pdf.

[108]Goodstein, *supra* note 45.

[109]Empathy, a much misunderstood term, even in the world of the judi-
ciary, means "the intellectual identification with or vicarious experiencing
of the feelings, thoughts, or attitudes of another." RANDOM HOUSE DICTIO-
NARY OF ENGLISH LANGUAGE 468 (1979). It is a quality that is most desir-
able in, even if frequently absent from, today's federal judges at all levels
of the judicial system.

the harms *I* suffer justify redress, but the harms *you* suffer do not; *my* belief is worthy of constitutional protection, but *your* belief is of no consequence.

In any event, however tempting it might be to resolve this case under the *de minimis* theory's simple and direct approach, once again we are not free to do so. The Supreme Court has held that "the embarrassment and the intrusion of [a] religious exercise cannot be refuted by arguing that . . . [it is] of a *de minimis* character." *Lee v. Weisman*, 505 U.S. 577, 594 (1992). The reasons for this are self-evident. As was made clear in *Abington v. Schempp*, "the measure of the seriousness of a breach of the Establishment Clause has never been thought to be the number of people who complain of it," 374 U.S. at 264 (Brennan, J., concurring), nor is it any defense to urge that the religious practices here may be relatively minor encroachments on the First Amendment. That amendment is a fragile instrument. "The breach of neutrality that is today a trickling stream may all too soon become a raging torrent and, in the words of Madison, 'it is proper to take alarm at the first experiment on our liberties.' " *Id.* at 225 (majority opinion). For this reason, the "Constitution . . . requires that we keep in mind 'the myriad, subtle ways in which Establishment Clause values can be eroded.' " *Santa Fe*, 530 U.S. at 314 (quoting *Lynch v. Donnelly*, 465 U.S. 668, 694 (1984) (O'Connor, J., concurring)).

Finally, I note that there are those who would suggest that minor constitutional violations can be countenanced because the judiciary will always stand vigilant in the face of more "significant" threats against our liberty. Indeed, this was the approach that the Supreme Court itself adopted when, at a low point in its Establishment Clause jurisprudence, it announced with "abundant assurance that there is no real threat [to liberty] 'while this Court sits.' " *Marsh v. Chambers*, 463 U.S. 783, 795 (1983) (quoting *Panhandle Oil Co. v. Mississippi ex rel. Knox*, 277 U.S. 218, 223) (1928) (Holmes, J., dissenting)). But as the history of the Pledge of Allegiance as well

as other more significant events in judicial history demonstrate, that is not always the case. Although some might think that judges are capable of making all of their decisions strictly on the basis of objective legal analyses, today's decision represents but an example of how far they may stray from the governing law. The *Marsh* statement is at best aspirational. The threat to First Amendment safeguards still exists today. "[I]n the hands of government what might begin as tolerant expression of religious views may end in a policy to indoctrinate and coerce." *Lee*, 505 U.S. at 591-92. "[T]he First Amendment to our Constitution was designed to avoid these ends by avoiding these beginnings." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 641 (1943). We cannot, sadly, always count on today's courts to protect First Amendment freedoms, at least not those of individuals. Sometimes the reasons are difficult to discern. Here, unfortunately, those reasons would appear to be fairly obvious.

## VI.　Conclusion

I end where I began. Today's majority opinion will undoubtedly be celebrated by a large number of Americans as a repudiation of activist, liberal, Godless judging. That is its great appeal; it reaches the result favored by a substantial majority of our fellow countrymen and thereby avoids the political outcry that would follow were we to reach the constitutionally required result. Nevertheless, by reaching the result the majority does, we have failed in our constitutional duty as a court. Jan Roe and her child turned to the federal judiciary in the hope that we would vindicate their constitutional rights. There was a time when their faith in us might have been well placed. I can only hope that such a time will return someday.

As a judge of an intermediate appellate court, I would hold that our decision is controlled by the binding Supreme Court precedents governing this case. We are required to follow those precedents regardless of what we believe the law should be or what we think that the Supreme Court may hold in the

future. Were today's majority to examine the amended Pledge as applied "through the unsentimental eye of our settled doctrine, it would have to strike it down as a clear violation of the Establishment Clause." *Marsh v. Chambers*, 463 U.S. 783, 796 (1983) (Brennan, J., dissenting). Following settled precedents, I conclude that the state-directed, teacher-led daily recitation in public schools of the amended "under God" version of the Pledge of Allegiance, unlike the recitation of the historic secular version, without the two added words, contravenes the rules and principles set forth in *Lemon v. Kurtzman*, *Santa Fe v. Doe*, and *Lee v. Weisman*. Accordingly, we are, in my view, required to hold that the amendment, as applied, violates the Establishment Clause of the United States Constitution. I should add that I firmly believe that the existing Supreme Court cases and doctrine reflect the true purpose and values of the Establishment Clause and of our Constitution as a whole, and that the holding that we should, but do not, reach best ensures the rights and liberties of the schoolchildren of this country. Finally, I firmly believe that any retreat from the existing Supreme Court doctrine and cases would constitute a most unfortunate diminution of the freedom of all our citizens.

Had my views prevailed here, our decision would not preclude daily recitation of the Pledge of Allegiance by public schoolchildren. To the contrary, public schoolchildren would be free to recite the Pledge as it stood for more than sixty years, a patriotic Pledge with which many of us grew up — a patriotic Pledge that is fully consistent with the Establishment Clause. All that would be required would be the deletion of the two words added by an amendment designed to promote religion and to indoctrinate schoolchildren with a religious belief. As has long been agreed in this nation, the teaching of religious views is the function of the family and the Church, not the State and the public school system.

As a judge of this court, I deeply regret the majority's decision to ignore the Pledge's history, the clear intent and pur-

pose of Congress in amending the Pledge, the numerous Supreme Court precedents that render the school district's course of conduct unconstitutional as applied, and the very real constitutional injury suffered by Jan Roe and her child, and others like them throughout this nation.

Accordingly, I dissent.